NORTH CAROLINA

DURHAM COUNTY

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
20 CVS 1440

JOHN DOE,

        Plaintiff,

    vs.

DUKE UNIVERSITY

        Defendant.

)
)
)
)
)
)
)
)
)

**ORDER**

IT IS HEREBY ORDERED by the Honorable Orlando F. Hudson, Jr. that the verification to the Complaint herein shall be filed under seal by the Clerk of Court.

This the _8_ day of October, 2020.

Honorable Orlando F. Hudson, Jr.
Senior Resident Superior Court Judge

Sealed docs in Rm 1610 10-9-2020 funael

NORTH CAROLINA

DURHAM COUNTY

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
20 CVS *1440*

FILED

JOHN DOE,

2020 OCT - 1  P 3: 35

Plaintiff,          )
                    )
DURHAM CO., C.S C.
vs.                 )      **TEMPORARY RESTRAINING ORDER**
BY                  )
                    )
DUKE UNIVERSITY     )
                    )
Defendant           )

THIS MATTER coming on for hearing and being heard before the undersigned Superior Court Judge upon motion of the plaintiff for a temporary restraining order pursuant to Rule 65 of the Rules of Civil Procedure, the plaintiff being represented by Emilia I. Beskind and Jay H. Ferguson; and the Court having considering the verified complaint inclusive of its attachments and the Motion for Temporary Restraining Order;

IT APPEARING TO THE COURT from the aforementioned pleadings that the plaintiff will be irreparably harmed in the event a temporary restraining order is not entered in this matter for the following reasons:

        a. Except for the improper discipline imposed on Plaintiff, he has been a student in good standing, has had no disciplinary record, maintains a 3.97 grade point average.

        b. Removing plaintiff from classes in the middle of the semester pending the resolution of this case will disrupt his studies and his academic performance.

        c. Plaintiff is due to graduate at the end of the current semester. The improper discipline will deprive him of the ability to receive his degree.

        d. Plaintiff is simultaneously enrolled in a master's program at Duke University. His graduation date from that program is projected to be at the end of the Spring Semester 2021. This will be further disputed by the improper disciplinary proceedings.

        e. Plaintiff has a potential offer of employment scheduled to begin in July of 2021. That potential employment offer is contingent on his graduation and will be withdrawn should the improper discipline be applied.

        f. Plaintiff receives a $2000 dollar scholarship from an outside entity. That scholarship will be withdrawn should he fail to remain in school this semester.

        g. Plaintiff's family has expended money for the portion of his tuition which was not paid through his scholarship which will not be refunded by Duke.

IT FURTHER APPEARING TO THE COURT that this order should be granted to Plaintiff without waiting for notice and hearing from the Defendant Duke University in order to return the parties to the status quo immediately prior to Plaintiff's suspension from Duke University so the Plaintiff can immediately return to his studies to prevent irreparable harm by his absence from classes and his housing. Any further delay in returning the parties to the status quo that has existed for the years long pendency of the disciplinary proceedings would cause irreparable injury.

The Court, having considered the condition of bond as required by Rule 65(c) hereby sets bond in the amount of _____ and Plaintiff has posted this surety to secure the defendant from damages for the restraining order prayed.

IT IS THEREFORE ORDERED that the Defendant Duke University is hereby restrained from suspending the Plaintiff (as that person is identified in a letter from Tim Bounds dated October 7, 2020). Duke University shall re-enroll the Plaintiff and return him to the same status as the Plaintiff enjoyed prior to his suspension of October 7, 2020 for all purposes, including but not limited to his status as a student at Duke University.

IT IS FURTHER ORDERED that a copy of this Temporary Restraining Order shall be served upon the defendant in the manner now provided for service of process.

_3_. This Temporary Restraining Order was entered on the _7th_ day of _October_ at _20_ _AM_ and shall expire within ten days unless extended by further order of the Court or by consent.

Superior Court Judge

NORTH CAROLINA

DURHAM COUNTY

FILED

JOHN DOE,
Plaintiff,

2020 OCT -7 P 3: 34

DURHAM CO. C.C.C.
BY_____

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
20 CVS ___1440___

vs.

DUKE UNIVERSITY

Defendant.

**MOTION FOR TEMPORARY
RESTRAINING ORDER**

NOW COMES the Plaintiff, through counsel, and moves the Court pursuant to Rule 65 of the North Carolina Rules of Civil Procedure for a temporary restraining order. In support of this motion, Plaintiff says:

1.      Plaintiff/movant incorporates all of the allegations of the Complaint filed in this action herein as if fully set forth.

2.      Until October 7, 2020, Plaintiff was a student at Duke University.

3.      Plaintiff was de-enrolled after a student disciplinary proceeding which found that he violated the Student Sexual Misconduct Policy. Plaintiff steadfastly denies any wrongdoing or any violation of said policy.

4.      Plaintiff has this date filed suit against the defendant alleging the student disciplinary proceeding was not proper and that he is entitled to relief.

5.      Defendant has violated and continues to violate the rights of the Plaintiff and Plaintiff will suffer immediate and irreparable injury before defendant and its counsel can be heard in opposition to the restraining order in that:

> a. Except for the improper discipline imposed on Plaintiff, he has been a student in good standing, has had no disciplinary record, maintains a 3.97 grade point average.
>
> b. Removing plaintiff from classes in the middle of the semester pending the resolution of this case will disrupt his studies and his academic performance.
>
> c. Plaintiff is due to graduate at the end of the current semester. The improper discipline will deprive him of the ability to receive his degree.
>
> d. Plaintiff is simultaneously enrolled in a master's program at Duke University. His graduation date from that program is projected to be at the end of the Spring Semester 2021. This will be further disrupted by the improper disciplinary proceedings.

e. Plaintiff has a potential offer of employment scheduled to begin in July of 2021 in which he will receive substantial compensation. That potential employment offer is contingent on his graduation and will be withdrawn should the improper discipline be applied.

f. Plaintiff receives a $2000 dollar scholarship from an outside entity. That scholarship will be withdrawn should he fail to remain in school this semester.

g. Plaintiff's family has expended money for the portion of his tuition which was not paid through his scholarship which will not be refunded by Duke.

6.     The aforementioned injuries are immediate and, without a temporary restraining order being issued by this court, will be irreparable.

7.     Plaintiff is moving the Court to enter an order maintaining the status quo as the situation existed for the 32-month period prior to October 7, 2020.

8.     This motion is made *ex parte*. No notice of this particular filing was given to Duke University. The harm already caused to the Plaintiff, which continues to occur on a daily basis and which will be exacerbated when the Plaintiff must leave his housing by tomorrow is so imminent that relief should be granted before Duke University and its counsel can be noticed and heard in opposition to this motion.

9.     Undersigned counsel certify that they will immediately notify Duke University of this suit, this motion and any temporary restraining order, and will cooperate with Duke University in scheduling the hearing on the preliminary injunction in the event Duke University would like the hearing at a time other than the one initially set by the court.

10.     Plaintiff requests the Court to either waive the security bond required by Rule 65(c) of the Rules of Civil Procedure or set a nominal bond in compliance with the rule in light of the fact that there is no harm to Duke University in granting this motion as indicated by the Plaintiff's presence as a student at Duke University for the last 32 months since the event happened which gave rise to the disciplinary proceedings.

WHEREFORE, Plaintiff prays the Court to enter a temporary restraining order requiring Duke University to return the Plaintiff to his status as a student immediately prior to the suspension decision of October 7, 2020.

THOMAS, FERGUSON & BESKIND, LLP

By: 

Emilia I. Beskind
119 East Main Street
Durham, NC 27701
(919) 682-5648 Telephone
(919) 688-7251 Facsimile
Beskind@tfblawyers.com

Jay H. Ferguson
119 East Main Street
Durham, NC 27701
(919) 682-5648 Telephone
(919) 688-7251 Facsimile
Ferguson@tfblawyers.com

COUNSEL FOR PLAINTIFF

# STATE OF NORTH CAROLINA

No.

20 CVS

Durham County

In The General Court Of Justice
☐ District ☒ Superior Court Division

Name And Address Of Plaintiff 1
John Doe
c/o Emilia Beskind, 119 E Main St, Durham, NC 27701

Name And Address Of Plaintiff 2

2020 OCT -7 P 12: 09

DURHAM CO., C.S.C.

BY

**GENERAL CIVIL ACTION COVER SHEET**

☐ INITIAL FILING ☐ SUBSEQUENT FILING

Rule 5(b) of the General Rules of Practice for the Superior and District Courts

**VERSUS**

Name And Address Of Defendant 1
Duke University

Name And Address Of Attorney Or Party, If Not Represented
(complete for initial appearance or change of address)
Emilia I. Beskind
119 E. Main Street
Durham, NC 27701

| Telephone No. | Cellular Telephone No. |
|---|---|
| 919.682.5648 | |

| NC Attorney Bar No. | Attorney Email Address |
|---|---|
| 47241 | beskind@tfblawyers.com |

Summons Submitted
☒ Yes ☐ No

Name And Address Of Defendant 2

☒ Initial Appearance in Case ☐ Change of Address

| Name Of Firm | Fax No. |
|---|---|
| Thomas, Ferguson & Beskind, LLP | 919.688.7251 |

Counsel For
☐ All Plaintiffs ☐ All Defendants ☐ Only: (list party(ies) represented)

Summons Submitted
☐ Yes ☐ No

☒ Jury Demanded In Pleading ☐ Complex Litigation ☐ Stipulate to Arbitration

## TYPE OF PLEADING

(check all that apply)

☐ Amend (AMND)
☐ Amended Answer/Reply (AMND-Response)
☐ Amended Complaint (AMND)
☐ Assess Costs (COST)
☐ Answer/Reply (ANSW-Response) (see Note)
☐ Change Venue (CHVN)
☒ Complaint (COMP)
☐ Confession Of Judgment (CNFJ)
☐ Consent Order (CONS)
☐ Consolidate (CNSL)
☐ Contempt (CNTP)
☐ Continue (CNTN)
☐ Compel (CMPL)
☐ Counterclaim (CTCL) Assess Court Costs
☐ Crossclaim (list on back) (CRSS) Assess Court Costs
☐ Dismiss (DISM) Assess Court Costs
☐ Exempt/Waive Mediation (EXMD)
☐ Extend Statute Of Limitations, Rule 9 (ESOL)
☐ Extend Time For Complaint (EXCO)
☐ Failure To Join Necessary Party (FJNP)

☐ Failure To State A Claim (FASC)
☐ Implementation Of Wage Withholding In Non-IV-D Cases (OTHR)
☐ Improper Venue/Division (IMVN)
☐ Including Attorney's Fees (ATTY)
☐ Intervene (INTR)
☐ Interplead (OTHR)
☐ Lack Of Jurisdiction (Person) (LJPN)
☐ Lack Of Jurisdiction (Subject Matter) (LJSM)
☐ Modification Of Child Support In IV-D Actions (MSUP)
☐ Notice Of Dismissal With Or Without Prejudice (VOLD)
☐ Petition To Sue As Indigent (OTHR)
☐ Rule 12 Motion In Lieu Of Answer (MDLA)
☐ Sanctions (SANC)
☐ Set Aside (OTHR)
☐ Show Cause (SHOW)
☐ Transfer (TRFR)
☐ Third Party Complaint (list Third Party Defendants on back) (TPCL)
☐ Vacate/Modify Judgment (VCMD)
☐ Withdraw As Counsel (WDCN)
☐ Other (specify and list each separately)

NOTE: All filings in civil actions shall include as the first page of the filing a cover sheet summarizing the critical elements of the filing in a format prescribed by the Administrative Office of the Courts, and the Clerk of Superior Court shall require a party to refile a filing which does not include the required cover sheet. For subsequent filings in civil actions, the filing party must include either a General Civil (AOC-CV-751), Motion (AOC-CV-752), or Court Action (AOC-CV-753) cover sheet.

(Over)

NORTH CAROLINA

DURHAM COUNTY

JOHN DOE,

Plaintiff,

vs.

DUKE UNIVERSITY

Defendant.

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
20 CVS

20 CVS 1440

**COMPLAINT**

COMES NOW the Plaintiff, and for his complaint against the Defendant Duke University

alleges as follows:

## THE PARTIES

1.       This suit arises as a result of false allegations that Plaintiff, a male student at Duke

University, sexually assaulted a female Duke University student (hereafter referred to as

"Complainant"). Plaintiff files this suit under the pseudonym "John Doe" to protect the privacy

of both the Plaintiff and the Complainant. He is known to the Defendant and is

referenced/identified in many of the exhibits attached hereto although his name and the name of

the Complainant have been redacted.

2.       Plaintiff is a citizen and resident of Durham County, North Carolina. At all times

relevant to this action, Plaintiff was a student at Duke University in Durham County, North

Carolina.

3.       Defendant Duke University (hereafter "Duke") is a nonprofit corporation formed

under the laws of North Carolina, with its primary place of business in Durham County, North

Carolina.

4.     This suit challenges the propriety of an action by Duke to suspend Plaintiff for allegedly violating its Sexual Misconduct Policy. Said policy which was in effect at all times alleged herein is attached hereto as Exhibit A.

## JURISDICTION AND VENUE

5.     The Superior Court of Durham County has subject matter jurisdiction over this action because it arises under the common law of North Carolina, and the amount in controversy exceeds $25,000, exclusive of interest and costs.

6.     Venue is proper because all parties are residents of Durham County and all of the events giving rise to these claims occurred in Durham County.

## FACTUAL ALLEGATIONS

7.     At all times herein alleged, Plaintiff was enrolled as a student at Duke, pursuant to an educational contract ("contract") between Plaintiff and Duke.

8.     Plaintiff matriculated to Duke in 2017.

9.     Plaintiff attended Duke on a partial scholarship. While part of the costs of Plaintiff's attendance was covered by the scholarship, his family paid more $220, 218  dollarsto cover the remaining costs.

10.     Plaintiff is an accomplished student and has maintained a GPA of 3.97.

11.     While at Duke, Plaintiff also worked as TA in 4 classes

12.     Plaintiff was in the final steps of becoming a Rhodes Scholar nominee from Duke University.

13.     That nomination was suddenly withdrawn after the hearing panel's finding of responsibility but before the completion of an appeal despite the fact that the student conduct process at that stage was confidential and not yet final.

14.     Except for the allegation noted below, Plaintiff has maintained a clean

disciplinary record while enrolled at Duke.

## January 19, 2018

15.     During the early morning hours of January 19, 2018, Complainant and Plaintiff

engaged in sexual contact and activities.

16.     At the time, Plaintiff was a first-year student at Duke and the Complainant was a

first-year student.

17.     Plaintiff and Complainant agree, and there is no dispute that, the following facts

about the encounter between them are true:

      a.  The two met a few days prior to the night in question. They met up again at a
          "pre-game" party on the night of January 18, 2018.

      b.  After the "pre-game", Plaintiff and the Complainant went together to Devine's - a
          local bar.  While at Devine's, the two were separated.

      c.  Plaintiff left Devine's without the Complainant and returned to his room to go to
          sleep.

      d.  At 12:25 a.m., on January 19, 2018, the Complainant texted the Plaintiff
          indicating that she was upset that they had been separated at Devine's because she
          had wanted to hook up with Plaintiff.

      e.  The Plaintiff said he was still at Devine's and asked where the Complainant was.
          She replied that she had left, and she was mad at the Plaintiff because she wanted
          to hook up with him.

      f.  Plaintiff told the Complainant by text he had returned to his dorm and invited her
          to join him there.

      h.  When Complainant arrived at Plaintiff's room, the two voluntarily engaged in the
          following consensual, sexual acts: oral sex, vaginal intercourse, and anal
          penetration of the Complainant.

      i.  Complainant then requested  anal intercourse.

18.     Plaintiff and Complainant disagree about the exact wording of Complainant's suggestion to have anal intercourse and that disagreement between them formed the heart of a Duke Sexual Misconduct case wherein Plaintiff was the respondent. The Complainant asserts that she said she suggested having anal-penile intercourse and requested that the Plaintiff use manufactured lubricant. Plaintiff asserts that she requested anal-penile intercourse, but that there was no discussion of lubricant.

## Procedural History of Student Disciplinary Proceedings

19.     While the aforementioned incident happened on January 19, 2018 the disciplinary process at Duke University was not instituted until over a year later, on February 10, 2018

20.     On February 10, 2018, Plaintiff received notice from Victoria Krebs asking him to come in a meet with her. A meeting was scheduled for the following day, February 11, 2018.

21.     Victoria Krebs is Associate Dean of Students, Title IX Outreach and Response Coordinator, and at all times alleged herein was an agent of Duke.

22.     According to the Duke University Sexual Misconduct Policy, the purpose of this meeting "is to inform the respondent of the University's disciplinary process and possible outcomes."

23.     Instead of simply providing information, Dean Krebs began asking the Plaintiff many questions about the incident that occurred a year earlier. She took extensive notes throughout that conversation.

24.     At that time the investigation did not go forward because the Complainant decided to not participate in the student disciplinary process.

25.     In May, 2020, over two years after the incident between the Plaintiff and Complainant, the Complainant decided to reinitiate her complaint from two years earlier. As a

result of the complaint, Duke assigned two trained investigators to conduct interviews of all the witnesses the school deemed relevant.

26. After all the witnesses deemed relevant were interviewed, an investigative report was issued by Duke.

27. Included in the report was a small section of Dean Krebs' notes from her meeting with the Plaintiff in February 2018 even though she was never interviewed by the Duke investigators.

28. After receiving the report, Plaintiff asked for and was granted a meeting with Dean Jenna McCullers, a co-worker of Dean Krebs, to talk about the report and the upcoming disciplinary hearing.

29. At all times alleged herein Jenna McCullers was an agent of Duke.

30. That meeting took place on July 31, 2020.

31. At that meeting Plaintiff raised his concerns about Dean Krebs' inclusion in his case. Plaintiff asked Dean McCullers whether Dean Krebs would testify as a witness and he specifically requested a copy of her complete notes as the investigative report only contained a very small snippet of the notes. Dean McCullers told Plaintiff that it was unclear whether Dean Krebs would testify and that Plaintiff's request for Krebs' notes would be considered.

32. The disciplinary hearing took place on August 6, 2020. Krebs' notes were never provided to Plaintiff or his counsel.

33. The critical issue to be decided by the disciplinary hearing panel under the Student Sexual Misconduct policies which is relevant for this suit was: What kind of lubricant was consented to during the anal sex proposed by the Complainant? See Exhibit B Hearing Report, p2.

34.     In deciding this issue, the hearing panel was required to make a credibility determination between the Plaintiff and the Complainant. Both parties agreed that the Complainant suggested having anal sex. However, the Complainant claimed that she asked the Respondent to use manufactured lubrication and the Plaintiff agreed that she requested anal sex but didn't say anything about lubricant. At its base, the question was whether the Complainant told Plaintiff what kind of lubricant to use during anal sex.

35.     Central to this decision by the hearing panel was the snippet of notes provided by Victoria Krebs within the investigative report as well her oral testimony before the hearing panel. The snippet that was set forth within the investigative report quoted Plaintiff as saying to Krebs: "she said she wanted to have anal sex, so he looked for lube. He had none so he tried with spit. She said ow and he stopped immediately, and they went back to having vaginal sex." See Exhibit C. Investigative Report, pp. 36-37.

36.     A great deal of the questions asked by the panel dealt with this moment in time and this search for lubricant, and in the findings by the hearing panel, it said that it based its credibility determination on this moment in time.

37.     The quoted snippet was contained within a two-page document. The remainder of the document was entirely redacted and never provided to Plaintiff.

38.     The Plaintiff was found responsible and given a sanction of a three-semester suspension along with some required meetings and classes on the concept of affirmative consent.

39.     Plaintiff appealed the finding of the hearing panel that he violated the Student Sexual Misconduct Policy on the grounds of procedural error. In that appeal he raised concerns about Dean Krebs' role in this process, his inability to question her because he did not receive her notes, as well as other procedural errors.

40.     On September 30, 2020, the Plaintiff appeared before the Appeal Board to amplify the grounds for his appeal. During that meeting, Dean Krebs and Dean Jenna McCullers were both called to testify to the board.

41.     Dean McCullers testified that the Plaintiff would have been entitled to Dean Krebs' notes. However, she stated first that she did not remember meeting with the Plaintiff prior to the hearing. Then, when she was presented with evidence of her zoom meeting request prior to the original hearing, she testified that she did not remember what was discussed in that meeting and did not remember the Plaintiff requesting Dean Krebs' notes.

42.     Plaintiff then offered to submit affidavits from Joe Cheshire and Catherine Brown. his two attorneys who were part of that meeting. verifying that they asked for the notes prior to the hearing. The Appeal Board denied his request to submit those affidavits.

43.     On October 7, 2020, the appeal was denied by Duke. See Exhibit D

44.     In the Appellate Panel Decision letter dated October 7, 2020, the Appeal Board claimed that Dean McCullers denied that the notes had been requested, which was not an accurate statement. She did not remember the meeting occurring at all and had to be reminded with a Zoom invite. The Panel also said that Plaintiff had no evidence he had requested the notes. The Appeal Board failed to mention that it would not allow Plaintiff to present the evidence corroborating his testimony that the notes had been requested.

45.     Plaintiff has exhausted his appeals through the Student Sexual Misconduct Policy.

## FIRST CAUSE OF ACTION: FAILURE TO PROVIDE PLAINTIFF WITH COMMON LAW FUNDAMENTAL FAIRNESS AND DUE PROCESS

46.     Plaintiff incorporates all the preceding allegations by reference here.

## Duke Violated Plaintiff's Due Process Rights by Failing to Allow Him to Review a Key Witness's Notes Prior to or During the Hearing

47.     As previously noted, prior to the hearing in this matter, Plaintiff was informed that Dean Krebs might testify. Her testimony would relate to statements made by Plaintiff to Krebs during their meeting and the snippet of notes included in the investigative report. The Plaintiff asked for and was subsequently denied the right to review or copy the rest of those notes which were taken contemporaneously more than a year before.

48.     Dean Krebs testified before the hearing panel from these notes at the hearing but refused to share those notes with the Plaintiff.

49.     Further, unlike any statements during the properly laid out investigative process mandated by the Duke Sexual Misconduct policy, Plaintiff was not given a chance to review the notes prior to them being included in the report in redacted form.

50.     During the regular investigative process conducted by trained investigators, the complainant and the respondent are given the opportunity to review what the investigator has documented and if there are errors, they may respond to the errors. If they believe they have been misquoted or misunderstood they are given the ability to comment on it. Here, the Plaintiff was not given that right because he was never shown Dean Krebs' notes.

51.     The Duke Sexual Misconduct Policy gives a respondent the right to pose questions to witnesses. Those questions are vetted by the hearing panel chair before being asked. Here, the Plaintiff could not propose questions based on the witness's contemporaneous notes because he was only given a snippet of those notes despite his request before the hearing.

52.     The timing of these notes also adds to the fundamental unfairness of withholding them during a hearing. The incident in this case happened in January 2018. When the Plaintiff

was interviewed by Duke investigators in May 2020 about the minute details of the encounter with the Complainant, he often said he did not remember because it had been more than two years since the event.

53.     Dean Krebs' informational meeting with the Plaintiff which turned into an investigative interview occurred more than a year before - in February 2019 - closer in time to when the events occurred. To deny the respondent the right to his own statements which were closer in time to the event was fundamentally unfair.

54.     Included in the investigative report was an exchange between the investigator Ericka Lewis and the Plaintiff. In that exchanged the investigator claims that Victoria Krebs' notes say the Plaintiff said that "he was not as nice as he should have been" after the sexual encounter ended. The notes provided in the report do not include this statement by the Plaintiff. This means that the investigators had access to more information in the notes than was shown to the Plaintiff.

55.     The Office of Student Conduct, often Dean Krebs or one of her coworkers, is the entity that decides what information is redacted from an investigative report. It is also the entity that directs the actions of the investigators.

56.     The end result of this direction and withholding was that Dean Krebs, a witness, controlled what information she provided to the Plaintiff and what information was included in the investigative report that went to the hearing panel.

57.     This was fundamentally unfair and denied the Plaintiff the measure of Due Process he is entitled to under the Duke Student Sexual Misconduct Policy.

**Duke Violated the Plaintiff's Due Process Rights by Not Recusing Dean Krebs and her Co Worker's at the Office of Student Conduct from the Decision-Making Process Once She Became an Important Witness**

58.     Victoria Krebs and the Office of Student Conduct are tasked with making relevance determinations and directing the actions of the investigators assigned to investigate sexual misconduct cases.

59.     Here, because Dean Krebs was an important witness, she had an interest in what information was provided to Plaintiff because she knew she would be subject to cross examination and said notes would be scrutinized by the hearing panel. Krebs arbitrarily and capriciously chose which section of her notes to provide to investigators. Krebs knew that if the remainder of her notes were not provided to Plaintiff, then her testimony could not be challenged or called into question through cross examination.

60.     It is arbitrary and capricious, fundamentally unfair and a violation of Due Process for a witness to act as both the gatekeeper of information provided to the investigators (and hearing panel) and to serve as a factual witness. This allows a witness to insulate herself from any type of challenging cross examination by denying a respondent basic evidence to which he was entitled even under Duke's own Sexual Misconduct Policy.

61.     Had Victoria Krebs acted in accordance with the role laid out for her under the Duke Sexual Misconduct policy during the initial meeting with the Plaintiff and merely provided information about his rights during the process she would have been able to make fair evidentiary gatekeeping decisions. However, she chose to conduct her own investigation. In doing so she created a conflict which adversely affected the integrity of the hearing process, thereby denying Plaintiff his right to Due Process.

62.     The decision on what information was included in the investigative report and what information was provided to Plaintiff should have been made by a conflict-free individual with no stake in the outcome of that decision. Accordingly, once Dean Krebs decided to

interrogate Plaintiff, neither Dean Krebs nor one of her co-workers should have been a part of the decision of what information would be provided to the investigators.

63. A university and its agents are under a common law obligation to not expel or impose severe discipline without providing fundamental fairness and Due Process.

64. Duke failed to adhere to principles of fundamental fairness in its dealings with its student, Plaintiff.

65. Duke did not follow its own internal rules and procedures with respect to the disciplinary proceedings against Plaintiff.

66. Duke did not provide a fair disciplinary process.

67. Duke, through the actions of the Office of Student Conduct and Dean Krebs allowed an interested witness to control if there was a hearing, what information would be provided during the hearing, and what information was provided to Plaintiff for evaluation and cross examination.

68. The actions of Duke amounted to a denial of Due Process and violated Defendant's obligation to treat Plaintiff fairly.

69. Plaintiff suffered substantial harm as a direct and proximate result of the Defendants' actions, including but not limited to, being found guilty of sexual misconduct, being suspended from school for three semesters, loss of his nomination as Rhodes scholar, and loss of job opportunities. Plaintiff has been damaged in an amount in excess of $25,000 and is entitled to recover in excess of $25,000 from Duke for the fundamental unfairness of its Student Sexual Misconduct hearing process and the denial of Plaintiff's rights to Due Process.

## SECOND CAUSE OF ACTION: BREACH OF CONTRACT

70. Plaintiff incorporates all of the proceeding allegations by reference here.

71.     Upon Plaintiff's enrollment, Plaintiff and Duke mutually entered into a contractual relationship ("the Contract"). The specific, certain, and identifiable terms of the Contract are set forth in The Duke Community Standard and Undergraduate Policies (*see* Exhibit E ), including the specific promised disciplinary procedures, procedural safeguards, appellate process, and substantive rights of the student, if accused of a violation of the Duke University conduct requirements. Likewise, the Contract sets forth the rights of Defendant Duke University with regard to addressing misconduct. The Contract is a binding contract with respect to Duke's authority to regulate, discipline, punish, sanction, suspend, or expel Plaintiff from Duke, among other limitations and obligations.

72.     The Plaintiff and Duke mutually intended to be bound by these terms.

73.     The Contract requires Duke to act fairly. It states that the purpose of the undergraduate disciplinary process is to "promote honesty, fairness and respect," and to "provide a fair and effective mechanism for resolving cases." Moreover, it guarantees an accused student the right to a fair and impartial hearing in accordance with written policies and procedures.

74.     The Contract also includes implied terms of good faith and fair dealing.

75.     Duke's actions as described above violated both the express and implied terms of the Contract. Dean Krebs and the Office of Student Conduct failed to act in good faith, treat the plaintiff fairly, and through self-dealing denied him the Contract's guarantee of a fair hearing.

76.     Duke's actions, as described above, violated the express terms of the Contract, particularly regarding a student's rights to propose relevant questions during a hearing.

77.     Here the decision of the hearing panel turned on testimony by Dean Krebs. She testified from contemporaneous notes she took during an "initial meeting" with Plaintiff.

78.     The Duke Sexual Misconduct policy states that during the "initial meeting",
Student Conduct, in this case Dean Krebs, "will inform the respondent of the University's
disciplinary process and possible outcomes." *See* Duke Sexual Misconduct Policy Exhibit A).

79.     Dean Krebs instead used that "initial meeting" as an investigative interview where
she sought information from Plaintiff about the incident and then later that night wrote down
what she believes he said in the form of two pages of notes.

80.     This is not the role laid out for the Title IX Coordinator in the Sexual Misconduct
Policy. In the policy the Title IX Coordinator exists as neutral gatekeeper who provides
information to both parties, determines if complaints meet the evidentiary threshold to proceed to
a hearing, and makes decisions on what evidence is relevant to include in the investigative packet
submitted to a hearing panel.

81.     Unlike the actual investigators tasked by Duke with looking into the allegations of
sexual misconduct, Dean Krebs did not reduce her impromptu investigation to writing and share
that information with client prior to the hearing giving him a chance to object to any errors.
Instead Dean Krebs unilaterally and arbitrarily refused to disclose her notes to Plaintiff.

82.     Only two sentences of those notes were provided to Plaintiff. Those two sentences
appear to have formed the basis for the hearing panel's finding of responsibility of a violation of
the Student Sexual Misconduct policy by Plaintiff.

83.     Without a chance to review the notes prior to Dean Krebs' testimony, Plaintiff
was denied the ability to use the rest of the document to question Dean Krebs about the totality
of her investigation or to refresh his recollection about two-year-old allegations.

84.     The entity of Duke that denied Plaintiff that information prior to the hearing was
the Office of Student Conduct acting through Duke agents, Dean Krebs or her co-workers.

85. When Dean Krebs stepped outside the role specified in the Contract and became an investigator and subsequently a witness in this matter, she relinquished her role as a neutral arbiter and became interested in the outcome.

86. Not only was Krebs a witness but she was also part of the body tasked with deciding what information was included in the hearing packet that the panel read prior to the proceeding.

87. Krebs was the person who presented what the panel considered to be material evidence of Plaintiff's guilt; however, she was also either the person or part the organization tasked with deciding if the Complainant met the evidentiary threshold to proceed to a hearing.

88. The Sexual Misconduct Policy indicates that the complainant and respondent will be treated fairly. This implies that the body which controls every aspect of the process will not favor one side over the other or engage in self-dealing for some other reason.

89. The very fact that Dean Krebs stepped outside of her role and became an investigator indicates a lack of impartiality from the beginning of the process.

90. Further, Krebs acted as both a witness and an investigator. Every other witness in this process was interviewed by the trained investigators. Krebs was not interviewed. She merely inserted a self-selected portion of her notes into the report and refused to disclose the remainder which Plaintiff believes, and therefore alleges, were exculpatory.

91. Once Krebs took the aforementioned actions it was no longer possible for her to act impartially.

92. Because of Dean Krebs' extra-contractual actions, Plaintiff was denied a neutral decision maker.

93.     Krebs was the person who sponsored the evidence. It follows that she would believe that her evidence was relevant and should be included.

94.     Plaintiff was entitled to a fair decision by the Office of Student Conduct after the investigation was completed on whether, given the information gathered, there should even be a hearing. However, the person who made that decision, Dean Krebs or one of her co-workers, could not have been neutral because the evidence came from their office.

95.     Plaintiff was entitled to a fair decision on what information was provided to him and included in the packet. Again, he did not receive one because the person deciding what portion of a witness's testimony was relevant was the witness herself - Dean Krebs.

96.     In addition, the Duke University Sexual misconduct policy grants students the right to an appeal in sexual misconduct cases.

97.     Encompassed in this right is the understanding that he appeal will be judged on its own merits by the assigned appeal committee. That the decision on an appeal will not be made prior to the actually appeal hearing.

98.     The Plaintiff was on track to be a Rhodes Scholar nominee from Duke University. This nomination requires that the University President certify the candidate. The Plaintiff was in the final stages of that process. The process began and continued well after the accusation of sexual misconduct was leveled against the Plaintiff. There was no reason it should not continue until the full process had completed.

99.     The next mandated step in the hearing process was the Plaintiff's appeal which was scheduled for September 30, 2020. However, on September 24, 2020 the Plaintiff was called into a meeting with the Duke committee in charged on the Rhodes nominations and infomed that the President of Duke University was refusing to put forward his nomination.

100. As the nomination process had begun and continued during the time that the misconduct complaint was pending it appears that the President of Duke University and the Rhodes committee took action at the time they did because the considered the process to be complete and the result final as of September 24, 2020. At that time the Plaintiff had not yet received his appeal.

101. The Universities actions show that the appeals process in this case was a pre judged forgone conclusion. The head of the University apparently had confidence before the appeal was heard that it would be denied. This simply not the process that is mandated in the Duke community standard.

102. As a direct result of the breach of contract by Duke, through its agents, Plaintiff has been damaged in an amount in excess of $25,000 and is entitled to recover in excess of $25,000 from Duke for this breach.

## THIRD CAUSE OF ACTION: NEGLIGENCE

103. Plaintiff incorporates all of the preceding allegations by reference here.

104. Defendant has engaged in an active course of conduct that created a risk of foreseeable harm to Plaintiff and, as such, Defendant was required to act reasonably.

105. Duke owed a duty of care to Plaintiff in the handling of the allegations against him and the resulting disciplinary process.

106. A special relationship exists between a student and a university where the university has required the student to submit to an investigation and administrative judicial process, in this case a quasi-criminal process, for allegations serious enough to have suspension or expulsion as a consequence.

107. In their interactions with Plaintiff, specifically in conducting their investigation and adjudication of Plaintiff's disciplinary proceedings, Defendant owed Plaintiff a duty to exercise reasonable care, with regard for the truth, established procedures, fair notice of the scope of any charged offenses, notice of the procedures used in determining his guilt, and the important and irreversible consequences of their actions, as well as the Plaintiff's various rights and interests in general.

108. Through their acts set forth above, Defendant, on its own and acting through agents, breached said duty by carelessly, improperly, and negligently performing assigned duties, recklessly disregarding exculpatory evidence, and violating its own written procedures.

109. Duke had a duty to hire, retain, supervise, and train administrators who adhere to the policies of Duke and ensure the fairness of any disciplinary process, particularly one leading to a default consequence of suspension or expulsion.

110. At all relevant times set forth Duke, acting through and by its agents, had a continuing duty to reasonably, carefully, and continuously secure the services of qualified and well-trained agents, employees, and/or independent contractors, so as to reasonably assure that they were well-trained in reasonable methods of investigation, including the need for timely collection of impartial evidence, the thorough and complete investigation of all relevant allegations, the interviewing of all relevant witnesses and the need for disciplinary hearings to provide all the rights to accused students as guaranteed in The Duke Community Standard.

111. Duke breached its duty to Plaintiff by hiring, retaining, supervising, and training administrators whom Duke knew or should have known violated Duke's policies and handled disciplinary processes unfairly and in violation of accused student's rights.

112.     Dean Krebs, as an agent of Duke, owed a duty to Plaintiff to conduct the hearing in a reasonable manner and in compliance with Duke polices. She breached her duties, and the breach caused Plaintiff substantial harm. Dean Krebs was negligent in her duties by taking it on herself to become an investigator and subsequently a witness in this case. She again breached her duties when, after becoming an interested witness in this case, by not recusing herself from any further decisions such as if the evidence warranted a hearing, when that hearing would be, and what evidence would be provided to Plaintiff before that hearing.

113.     The Office of Student Conduct and its employees, had a duty to independently and fairly review both the investigation and any requests by the parties prior to or during the hearing. Upon information and belief, the Office of Student Conduct and its employees breached this duty, by failing to recuse itself when a co-worker, Dean Krebs became an interested party to the hearing. This breach caused Plaintiff substantial harm, and Duke is liable for the negligence of its Office of Student Conduct.

114.     Defendant Duke University is vicariously liable for the negligence of its employees and agents, including but not limited to, the negligence of Dean Krebs, and the employees in the Office of Student Conduct.

115.     As a direct and proximate result of the negligence of Defendant, Plaintiff suffered substantial harm and damages as stated previously and has incurred damages in an amount in excess of $25,000 and is entitled to recover in excess of $25,000 from Duke for its negligence.

## PRELIMINARY AND PERMANENT INJUNCTIVE RELIEF

116.     Plaintiff incorporates all the preceding allegations by reference here.

117.     Plaintiff, pursuant to N.C. Gen. Stat § 1-A-1, Rule 65, and N.C. Gen. Stat. § 1-485, seeks temporary, preliminary, and permanent injunctive relief enjoining Duke from

suspending or involuntarily withdrawing Plaintiff from Duke, negatively altering Plaintiff's status as a student enrolled at Duke.

118.    Duke's conduct deprives or will deprive Plaintiff of his clearly established rights and will tend to render any judgment in the litigation ineffectual.

119.    Plaintiff will suffer irreparable harm if Duke is not preliminarily enjoined from denying Plaintiff rights during the pendency of the lawsuit.

120.    Plaintiff will suffer irreparable harm if Duke is not preliminarily and permanently enjoined from suspending him and involuntarily withdrawing him from Duke, negatively altering Plaintiff's status as an enrolled student.

121.    In support of this injunctive relief sought, Plaintiff has filed this verified Complaint and relies on the allegations herein as well as the documents attached hereto as Exhibits.

WHEREFORE, Plaintiff prays the Court as follows:

1.    For an Order preliminarily and permanently enjoining Defendant Duke University and anyone acting on its behalf from involuntarily withdrawing Plaintiff from Duke University, de-enrolling him from classes, terminating his on-campus housing, and any other act or omission authorized by the purported involuntary withdrawals, suspension, or other negative alteration of the Plaintiff's status as a student enrolled at Duke University.

2.    For damages in excess of $25,000.00;

3.    For costs, interest, and attorney fees;

4.    For trial by jury; and

5.    For such other relief as the Court deems just and proper.

This the 7 day of October , 2020.

THOMAS, FERGUSON & BESKIND, LLP

By: _____

Emilia I. Beskind
Beskind@tfblawyers.com

_____

Jay H. Ferguson
Ferguson@tfblawyers.com
119 East Main Street
Durham, NC 27701
(919) 682-5648 Telephone
(919) 688-7251 Facsimile

*Counsel for Plaintiff*

NORTH CAROLINA

DURHAM COUNTY

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
20 CVS _____

JOHN DOE,
               Plaintiff,

    vs.

DUKE UNIVERSITY

               Defendant.

)
)
)
)
)
)
)
)
)

## **VERIFICATION FILED UNDER SEAL**

# Exhibit A



# STUDENT SEXUAL MISCONDUCT POLICY AND PROCEDURES: DUKE'S COMMITMENT TO TITLE IX

# I. INTRODUCTION

Duke University is committed to encouraging and sustaining a learning and living community that is free from harassment, violence, and prohibited discrimination. In that regard and consistent with federal law (e.g., Title IX of the Education Amendments of 1972 and the Violence Against Women Act), Duke has developed this comprehensive Student Sexual Misconduct Policy, applicable to all students (undergraduate, graduate, and professional, or any student enrolled in any Duke program). Further, Duke conducts extensive education and awareness programs with the goal of preventing and discouraging sexual/gender violence and other forms of sexual misconduct.

As discussed more fully below, this Student Sexual Misconduct Policy prohibits all forms of sex/gender-based harassment, sexual/gender violence, sexual exploitation, relationship violence (domestic violence and dating violence), and stalking. Collectively, these terms are referred to in this policy as "**Sexual Misconduct**." They are defined below under "Prohibited Conduct." (Note that non-sex/gender-based harassment is also a violation of university policy, as described under the university's Harassment Policy, available at bit.ly/dukeharassment.)

The Student Sexual Misconduct Policy serves three principal purposes. First, it establishes conduct standards—namely, prohibited sexual misconduct—for all Duke students. Note that a violation of this policy may also constitute a crime, which can be independently reported to Duke Police, Durham Police, or other appropriate law enforcement agency.

Second, the Student Sexual Misconduct Policy outlines reporting, investigation, and complaint resolution procedures in cases where it is alleged that a Duke student has engaged in sexual misconduct. This policy refers to the individual who is the alleged victim of the behavior(s) in question as the "**complainant**" and the student alleged to have committed the violation of the policy as the "**respondent**." Both the complainant and the respondent will be treated fairly and with respect throughout the process. Respondents are entitled to a presumption that there is not a violation of this policy throughout the disciplinary process unless and until they are found responsible for a violation of this policy.

In the paragraphs that follow, the Student Sexual Misconduct Policy specifies to whom violations of this policy should be reported, the availability of confidential reporting, administrative actions available to the complainant and the respondent, how the university will investigate and resolve alleged violations, possible sanctions, and appeals.

The Office of Student Conduct is primarily responsible for implementing these procedures; the Office for Institutional Equity assists by investigating reports that the Office of Student Conduct refers to it. Anyone with concerns about a possible violation of the Student Sexual Misconduct Policy by a student is encouraged to contact the Office of Student Conduct at 919-684-6938, conduct@duke.edu, or via studentaffairs.duke.edu/conduct/report-incident.

Third, the Student Sexual Misconduct Policy describes resources available on campus and in the community to assist students in dealing with the impact of sexual misconduct, whether it happened recently or in the past. Such services include, for example, the Office of Gender Violence Prevention and Intervention (GVPI) in the Women's Center, Counseling and Psychological Services (CAPS), DukeReach, Duke Police (for possible criminal conduct), and administrative actions arranged or issued by the Office of Student Conduct, the Office for Institutional Equity, GVPI, and/or the Vice President for Student Affairs (or designee). In addition, resources are available to respondents during and, in some cases, after the complaint process.

Dr. Benjamin D. Reese (919-684-8222, ben.reese@duke.edu), Vice President of the Office for Institutional Equity (oie.duke.edu), is the individual responsible for the coordination and administration of Duke's nondiscrimination and harassment policies generally. Howard Kallem (919-684-1437, howard.kallem@duke.edu), also in the Office for Institutional Equity, is the Director of Title IX Compliance (Title IX Coordinator). In this role, Mr. Kallem is responsible for overseeing the university's Title IX compliance, including this policy and its complaint-resolution procedures; as such, Mr. Kallem receives comments/concerns from students about this policy's implementation. The Office for Institutional Equity is located in Smith Warehouse, 114 S. Buchanan Blvd., Bay 8, Durham, North Carolina, 27708.

## CONFIDENTIALITY

A student may discuss an alleged violation of this policy without the information being reported to the Office of Student Conduct with those who serve in a professional role in which communication is privileged under North Carolina law and to those whom the university has designated as a confidential resource consistent with Title IX. Those persons include:

- Student Health staff
- Counseling & Psychological Services (CAPS) staff
- Women's Center staff
- Clergy who are acting as such in their professional role at Duke
- Ombudsperson

Students should be aware that, with the exception of these confidential resources, all employees who become aware of conduct that might fall under this policy are expected to notify the Office of Student Conduct with the names of the parties involved and the details of the report. Students who serve in an ongoing peer-advising role (such as Resident Assistants) are also expected to file such reports with the Office of Student Conduct.

## INFORMATION FOR COMPLAINANTS

Complainants will be treated with respect before, during, and after the disciplinary process. During an initial meeting, the Office of Student Conduct will inform the complainant of the university's disciplinary process and possible outcomes. The Office of Student Conduct will communicate substantive and, when warranted, procedural developments regarding an investigation. The alleged conduct may also be criminal in nature, and complainants have the right to report—or not to report—the conduct to Duke Police, Durham Police, or other appropriate law enforcement agency. A criminal report does not preclude university disciplinary action.

Complainants are strongly encouraged to seek counseling and support available through resources such as Gender Violence Prevention and Intervention (GVPI) in the Women's Center, Counseling and Psychological Services (CAPS), and Durham Crisis Response Center (DCRC). For more information on these resources, please see "Support Services and Options for Complainants" on page 48.

Regardless of whether a complainant pursues a criminal complaint and/or the university's complaint process through this policy, the university may investigate the incident(s) in question and will take appropriate responsive action to ensure that the educational environment is free of harassment and to prevent the recurrence of a hostile environment—and, if appropriate, remedy the effects of the alleged harassment on the complainant. As discussed later in the policy, remedies available to a complainant may include, but are not limited to: reasonable academic accommodations, on-campus housing reassignment, a "no contact" directive between the respondent and the complainant, and disciplinary action against the respondent as determined through the disciplinary process outlined in this policy. Mediation is not appropriate for any allegation of sexual violence.

A complainant may request or the university may issue administrative actions and supports such as a "no contact" directive and changes to academic and living situations through the Office of Student Conduct, GVPI in the Women's Center, and/or the Title IX Coordinator regardless of whether a complainant files a formal report. A complainant will be notified as to what changes are reasonably available and/or are being implemented.

## INFORMATION FOR RESPONDENTS

Respondents will be treated with respect before, during, and after the disciplinary process. During an initial meeting, the Office of Student Conduct will inform the respondent of the university's disciplinary process and possible outcomes. The Office of Student Conduct will communicate substantive and, when warranted, procedural developments regarding an investigation. Note that alleged behavior may also be criminal in nature, and a respondent may be subject to a criminal investigation by the appropriate law enforcement agency at the same time as an investigation by the university under this policy; the respondent may wish to consult with a criminal lawyer as the Office of Student Conduct does not provide advice as to the criminal process. Respondents are entitled to a presumption that there is not a violation of this policy throughout the disciplinary process unless and until they are found responsible for a violation of this policy.

Respondents have the right to (and are strongly encouraged to seek) counseling and support available through resources such as CAPS, DukeReach, or other university and local resources.

A respondent may request, or the Office of Student Conduct and/or the Title IX Coordinator may change, academic and living situations and will be notified as to what changes are reasonably available and/or are being implemented.

# II. SCOPE

This Student Sexual Misconduct Policy applies to any instance in which any Duke student (undergraduate, graduate, professional, or any student enrolled in any Duke program) is alleged to have engaged in sexual misconduct against anyone (e.g., a student, employee, or third party such as a visiting athlete, guest speaker, or contractor), regardless of the complainant's or respondent's sex, gender, sexual orientation, or gender identity.[1] The university will respond to any complaint of sexual

[1] The Office for Institutional Equity (Smith Warehouse, Bay 8, 919-684-8222) receives reports and handles complaints alleging sexual misconduct by employees and all other non-Duke students under the Duke University Harassment Policy, oie.duke.edu/we-can-help/complaints-and-concerns/harassment.

Case 1:20-cv-00996   Document 1-3   Filed 11/02/20   Page 32 of 178

misconduct, including conduct alleged to have occurred during breaks, leaves of absence, or periods of dismissal, whether on or off campus. The disciplinary process is available as an option while a respondent remains a student at Duke. With the agreement of the Vice President for Student Affairs and the dean of the respondent's college or school, disciplinary action may be taken against a student who has graduated and is alleged to have committed a violation while a student.

# III. PROHIBITED CONDUCT

Rule. Duke University prohibits all forms of sex/gender-based harassment, sexual/gender violence, sexual exploitation, relationship violence (domestic violence and dating violence), and stalking.

Sex/Gender-Based Harassment. Sex- or gender-based harassment may take two forms:

One form of harassment is unwelcome verbal or physical conduct based on sex that, because of its severity, persistence, and/or pervasiveness, creates a hostile environment by interfering significantly with an individual's work or education, or adversely affecting an individual's living conditions.

The other form of harassment is a student's use of a position of authority (e.g., as a TA, RA, team captain, or officer in a fraternity or sorority) to engage in unwelcome sexual advances, requests for sexual favors, or other verbal or physical conduct of a sexual nature when:

- submission to such conduct is explicitly or implicitly made a term or condition of an individual's employment or education; or
- submission to or rejection of such conduct is used as a basis for decisions affecting an individual's education or employment.

The conduct alleged to constitute harassment under this policy must be sufficiently severe, persistent, and/or pervasive to actually interfere with the complainant's work, education, or living conditions to a significant degree. The severity, persistence, and/or pervasiveness of the alleged conduct will also be evaluated from the perspective of a reasonable person similarly situated to the complainant and in consideration of the context of the behavior.

Harassment must be distinguished from behavior that, even though unpleasant or disconcerting, is appropriate to the carrying out of certain instructional, advisory, or supervisory responsibilities or to legitimate academic and related discussions.

Sexual Violence. Sexual violence is a particularly severe form of harassment defined as any physical act of a sexual nature based on sex and perpetrated against an individual without consent or when an individual is unable to freely give consent. See Section IV of this policy (page 43) for more information about consent.

Physical acts of a sexual nature include, but are not limited to, touching or attempted touching of an unwilling person's breasts, buttocks, inner thighs, groin, or genitalia, either directly or indirectly; and/or sexual penetration (however slight) of another person's oral, anal, or genital opening with any body part or object.

Sexual Exploitation. Sexual exploitation includes taking sexual advantage of another without consent for one's benefit or the benefit of another party.

Examples of conduct that may constitute sex/gender-based harassment include:

- Continued unwelcome questioning about intimate or personal matters
- Unwelcome touching, or other physical acts of a sexual nature
- Severe, persistent, or pervasive comments or jokes of a sexual nature
- Severe, persistent, or pervasive unwelcome comments or conduct regarding an individual's sexual orientation or gender identity
- Sending emails that contain extreme or persistent sexual messages, images, or language
- Repeated derogatory comments of a non-sexual nature relating to a particular sex/gender generally and targeted to (a) specific individual(s) of that sex/gender
- Sex/gender-based violence—non-sexual physical assault of an individual because of the individual's sex or gender

Harassment may be verbal, nonverbal, or physical and the above list is not exhaustive, but intended only to provide general examples of possible prohibited conduct.

Relationship Violence. Relationship violence is any act of violence or pattern of abusive behavior in an intimate relationship that is used by one partner to gain or maintain power and control over another partner. Relationship violence can be physical, sexual, emotional, economic, or psychological actions or threats of actions that influence another person. Relationship violence includes domestic violence and dating violence (adapted from the Office on Violence Against Women, U.S. Department of Justice, justice.gov/ovw/domestic-violence).

- **Domestic violence** is any act of violence or pattern of abusive behavior committed by a student against the student's current or former spouse/cohabitant, person similarly situated under domestic or family violence law, or anyone else protected under domestic or family violence law.
- **Dating violence** is any act of violence or pattern of abusive behavior committed by a student who has been in a social relationship of a romantic or intimate nature with the complainant. Whether there was such relationship will be gauged by its length, type, and frequency of interaction.

Sex/Gender-Based Stalking. Sex/gender-based stalking is a course of conduct (including cyberstalking) directed at a specific person that would cause a reasonable person to fear for her, his, or others' safety, or to suffer substantial emotional distress. Stalking by a student not based on sex or gender is addressed under the Stalking Policy.

## RETALIATION

Retaliation is prohibited under Title IX and this policy and is adjudicated under this policy and procedures. Retaliation is defined as words or acts taken in response to a good-faith reporting of sexual misconduct, or to an individual or group's participation in Duke's complaint process or the follow up to a Duke complaint. The policy's prohibition against retaliation also protects individuals who oppose through words or actions what they reasonably believe to be sexual misconduct. Retaliation will be a violation of this policy when it is sufficiently serious (e.g., severe, persistent, and/or pervasive) to discourage a reasonable person from further such activity. The protection against retaliation applies to the parties and to all witnesses. All persons who believe they have been subjected to misconduct under this policy are encouraged and have the option to seek support, utilize available resources, and come forward with their concern or complaint.

> Fear of retaliation should never be an obstacle to reporting an incident of alleged sex/gender-based harassment, sexual/gender violence, sexual exploitation, relationship violence, or stalking.

# IV. CONSENT

Consent is an affirmative decision to engage in mutually acceptable sexual activity freely given by clear actions and/or words.

> Consent is an informed decision made freely and actively by all parties. Relying solely upon nonverbal communication can lead to miscommunication. It is important not to make assumptions; if confusion or ambiguity on the issue of consent arises anytime during a sexual interaction, it is essential that each participant stops and clarifies, verbally, willingness to continue.

Students should understand that consent may not be inferred from silence, passivity, or lack of active resistance alone. Furthermore, a current or previous dating or sexual relationship is not sufficient to constitute consent, and consent to one form of sexual activity does not imply consent to other forms of sexual activity.

Conduct is "without consent" if no clear consent, verbal and/or nonverbal, is given. An individual is "unable to freely give consent" when the individual is incapacitated (arising, for example, from the use of alcohol or other drugs or when the individual is passed out, asleep, unconscious, or mentally or physically impaired). An individual is also unable to freely give consent when the individual is coerced into sexual activity, such as, for example, through the use of physical force, threat of physical or emotional harm, undue pressure, isolation, or confinement.

The perspective of a reasonable person will be the basis for determining whether a respondent knew, or reasonably should have known, whether a complainant was able to freely give consent and whether consent was given. Additionally, being

Case 1:20-cv-00996   Document 1-3   Filed 11/02/20   Page 34 of 178

intoxicated or incapacitated does not diminish one's responsibility to obtain consent and will not be an excuse for sexual misconduct.

## THE IMPACT OF ALCOHOL OR OTHER DRUGS

The use of alcohol or other drugs can impair effective communication about sexual activity and can hinder one's ability to pick up on danger cues and resist an assault. Alcohol or other drugs can also lower inhibitions and create an atmosphere of confusion over whether consent is freely and effectively given.

# V. COMPLAINT RESOLUTION

A flowchart illustrating the complaint resolution process can be found on page 52.

## REPORTING

Students are encouraged to report violations of this policy to the Office of Student Conduct, 200 Crowell Hall, conduct@duke.edu, 919-684-6938, studentaffairs.duke.edu/conduct/report-incident.

Once a report is received, an investigation and possible immediate and/or interim measures may occur, including adjudication through the disciplinary process described below, administrative actions (e.g., a "no contact" directive, trespass from campus, interim suspension), reasonable academic or housing modifications, or other measures designed to reasonably minimize the possible recurrence of, and mitigate the effects of, the alleged conduct.

The Office of Student Conduct handles an alleged violation of this policy when the person alleged to have committed a violation is a student. (The Office for Institutional Equity, Smith Warehouse, Bay 8, 919-684-8222, receives reports in which the person alleged to have committed a violation is an employee or third party.) Reports involving an alleged student respondent may be filed at any time while the respondent remains a student at Duke; prompt reporting can aid an investigation.

A complainant may request that the Office of Student Conduct not reveal the complainant's identity in responding to a report. (In some situations, it may be possible to proceed fully with an investigation without disclosing the name of the complainant.) A complainant may also request that the university take limited or no action in response to a report.

A request to preserve the confidentiality of any party involved in a report or that no action be taken should be made to the Office of Student Conduct, 919-684-6938, conduct@duke.edu. Staff in the Office of Student Conduct will confer with the Title IX Coordinator about the request and inform the party of the extent to which confidentiality may be maintained. The university will attempt to preserve the confidentiality of the complainant and/or respect a request for limited or no action in response to a report except when, in the university's judgment, doing so would jeopardize the safety of members of the university community (including the complainant) or where the university is required by law to disclose the information (such as in response to a legal process).

## IMMEDIATE AND/OR INTERIM MEASURES

The Office of Student Conduct may issue administrative actions immediately and/or on an interim basis as deemed appropriate, including but not limited to restrictions on contact between the complainant, the respondent, and/or other involved parties; exclusion from areas of campus; and, removal or relocation from residential areas. The Office of Student Conduct adjudicates alleged violations of such through its policies and procedures. The Vice President for Student Affairs, or designee, may impose an interim suspension.

## TIME FRAMES

The Office of Student Conduct seeks to resolve complaints under this policy within 60 business days from receipt of a report, excluding days classes are not in session (see additional information about Appeals, on page 47, for additional time frames). An investigation typically takes 21 to 45 business days to complete. Generally, within 15 business days after completion of an investigation, an administrative or panel hearing, if applicable, is scheduled. During this time, staff in the Office of Student Conduct may seek clarifying information and/or meet with a complainant, respondent, investigator, or others.

Circumstances may require the university to extend this overall time frame or any individual time frame discussed in this policy. Examples of reasons why time frames may need to be extended include the complexity of the case, delays due to fall/spring/summer/holiday breaks, inclement weather, and other extenuating circumstances. Exceptions to these time frames will be communicated to the complainant and respondent.

## ADVISORS

A complainant and a respondent have access to trained Disciplinary Advisors to guide them through the disciplinary process. Complainants and respondents may consult with anyone they wish (including an attorney) during any stage of this process. One advisor of the complainant's/respondent's choice (either the university-appointed Disciplinary Advisor or another advisor of their choice) may accompany the complainant/respondent to any meeting with Office of Student Conduct staff, the investigator, or to a hearing. The advisor's role in any meeting or hearing is limited to quietly conferring with the complainant or respondent through written correspondence or whisper, and the advisor may not address any other participant or the hearing panel. An advisor may not also be a witness.

## INVESTIGATION

After it receives a report, the Office of Student Conduct typically meets with a complainant and respondent separately in order to review the disciplinary process and to hear an overview of each party's account of the incident. Immediate, interim, and/or long-term measures may also be discussed. The Office of Student Conduct may use any information gleaned through this and/or subsequent meetings with the complainant/respondent in the disciplinary process.

If the Office of Student Conduct determines further investigation is warranted, it will refer the report to the Director of Title IX Compliance, who will assign the case to an investigator from the Office for Institutional Equity. The investigator interviews witnesses, collects additional information, and submits a written report of relevant information to the Office of Student Conduct. The Office of Student Conduct will review the report for completeness and relevance (as that term is defined in Section VI), and direct further investigation as necessary before the report is shared with the complainant and respondent.

The investigator's final report will be shared with the complainant and respondent, who then have five business days to respond in writing to the report with any clarifications, witness statements, or other information. The complainant and respondent must also submit in writing by that time the names of any material witnesses the complainant/respondent wishes to testify (should the matter proceed to a hearing) and a summary of information each witness would provide through his/her testimony. (Character witnesses are not permitted.) Names of witnesses provided by the complainant/respondent will be shared with the other party. After the five-business-day deadline, the complainant and respondent may not provide any additional information for the hearing packet (defined on page 46) and may not produce any additional material at the hearing, unless that information was not reasonably available prior to the closing of the five-day window. The hearing panel or the Office of Student Conduct, as appropriate, determines whether to grant exceptions to this five-day deadline.

The Office of Student Conduct will determine what, if any, changes or additions are made to the investigator's report based upon its review of the report and feedback as described above from the complainant and respondent.

The Office of Student Conduct will determine whether to proceed to a hearing based on its assessment of whether there is sufficient information to believe that a policy violation may have occurred. The Office of Student Conduct will convey this decision in writing to the complainant and respondent as applicable, who may ask that the Office of Student Conduct reconsider its decision.

# VI. HEARING PROCEDURES

When the Office of Student Conduct decides that a case should proceed to a hearing, the case may be resolved either through an administrative resolution or a hearing panel. Under both types of proceedings, the university will use a "preponderance of the evidence" (more likely than not) standard.

## ADMINISTRATIVE HEARING

At the discretion of the Office of Student Conduct, and with the agreement of both the complainant and respondent, a report may be resolved through an administrative hearing. The parties will be notified (typically via email) of the specific violations of the Student Sexual Misconduct Policy under consideration in advance of an administrative hearing. A designee of the Office of Student Conduct will review the information gathered during the investigation separately and in private with each party and give each party an opportunity to respond. The designee will determine if the respondent is responsible for the alleged policy violation(s), and, if so, issue (an) appropriate sanction(s). The parties will be notified in writing of the outcomes concurrently. If the respondent or complainant does not accept the administrative hearing resolution, either party may request by the stated deadline (typically 72 hours after notification of the outcome) a hearing before a hearing panel, as described below. If such a request is made, the Office of Student Conduct will then proceed in scheduling a hearing panel. The proposed outcome from the administrative hearing will not be disclosed to the hearing panel unless the complainant or respondent shares such information.

## HEARING PANEL

If the Office of Student Conduct decides the case should be resolved through a hearing panel, the Office of Student Conduct will appoint a specially trained three-person hearing panel (typically including two faculty or staff members and one student and, when possible, at least one representative of the complainant's and respondent's school(s)) to resolve a complaint under this policy. A finding of responsibility must be based on a unanimous vote. Sanctions of suspension or expulsion must also be supported by a unanimous vote. A majority vote is required for all other sanctions.

The following procedures apply to a complaint that proceeds to a hearing panel:

- Notice. Both the complainant and the respondent will be notified at least 120 hours in advance of the date and time of the hearing and the names of the hearing panelists.

- Hearing Packet. In advance of the hearing, the Office of Student Conduct finalizes a packet with information it deems relevant to the case to be shared with the hearing panel. The hearing packet typically includes the investigator's report (if applicable). The Office of Student Conduct will share a copy of that packet with both the complainant and the respondent at least 120 hours in advance of the hearing.

- Conflict of Interest. A complainant and/or respondent may challenge the participation of a panelist because of perceived conflict of interest, bias, or prejudice. Such challenges, including rationale, must be made to the Office of Student Conduct at least 72 hours prior to the commencement of the hearing. At its discretion, the Office of Student Conduct will determine whether such a conflict of interest exists and whether a panelist should be replaced. Postponement of a hearing may occur if a replacement panelist cannot be immediately identified.

- Witnesses. The hearing panel may, at its discretion, exclude witnesses or witness testimony the panel considers irrelevant or duplicative.

- Electronic Devices. A respondent, complainant, advisor, and/or witness may not bring electronic devices that capture or facilitate communication (e.g., computer, cell phone, audio/video recorder, etc.) into a hearing room, unless authorized by the hearing panel. The Office of Student Conduct will make an audio recording of the hearing to be kept on file for three years. Reasonable care will be taken to create a quality audio recording and minimize technical problems; however, technical problems that result in no recording or an inaudible one will not be a valid argument for appeal.

- Hearing Procedure. A hearing panel has general authority over the conduct of the hearing (e.g., it may set time frames for witness testimony and it may limit opening/closing statements or their length, etc.). The general course of procedure for a panel hearing is as follows: introductions; respondent's statement accepting or denying responsibility; opening comments from the complainant; opening comments from the respondent; questions from the panel; testimony/questions of other material witnesses (if applicable); closing comments from the complainant; and, closing comments from the respondent. A complainant or respondent may not question each other or other witnesses directly, but may raise questions to be asked of that party through the hearing panel, which will determine whether to ask them. The hearing panel determines the relevancy of any information presented/submitted at the hearing and can exclude irrelevant information.

- Hearing Facilitator. A staff member from the Office of Student Conduct will serve as the non-voting hearing facilitator.
- Relevance.
  - In evaluating the relevance of information, the Office of Student Conduct, the investigator from the Office for Institutional Equity, and the hearing panel, as appropriate, considers, among other things, whether the information bears on a fact at issue in the case, is more prejudicial than probative, or is duplicative.
  - Polygraph examinations and/or their results are neither admissible nor considered in any part of the disciplinary process.
  - A complainant's or respondent's prior or subsequent sexual activity is typically not relevant and will only be considered as evidence when the previous or subsequent behavior was substantially similar to the conduct at issue or indicates a pattern of behavior and substantial conformity with that pattern.

The complainant and respondent will receive verbal notification of the decision of a hearing panel no later than five business days after the hearing. Notification will be individually given to the respondent and complainant at approximately the same time. A written hearing report outlining the decision and rationale of the hearing panel will be delivered to the respondent and the complainant typically within 10 business days of the hearing.

## SANCTIONS

Sanctions for a finding of responsibility include, but are not limited to, expulsion, suspension, disciplinary probation, recommended counseling, and/or other educational sanctions. The hearing body will determine the sanctions, first considering whether expulsion (permanent removal) from the university is appropriate. While expulsion is the starting point for consideration, the hearing body has discretion to decide that (a) different sanction(s) is (are) appropriate. Factors pertinent to the determination of what sanction applies include, but are not limited to, the nature of the conduct at issue, prior disciplinary history of the respondent (shared with a panel only upon a finding of responsibility for the allegation), previous university response to similar conduct, and university interests (e.g., in providing a safe environment for all).

## LONG-TERM/INDEFINITE MEASURES AND/OR REMEDIES

The Director of Title IX Compliance and/or staff in the Office of Student Conduct will work with the complainant and respondent as applicable to identify and implement any appropriate/necessary long-term or permanent measures/remedies. The Director of Title IX Compliance and/or staff in the Office of Student Conduct will also identify appropriate remedies/measures to address any effects of substantiated conduct on the university community. Long-term remedies/measures may include extending or making permanent any interim protective measures or implementing additional measures. The Director of Title IX Compliance and/or staff in the Office of Student Conduct will consider whether there is a need for additional measures/ remedies, which may include "no contact" directives and reassignment or removal from a class or on-campus living area.

## APPEALS

A respondent or complainant may appeal the hearing panel's decision by submitting a written appeal statement within five business days of the date the hearing report is sent to the parties. Appeals are limited to five pages (12-point font, 1-inch margins). The two grounds for appeal are:

1. New information not reasonably available at the time of the hearing that is material to the hearing panel's decision; and/or

2. Procedural error(s) that materially impacted the hearing panel's decision.

The appeal statement must identify the ground(s) for appeal. Note that an appeal is not a re-hearing of the case.

The composition of the Appellate Board for cases arising under this policy includes specially trained members of the university community appointed by the Vice President for Student Affairs. The chair of the Appellate Board or the chair's designee is responsible for selecting three-person panels from membership of the Appellate Board to consider appeals.

If, by majority vote, the appellate panel determines that a ground of appeal is substantiated, the panel will return the case to the Office of Student Conduct. Otherwise, the decision of the hearing panel stands. When a case is returned to the Office of Student Conduct, the Office of Student Conduct may decide to drop the case (e.g., based on insufficient information to believe that a policy violation may have occurred), send the case to the original hearing panel for reconsideration, send the case to a new hearing panel with the same or different charges, and/or (re)implement any aspect of the disciplinary process. A different decision (i.e., the decision of responsibility and/or sanctions) may subsequently result.

## Procedures

The Appellate Board's role is limited to reviewing the hearing panel record, the appealing party's ("**appellant**") written appeal statement, any response to that statement by the other party ("**appellee**"), and information presented at a meeting of the Appellate Board, if convened.

The appellate panel will typically notify the parties of its decision regarding an appeal in writing within 20 business days from receipt of the appeal statement. If the decision will take longer, the chair will inform the parties.

The following procedures guide the Appellate Board process:

- **Appeal Statement.** The written hearing report will include instructions for submitting an appeal. The chair may summarily deny an appeal if it is not based on one or both grounds of appeal.

- **Composition of Panel.** If the appeal is not summarily denied by the chair, the chair will convene a three-person panel and notify the appellant and appellee of the names of the panel members. When possible, the chair will select at least one Appellate Board member from the school community of the complainant and respondent. The appellant and/or appellee may challenge the participation of an appellate panelist because of perceived conflict of interest, bias, or prejudice. Such challenges, including rationale, must be submitted in writing to the chair no later than 24 hours after notification of the names of the appellate panel members. The chair will determine whether such a conflict of interest exists and whether a panelist should be replaced.

- **Response to Appeal.** The chair will provide written notice to the appellee that an appeal has been submitted and will give the appellee an opportunity to review the appeal statement. The appellee may submit a written response to the appeal ("response"). The response is due five business days from the date the chair provides written notice of the appeal to the appellee and is limited to five pages (12-point font, 1-inch margins). The chair will provide the appellant an opportunity to review the response, though no additional opportunity to respond in writing will be provided to the appellant.

- **Exceptions.** The appellant and appellee may submit to the chair requests for exceptions to page limits or deadlines. Exceptions must be requested in advance of any deadline by sending an email to appeals@duke.edu, with justification for such request(s). If either party fails to meet a deadline or exceeds page limits without receiving an exception, the chair has the discretion to summarily reject an appeal or the appellate panel may disregard the response.

- **Meetings.** On its own or at the request of the appellant or appellee, the appellate panel may convene a meeting to give the parties an opportunity to amplify the reason(s) for the appeal or the response. If a meeting is convened, the appellate panel will invite both the appellant and appellee, who may bring an advisor of their choice to the meeting. The advisor's role is limited to quietly conferring with their advisee, and may not address the appellate panel. In the event an appeal alleges a procedural error, the appellate panel may request that (a) staff member(s) in the Office of Student Conduct, the Office for Institutional Equity, and/or member(s) of the hearing panel attend the meeting to gather more information about the alleged procedural error.

- **Written Decision.** The Appellate Board will provide written notification of the final decision to the appellant and appellee at approximately the same time.

# GETTING HELP

Any student at Duke University who experiences sexual/gender violence—regardless of sex/gender—may contact the Women's Center at 919-684-3897 or email WCHelp@duke.edu. See "Support Services and Options for Complainants" below for additional information. In case of emergency or immediate threat, call 911 or Duke Police at 919-684-2444.

## SUPPORT SERVICES AND OPTIONS FOR COMPLAINANTS

A variety of support resources are available on campus and in the community to assist students in dealing with sexual misconduct, whether it happened recently or in the past. The following is a list of helpful resources. Additional resource information is available at studentaffairs.duke.edu/wc.

**Information, advocacy, counseling, and emotional support.** The Office of Gender Violence Prevention and Intervention (GVPI) provides education, advocacy, and support for students who experience sexual and relationship violence, sex/gender-based harassment, and sex/gender-based stalking, as well as for their friends and families.

Students of any gender can receive information, support, and accompaniment regarding medical treatment, reporting options, academic and residential accommodations, referrals, legal options, and trauma-focused therapy. Walk-in or scheduled appointments with the GVPI Coordinator are available during business hours by calling 919-684-3897, emailing womenctr@duke.edu, or by visiting the Women's Center (located at 001 Crowell Building (underneath the Coffeehouse) on East Campus. Emergency after-hours assistance is available via pager at 919-970-2108. All services are free and confidential and do not require making a formal report to the police or the university.

Counseling and Psychological Services (CAPS) also offers ongoing counseling services; call 919-660-1000 for an appointment. For 24-hour crisis information and referral, contact the GVPI information line at 919-681-6882, the Dean on-Call (pager number 919-970-4169), or the Durham Crisis Response Center at 919-403-6562 (for 24-hour hotline). All services are confidential and do not require making a formal report to the police or the university.

Medical concerns. Students should seek medical attention immediately to have the most options for the prevention of pregnancy and sexually transmitted infections. Even if physical injuries are not apparent, one may have injuries as a result of sexual assault that are not easily seen. For immediate and urgent medical concerns, students may go directly to the Emergency Department (ED) of Duke Medical Center (off Erwin Road near Trent Hall). Duke Police (911 or 919-684-2444 from non-campus phones) can provide transportation without students having to make a report. Services available at the Emergency Department are: medical care, evidence collection, emergency contraception, and sexually transmitted infection prevention.

Evidence can be collected anonymously. Evidence is best collected within 120 hours of the assault. Pursuing a criminal case is not necessary in order to have the evidence collected anonymously. A blind report can be filed that includes no identifying information other than a case number. A student may decide later whether to file a police report. Health insurance and the State of North Carolina may cover portions of the costs of medical care. The GVPI coordinator in the Women's Center will help students address any concerns they have about covering the costs of the medical exam or other related expenses. Both the Emergency Department and Student Health have Sexual Assault Nurse Examiners (SANE), who are specially trained to work with individuals who have been sexually assaulted.

For less immediate medical concerns, students may schedule an appointment at Student Health (919-681-WELL). The services available are: medical care, emergency contraception, and sexually transmitted infection prevention. The student health fee covers all services, except for a minimal charge for emergency contraception. Staff from GVPI can accompany students to the ED or Student Health.

Reporting to the police. Sexual misconduct may be criminal in nature, and a student may choose to file a report with law enforcement. Duke Police (911 or 919-684-2444 from non-campus phones) will respond to emergencies and non-emergencies to provide assistance by intervening in cases of assault, providing transportation to the Emergency Department, taking reports of an assault, and/or investigating and participating in legal or disciplinary action. They are responsible for notifying the community in a case of continuing danger, issuing a trespass order that requires an individual to stay away from campus or a particular area of campus when needed, and providing referrals and information including how to obtain a restraining order. Assaults that occur off campus may fall under the jurisdiction of the Durham Police Department or other law enforcement agency. Students may contact the Durham Police directly (911 off campus or 919-560-4427/560-4609) or the GVPI office or Duke Police can help facilitate reporting. Blind reporting—filing a report without one's name attached to it—is an available option with both Duke Police and Durham Police. Regardless of whether a complainant pursues a criminal complaint, the university will investigate the incident in question and take appropriate responsive action to ensure that the educational environment at Duke is free of harassment and to prevent the recurrence of a hostile environment, and, as appropriate, to remedy the effects of the harassment.

Case 1:20-cv-00996   Document 1-3   Filed 11/02/20   Page 40 of 178

# EXAMPLES OF SEXUAL MISCONDUCT

Angela and Aaron have been in an ongoing relationship for a year and a half and have engaged in consensual sexual intercourse. One night while becoming intimate, Angela stops and says she doesn't feel like having sex that night. Aaron continues to touch her, saying that she got him excited and it wasn't fair of her to lead him on like that. Again, Angela tells him she does not want to have sex, and then is silent. Aaron decides she has given in, and proceeds to have sexual intercourse with her.

*This is a violation of the Student Sexual Misconduct Policy. Aaron had sexual intercourse with Angela against her will. The fact that Angela has freely consented to sexual intercourse with Aaron in the past does NOT mean he has her consent in this situation.*

Erin is talking to several of her friends in the hallway at a crowded party. Ryan, a student she knows from chemistry class, comes up behind her and places his arms around her waist. She says hi to Ryan and continues her conversation. Ryan gradually moves his hands up to her breasts. She turns to him and tells him to stop, saying she doesn't want to be touched in that way and that he should have more respect for her. He laughs, tells her she takes herself too seriously, and again begins to grope her.

*This is a violation of the Student Sexual Misconduct Policy. Ryan touched Erin in a sexual way without her consent, and continued to do so after she told him to stop. This behavior is a form of sexual/gender violence.*

Kristen and Myra have been intimate for a few weeks. One night, Myra calls Kristen and asks her to come over. When she arrives, Myra kisses Kristen passionately and leads her into the bedroom. They each express their excitement and desire to "hook up," and are soon making out heavily in Myra's bed. After a while, Kristen tries to engage in oral sex with Myra. Myra tells Kristen that she really likes her, but that she doesn't feel ready for that. Kristen tells Myra she's just being shy, and ignores her when she repeats that she doesn't feel ready. Finally, Kristen threatens to reveal on the Internet that Myra is a lesbian. Because Myra has not yet come out to her friends and family, she becomes frightened and silent. Kristen proceeds with oral sex.

*This is a violation of the Student Sexual Misconduct Policy. Because of Kristen's manipulative and threatening arguments, Myra was afraid and unable to freely give her consent. Kristen did not receive consent from Myra and has committed sexual/gender violence.*

Liz and Tom have been together for six months. Liz often tells her friends stories of Tom's sexual prowess, and decides to prove it to them. One night, she and Tom engage in consensual sexual intercourse. Without Tom's knowledge, Liz sets up her digital camera to videotape them having sex. The next evening, she uploads the video to an online video-sharing site and discusses it with her friends online.

*This is a violation of the Student Sexual Misconduct Policy. Tom's consent to engage in sexual intercourse with Liz did NOT mean Liz had obtained his consent to videotape it. This is a form of sexual exploitation.*

Andrew and Felix have been flirting with each other all night at a party. Around 12:30 a.m., Felix excuses himself to find a bathroom. Andrew notices Felix slurring his speech. Andrew wonders if Felix went to the bathroom to vomit. When Felix returns, the two begin flirting more heavily and move to a couch. As the conversation continues, the two become more relaxed and more physically affectionate. Andrew soon suggests they go back to his room, and Felix agrees. As they walk down the stairs, Andrew notices that Felix looks unstable and offers his arm for support and balance. When they get back to his room, Andrew leads Felix to the bed and they begin to become intimate. Felix becomes increasingly passive and appears disoriented. Andrew soon begins to have sexual intercourse with him. The next morning, Felix thinks they had sex but cannot piece together the events leading up to it.

*This is a violation of the Student Sexual Misconduct Policy. Felix was passive, and the Policy states that consent may not be inferred from silence, passivity, or lack of active resistance. Moreover, Felix was clearly incapacitated by alcohol, and thus unable to freely consent to engage in sexual activity with Andrew. Although Andrew may not have known how much alcohol Felix had consumed, he saw indicators from which a reasonable person would conclude that Felix was incapacitated, and therefore unable to give consent. Andrew in no way had consent from Felix.*

Denise is a graduate teaching assistant in Paul's economics class. She notes that he has not been performing well on take-home assignments and exams. Both of them have come to a party, each with their own group of friends. Denise has consumed one can of beer, while Paul is rather intoxicated. Denise sees Paul and approaches him. She flirts with him, telling him that she can help him improve his grades if he will hook up with her. As Paul turns to walk away, Denise grabs his buttocks and squeezes them.

*This is a violation of the Student Sexual Misconduct Policy. Denise, in a position of power over Paul as his teaching assistant, attempted to arrange a quid pro quo sexual relationship. Additionally, she did not seek consent from Paul to touch him, even if a reasonable person could conclude that Paul was not too intoxicated in order to provide consent.*

A student had recently visited another country; on his return, he wrote an article for *The Chronicle* in which he used sexually explicit terms and examples to describe the treatment of women in that country. Other students are offended by the article.

*This would not be a violation of the Student Sexual Misconduct Policy. Sexual harassment is unwelcome conduct of a sexual nature that, because of its severity and/or persistence, interferes significantly with an individual's work or education. The conduct is evaluated from the perspective of a reasonable person and in consideration of the context of the behavior. It is not enough that other students are offended by the article for it to be a violation of the policy. Duke is committed to principles of academic freedom and conduct with a legitimate educational or related purpose will not be considered a policy violation.*

Abby and Mike are graduate students working in the same lab. They have been dating for a year. Abby often calls Mike names and damages his belongings when she's upset. She once poured a soda over his laptop after she saw him talking to another woman. Last week, she threw a cell phone at his head when he was late picking her up from work.

*This would be a violation of the Student Sexual Misconduct Policy. Relationship violence, including domestic and dating violence, includes physical, sexual, emotional, economic, or psychological actions or threats of actions that reasonable person in similar circumstances would find intimidating, frightening, terrorizing, or threatening.*

Monica filed a complaint with the Office of Student Conduct alleging that, after she broke up with Marcus, Marcus has been stalking her. Marcus has told his friends about the complaint and several of them have launched a Twitter campaign threatening Monica and the witnesses supporting her claim if Monica doesn't drop the complaint.

*The conduct by Marcus's friends would be a violation of the Student Sexual Misconduct Policy. The policy prohibits retaliation against anyone who files a complaint or participates in the investigation of a complaint.*

Case 1:20-cv-00996   Document 1-3   Filed 11/02/20   Page 42 of 178

# STUDENT CONDUCT PROCESS FOR SEXUAL MISCONDUCT ALLEGATIONS



Student complainant or third party reports incident of Sexual Misconduct to a) Office of Student Conduct (OSC) or b) to a university employee, who informs OSC and provides names of the parties involved, if known. Note: Employees designated as a confidential resource (e.g., medical providers, therapists, clergy acting as such in their professional role at Duke, university ombudsperson) are exempt from reporting to OSC.

OSC sends the student complainant a letter requesting to meet and outlines resources for support, including the option to file a report with the appropriate law enforcement agency.

Student complainant is informed of disciplinary option through the university. Student may participate in the disciplinary process or decline to do so. In some cases, if enough information is available to investigate or initiate some intervention with an accused student, the university will proceed even if the student declines to participate, keeping the complainant's request for confidentiality to extent possible. Campus environment is evaluated when appropriate. OSC will discuss the matter with the student complainant (if he/she chooses to meet with OSC) before deciding what to do.

OSC forwards to Office of Gender Violence Prevention & Intervention (GVPI) in the Women's Center a copy of the report. GVPI reaches out to the complainant to provide confidential support. A student who declines to meet with OSC may still meet with GVPI staff.

A determination will be made by OSC whether sufficient information exists to move forward with a hearing.

An investigation may be conducted by the Office for Institutional Equity and a report of findings submitted to OSC. DukeReach will be offered as a resource for the respondent.

A "no contact" directive may be put into place between the complainant and the respondent. Additional interim measures may be considered.

At the discretion of OSC, an administrative hearing may be conducted to resolve the matter. If both complainant and respondent accept resolution, the matter is resolved. If one or both do not, a hearing panel is convened.

At the discretion of OSC, a three-person specially trained panel will consider the case. Respondent and complainant are invited to participate in hearing.

No later than five business days following the hearing, outcome will be conveyed individually to respondent and complainant at approximately the same time. Written notification will typically be made within 10 business days.

Both parties have right of appeal within grounds of appeal to Appellate Board.

Exhibit B



**Office of Student Conduct**
Dean of Students Office
Student Affairs

200 Crowell Hall
Box 90893
Durham, North Carolina 27708-0893

Telephone: (919) 684-6938
Fax: (919) 681-7390
www.studentaffairs.duke.edu/conduct

## Student Conduct Board Hearing Report
### Case No. ▮▮▮ -2018
### Wednesday, August 19, 2020

This is written notice of the Hearing Report as required under Section VI of the Student Sexual Misconduct Policy (the "Policy") of Duke University.

On May 6, 2020, the Complainant reported that on January 19, 2018, the Respondent engaged in non-consensual sexual activity with her when he penetrated her anally with his penis. After receiving the report, OSC obtained written statements from both parties. On or about May 2020, OSC forwarded this matter to the University's Office for Institutional Equity ("OIE") for investigation. Ericka Lewis and James Mason, OIE Investigators, were assigned to conduct the investigation. On July 22, 2020, Ericka Lewis and James Mason completed the investigation and compiled an investigative report regarding the same. The 45-page investigative report included attachments that consisted of the initial incident report; written statements from both parties; summaries of interviews with the Complainant, Respondent, and witnesses; and, documentary information provided by both parties and witnesses. Both parties had an opportunity to review the draft report, submit comments, and propose changes to the investigators' report before it was finalized.

The completed investigative report was forwarded to OSC to determine whether there was sufficient information to move forward to a hearing. OSC determined that there was sufficient information to move forward and convened a three-person hearing panel consisting of A.G. Chancellor, Jessica Emig, and Shawn Lenker ("Hearing Panel"). On July 28, 2020, OSC shared the hearing packet with the parties and on July 29, 2020, the hearing packet was shared with the Hearing Panel. The hearing packet included the investigative report and attachments prepared by Ericka Lewis and James Mason.

On August 6, 2020, the Hearing Panel considered whether the Respondent violated the University's Policy by engaging in sexual misconduct, specifically sexual violence, with the Complainant between the evening hours on January 18th, and the early morning hours of January 19, 2018.

Present for the hearing was the Respondent and his advisor, Joe Cheshire; and the Complainant and her advisor, Elizabeth Boehne. The hearing was coordinated by Dean

Jeanna McCullers. In addition to the parties, the Hearing Panel and parties questioned the following witnesses: ▮▮▮▮▮▮▮▮, Victoria Krebs, and ▮▮▮▮▮▮▮▮ [1]

Based upon the record as a whole, the Hearing Panel determined by a unanimous vote that, pursuant to Sections II, III, IV, and VI of the Policy, a preponderance of the evidence shows that the Respondent engaged in nonconsensual sexual misconduct with the Complainant. Specifically, the Hearing Panel determined that the parties engaged in physical acts of a sexual nature. The Hearing Panel further determined that there was sufficient evidence to establish that the Respondent anally penetrated the Complainant with his penis without her consent, and that he knew or reasonably should have known that the anal sex was "without consent". In reaching that determination, the Hearing Panel carefully and thoroughly evaluated all of the information and evidence presented in the hearing packet and during the hearing including, but not limited to, the credibility of both parties and the witnesses.

The crucial issue was whether Respondent reasonably should have understood that Complainant did not consent to anal sex unless he used lubrication. Complainant told the Hearing Panel that she explicitly stated to the Respondent that she was willing to have anal sex with lubrication and that spit was not sufficient lubrication. The Hearing Panel found this testimony to be credible and consistent with the other testimony she offered. Respondent denied that Complainant made any comments about lubrication until the Complainant was leaving his room after the sexual act was complete. However, during the Respondent's testimony he acknowledged looking for lubrication, such as lotion, and said that when he could not locate any, he decided to use spit. The Hearing Panel found this statement inconsistent with the Respondent's testimony that there was no conversation between him and the Complainant about lubrication until the Complainant was leaving the room. Moreover, the Hearing Panel did not find the Respondent's account of other parts of the evening credible. For example, the Respondent stated to the Hearing Panel that when the Complainant left his room, she made fun of him and they laughed; however, this was not consistent with the witness' statements that the Complainant appeared visibly upset before and shortly after leaving the Respondent's room.

Since the Hearing Panel determined that the Respondent violated the University's Policy by a preponderance of the evidence, the Hearing Panel considered the factors listed in Section VI of the Policy (Sanctions) and determined the appropriate sanctions. Specifically, the Hearing Panel considered the nature of the conduct at issue, that the Respondent had no prior disciplinary history with OSC, previous University response to similar conduct, and the University's interest in providing a safe environment for all. Based on the foregoing, the Hearing Panel imposes the following sanctions:

---

[1] The following witnesses were available to participate; however, the hearing panel and parties determined that they did not have questions for the following witnesses: ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ , and ▮▮▮▮▮▮ . The following witnesses indicated that they were not available to participate in the hearing or did not respond to Dean McCullers' request to participate: ▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮ .

1. Suspension: The Respondent is suspended from the University beginning with the 2020 Fall Semester through the end of the 2021 Summer Semester (three semesters). The Respondent is eligible to apply for readmission for the 2021 Fall Semester or thereafter.
2. Educational: Before being deemed eligible by OSC to apply for readmission, the Respondent must successfully complete a course of instruction, meet with the Director of Title IX Compliance or participate in counseling (if the Respondent chooses) that addresses sexual misconduct. If the Respondent decides to participate in a course of instruction, the course should be approved by OSC, in conjunction with the university's Director of Title IX Compliance, before the Respondent begins the course of instruction. The course of instruction, meeting, or counseling must include, but need not be limited to examination of:

    a. Affirmative consent, including definition, how it is communicated, and what does not constitute consent

## Appeal Rights

Pursuant to Section VI of the Policy, either party may appeal the hearing outcome on the following grounds:

1. New information not reasonably available at the time of the hearing that is material to the hearing panel's decision; and/or
2. Procedural error(s) that materially impacted the hearing panel's decision.

The appeal must be submitted in writing to appeals@duke.edu within five (5) business days of the date the Hearing Report is sent to the parties. This means that any appeal must be filed by **5:00 p.m. on August 26, 2020**. The appeal statement is limited to five pages (12-point font, 1-inch margins) and must identify the ground(s) for appeal. Please note an appeal is not a re-hearing of the case. The parties may refer to Section VI of the Policy for more detailed information regarding filing an appeal.

Exhibit C

# COMPLAINT OF SEXUAL MISCONDUCT
## INVESTIGATIVE REPORT
### PREPARED BY ERICKA LEWIS AND JAMES MASON

**CASE NUMBER:**      00079-2018
**COMPLAINANT:**
**RESPONDENT:**
**DATE OF ALLEGATION:**      JANUARY 19, 2018
**DATE OF REPORT:**      JULY 7, 2020

## ALLEGATIONS[1]

██████ (Complainant), an undergraduate student, reported that on January 19, 2018, ██████ (Respondent), an undergraduate student, engaged in non-consensual sexual activity with her when he penetrated her anally with his penis at ██████ Residence Hall ██████

## INTERVIEW LIST

page 2

## LIST OF ATTACHMENTS

| | | |
|---|---|---|
| Attachment A | Office of Student Conduct Report, provided by OSC, page 12 |
| Attachment B | ██████ written statement, provided by OSC, page 15 |
| Attachment C | ██████ written statement, provided by OSC, page 18 |
| Attachment D | Text messages between ██ and ██ provided by ██ page 20 |
| Attachment E | ██ sketch of ██ room, provided by ██ page 24 |
| Attachment F | ██ medical ██, provided by ██[2] page 25 |
| Attachment G | Text messages between ██████ provided by ██ page 32 |
| Attachment H | ██ sketch of ██ room, provided by ██ page 35 |

[1] This case has two incident reports regarding ██ allegations. The first report was filed on January 19, 2018, and it identifies ██ as the complainant, but it does not identify a respondent. The second report was filed anonymously on February 10, 2019, and it identified ██ as a respondent, but it did not identify a complainant. The first report (Attachment A) was modified in 2020 to identify ██ as the respondent.
[2] ██ provided redacted medical records she received from Duke University Hospital.

| Attachment I | Dean Victoria Krebs' February 12, 2019, notes (redacted), provided by OSC, page 36 |
| Attachment J | Text messages between ███████████ provided by ████ page 38 |
| Attachment K | ███████████ text message and email statements, provided by ████ page 41 |
| Attachment L | ████████ statement, provided by ████ page 43 |
| Attachment M | Text messages between ████ provided by ███ page 44 |

## INVESTIGATIVE PROCESS

The investigators interviewed ████████ and eight students. They informed all individuals of their credentials and their impartial role as the only investigators assigned to the case. They also informed them of the prohibition of retaliation, and that they could not guarantee confidentiality or anonymity. They explained that it is not the practice of the Office for Institutional Equity (OIE) to record interviews, and confirmed with each individual that they were not recording the interview.

## RELEVANT PROHIBITED CONDUCT

The Duke University Student Sexual Misconduct Policy, as printed in the *2017-2018 Duke Community Standard in Practice Guide: A Guide for Undergraduates* prohibits sexual violence. The Policy provides:

> Sexual violence is a particularly severe form of harassment defined as any physical act of a sexual nature based on sex and perpetrated against an individual without consent, or when an individual is unable to freely give consent.

> Physical acts of a sexual nature include, but are not limited to, touching or attempted touching of an unwilling person's breasts, buttocks, inner thighs, groin, or genitalia, either directly or indirectly, and/or sexual penetration (however slight) of another person's oral, anal, or genital opening with any body part or object.

> Consent is an affirmative decision to engage in mutually acceptable sexual activity freely given by clear actions and/or words.

## INTERVIEW SUMMARIES

████████████████, COMPLAINANT

The investigators interviewed ▓ via Zoom on May 21, 2020, from 4:15 to 5:17 p.m. ▓ ▓ advisor, was present during the interview.

▓ was a first-year student in January 2018. She stated that her friend ▓ introduced her to ▓ at party a few nights prior to January 18, 2018. ▓

▓ stated that on Thursday, January 18, 2018, she went to a pregame at a house near East Campus. She said she saw ▓ at the pregame and they played a couple of games together. She said she drank a combination of vodka and beer. She recalled that she wanted to remain at the pregame, but ▓ told her that she would have to leave with him if she wanted to hang out with him. ▓ stated that from the pregame she and ▓ took an Uber to Devine's, a local nightclub in Durham. She said that she lost ▓ while at Devine's due to the large crowd.

▓ stated that after she left Devine's she went to her residence hall and texted ▓ According to the text messages, ▓ began texting ▓ at 12:25 a.m. on January 19, 2018. (Attachment D) She said that she then went to ▓ where ▓ met her at a side door. She recalled that they went to ▓ room and his roommate was present. ▓ said that during their earlier conversation that evening, ▓ told her that his roommate would not be in his room. She stated that she told ▓ she was uncomfortable, but ▓ convinced her that it would be okay for her to be there. She recalled that ▓ roommate seemed "engrossed" in a video game on his computer and that he was wearing Bose headphones.

▓ stated that ▓ had a loft bed, which was close to the ceiling. (Attachment E) She said she realized her level of drunkenness when she had difficulty climbing up into ▓ bed.[3] ▓ stated that ▓ removed her shirt and jeans and threw them off the bed. She said she put her bralette and thong underneath a pillow because she did not want to be naked in front of ▓ roommate when she got dressed. She recalled that ▓ was already in his boxers.

▓ stated that she and ▓ kissed and he performed oral sex on her.[4] She said that she told ▓ she wanted to have sexual intercourse and he put on a condom. She stated that ▓ licked his hand and rubbed her vagina for lubrication. ▓ said that they had had vaginal sex in the "missionary" position with ▓ on top and her on her back. She recalled that the condom tore and she asked ▓ to get another condom, which he did. She noted that ▓ seemed annoyed and accused her of breaking the condom.

▓ stated that she and ▓ then switched to the "doggy style" position.[5] She said that she was on her hands and knees and that her upper body was against the end of the bed while ▓ was on his knees behind her. She stated that during vaginal intercourse in

---

[3] Investigator Lewis asked ▓ if she believed she was too intoxicated to engage in sexual activity. ▓ stated, "My judgment was impaired, but I consented and I was not black out drunk."

[4] In ▓ written statement, she said that ▓ also consensually penetrated her vagina with his finger. ▓ stated that she asked ▓ for a condom, he put it on, and that he penetrated her anus with his fingers, which she qualified as "consensual exploration." (Attachment B)

[5] In ▓ written statement, she stated that she asked to switch to the doggy style position, and ▓ put on a new condom. (Attachment B)

Case 1:20-cv-00996   Document 1-3   Filed 11/02/20   Page 51 of 178

this position ███ penetrated her anus with his fingers. ███ said that she was surprised when ███ penetrated her anus with his fingers, but noted that it did not bother her. She stated that because ███ had not mentioned anal penetration, she brought it up. She said she that when they stopped having sex, she told ███ that she might be open to having anal sex if he had a lubricant. She recalled that ███ told her to "spit." ███ said that she told ███ she would not spit because saliva would not be sufficient lubrication. She stated that she told him that she would only consider anal penetration if he had a ███ She noted that during their conversation, her buttocks were facing ███ ███ said that ███ then penetrated her anus with his penis. She stated that the anal penetration hurt and that she was "trapped" against the edge of the bed. She stated that she told ███ that the penetration hurt and that she wanted him to stop. ███ said that eventually ███ stopped and she moved so that her anus was no longer exposed. She said she wanted to discuss the incident with ███ but he was not interested in having the conversation.

███ said that she put on her underwear and clothes, and that while leaving ███ room, she called ███ an "asshole" and a "bad person." She recalled that when she left his room, she passed a male who was brushing his teeth. She said she pointed to ███ who was standing in his doorway, and screamed that ███ was an "asshole." She stated that after she entered the stairwell she began to cry. She said she called ███ ███ who told her she could come to her room. She stated that while walking from ███ to ███ Residence Hall (███ where she and ███ lived, she saw ███ an acquaintance, and a male named ███' She recalled that ███ and ███ put her arms over their shoulders and escorted her to ███ She said that they asked her questions, but she did not recall what she told them other than her request that they take her to ███

███ stated that ███ and ███ brought her to ███ room. She recalled that she eventually went to her room. She said she had difficulty walking and that she collapsed in her hallway on the way to her room.[6] She stated that ███ called ███ friend ███ and he came over. She recalled sobbing on the floor in her room. She said that ███ called their resident assistant (RA).[7] She said that an officer from the Duke University Police Department picked her up and ███ and ███ accompanied her to Duke University Hospital. She stated that she had a rape kit performed at hospital. (Attachment F)

Text messages provided by ███ reflect the following communication on January 19, 2018, beginning at 3:08 p.m.:

> What'd you tell people [?]
> Dude what'd you do [?]
> Are you okay??
>
> Please don't tell people I raped you ███ I have no idea what
> happened and I'm hearing a lot of stuff

[6] In ███ written statement, she said she collapsed due to emotional distress. ███ also stated that she felt anal pain before she went to the hospital. (Attachment B)
[7] ███ the RA, did not respond to Investigator Lewis' emails requesting to interview her.

talk to me please

My name is ▮▮ and I really do not think that is a good idea.

▮▮ I am so confused. I want to know what you're saying.
I've heard some terrible things and I don't know where they're
coming from. I just need to talk to you

(Attachment G)

## RESPONDENT

The investigators interviewed ▮▮ via Zoom on May 28, 2020, from 3:05 to 4:04 p.m.
Joe Cheshire, ▮▮ advisor, was present during the interview. The investigators
conducted a follow-up interview with ▮▮ via Zoom on June 11, 2020, from 12:31 to 12:41
p.m. Mr. Cheshire was present during the follow-up interview.

▮▮ was a first-year student in January 2018. He stated that he met ▮▮ at a fraternity
party two days before the alleged incident. He noted he did not interact with her between
the first time he met her and January 18, 2018.

▮▮ stated that on the evening of January 18, 2018, he saw ▮▮ at a fraternity party. He
said that after the party, he went to Devine's. He stated that he saw ▮▮ at Devine's and
recalled she came up to him a few times and tugged on his shoulder. He said he stayed at
Devine's for an hour and then left with fraternity members to get food. ▮▮ stated that
he returned to his room at approximately 1:00 a.m.

▮▮ stated that he was getting ready for bed when he received text messages from ▮▮
requesting to come to his room to "hook up." He said he fell asleep and that ▮▮ called
him numerous times. He recalled he answered her call and provided directions to his
residence hall. He said he let her in through a side door and they walked to his room.
▮▮ stated that his roommate, ▮▮ was in the room when ▮▮ arrived. He said
the lights were off, but the room was not pitch black because ▮▮ computer monitor
was on. He recalled that ▮▮ was sitting at his desk listening to music and playing a
video game. (Attachment H)

▮▮ stated that he and ▮▮ kissed and she removed her clothes before she got into his
bed. Investigator Lewis asked ▮▮ if he threw ▮▮ clothes away from his bed as
alleged. He said he did not recall doing so. ▮▮ stated that he performed oral sex on
▮▮ and then they engaged in vaginal sex. When asked if he asked ▮▮ to use her saliva
for lubrication for vaginal sex, he said he did not recall, but noted that it could have
happened. He recalled he used a condom. When asked if the condom ripped and if he
put on a second one, he said yes, but also noted that he was not certain because the sexual
activity occurred two years ago. When asked if he penetrated ▮▮ anus with his fingers
during vaginal sex ▮▮ said he did not recall doing so.

█████ stated that during vaginal sex, █████ suggested the doggy style position. He stated that when █████ turned around she said. "Stick it in my ass." When asked if he and █████ discussed lubrication prior to anal sex, █████ said he did not recall. Investigator Lewis informed █████ that █████ aid that she told him that she had never tried anal penetration and that she asked if he had lube. █████ stated that he did not recall █████ making that statement or asking for lube. When asked if he told █████ o spit to create lubrication for anal penetration, █████ said he did not recall. He said he did not recall █████ telling him that spit was not okay and that she did not want to engage in anal sex without lubrication.

█████ stated that he penetrated █████ anally with his penis. He stated he used the same condom that he used during vaginal penetration. █████ said that after two brief thrusts, █████ aid, "stop" and he stopped. When asked if █████ told him that it hurt, he said no and that he did not recall. Investigator Lewis asked █████ if █████ told him why she told him to stop. █████ said he did not recall. He stated that after he stopped penetration, he and █████ looked at each other, began to kiss, and resumed vaginal sex for three to four minutes.

█████ stated that at approximately 3:00 a.m., he asked █████ if it was okay to "call it a night." He said that █████ asked if she could stay in his room. He stated that he told █████ that he was eager to go to class the next day and asked her if she could go to her room. █████ stated that █████ climbed off his bed and got dressed. He recalled █████ was "lingering" in his doorway. He stated that as she was leaving she yelled to him that the next time they should go to her place to get lube. He said that █████ also commented about being upset about not sleeping in his room. When asked if █████ alled him any names, he said he did not recall and that he did not believe she did. He said he recalled leaving to go to the bathroom and that █████ left at approximately 3:30 a.m.

During █████ ollow-up interview, Investigator █████ questioned him about statements he made during a meeting with Dean Krebs in February 2019, a year after the sexual encounter. Investigator Lewis informed █████ hat according to Dean Krebs' notes, he told her that prior to anal sex, █████ told him that she wanted to have anal sex and that he looked for lube and that he tried to use spit for lubrication. (Attachment I) █████ tated that he did not recall looking for lube or using spit for lubrication. Investigator Lewis informed him that according to Dean Krebs' notes, he told her that █████ said "ow" during anal penetration. █████ aid that he recalled █████ said, "stop." and he added that he could not recall if she said "ow." Investigator Lewis informed █████ hat according to the notes, he informed Dean Krebs that after he and █████ esumed vaginal sex, he was not as nice to her as he should have been. █████ stated that he might have been referring to his denial of █████ request to spend the night in his room.

█████ stated that while on his way to class later that morning, he received a text from a fraternity he was rushing. He recalled the text message informed him that he was no longer welcome to join the fraternity. He said he received a similar message from a different fraternity an hour later. He stated that later that afternoon, his friend █████ █████ accused him of raping █████

On January 19, 2018, ▮▮ and ▮▮ engaged in the following text message exchange beginning at 3:28 p.m.▮

What's going on ▮▮ [?]
Where's ▮▮ [?]
Please talk to me [.]

Hey right now it's probably best if you don't talk to ▮▮ or do anything you may regret. I know it's frustrating and hard to hear but the best thing to do right now is wait and not make contact with people or react to anything you hear.

Okay can you please just tell her if what's going on is all true I really had no idea what was going on and if I did that I fucked up bad, but I really don't think I would do that.

(Attachment J)

Investigator Lewis showed ▮▮ the text messages during his interview. ▮▮ stated that when he sent the message to ▮▮, he did not have a full understanding of ▮▮ allegation. Investigator Lewis asked ▮▮ what he meant when he said, "if I did that I fucked up bad." ▮▮ said he was referring to raping someone generally. He noted he was trying to convey to ▮▮ that he would not have engaged in that behavior.

▮▮ stated that he asked ▮▮ what he recalled when ▮▮ was in the room with ▮▮. He said that ▮▮ told him that he heard, "sex noises."

▮▮ questioned the timing of ▮▮ allegation. He stated that he believes that ▮▮ decided to accuse him two years later because he was recently featured in newspapers and on social media for his work on a project.

Investigator Lewis interviewed ▮▮ via Zoom on May 21, 2020, from 4:00 to 4:15 p.m.

▮▮ was a first-year student in January 2018. He stated he met ▮▮ prior to coming to Duke because they were both from the same state. He said he does not know ▮▮.

▮▮ stated that around midnight on January 19, 2018, he and his friend ▮▮ were walking to their residence hall when they noticed a female crying under the archway on East Campus. He recalled when he asked the female if they could help her, he noticed it was ▮▮. He said ▮▮ looked like she had lost her breath and she could not speak. ▮▮ stated that ▮▮ then asked them to walk her to her ▮▮ and they agreed.

▮▮ stated that during the walk, ▮▮ told them that she had been raped. He recalled that ▮▮ told him and ▮▮ that she and the male were in his room engaging in sexual

Case 1:20-cv-00996   Document 1-3   Filed 11/02/20   Page 55 of 178

activity when he proceeded to have anal sex with her. He stated that ▮▮ told them that she said no to the male, but he continued to engage in the unwanted behavior. ▮▮ said that ▮▮ mentioned the male's name, but he could not remember it.

▮▮ stated that the next morning, ▮▮ texted him and asked if he could take her to an office on East Campus to speak with someone regarding sexual misconduct. He stated that he walked with ▮▮ to the office. He noted he had not heard anything regarding the alleged incident since that time.

▮▮▮▮

The investigators interviewed ▮▮ via Zoom on May 22, 2020, from 2:01 to 2:16 p.m.

▮▮ was a first-year student in January 2018. He said that he did not know ▮▮ or ▮▮ in January 2018.

▮▮ stated that on January 19, 2018, at around 2:30 or 3:00 a.m., he and his friend ▮▮ were walking towards Blackwell Residence Hall when they noticed a female as they were approaching an archway. He said he did not know the female, but ▮▮ did. He described her as "hysterical" and "mostly incoherent." He said that her face was "pretty red" and it appeared to him that she had been crying. ▮▮ stated that he recalled she commented, "We were together, but I wouldn't have let him do that." He stated that he and ▮▮ escorted her to her residence hall.

▮▮ stated that a few days later, ▮▮ told him that the female had been intoxicated. and ended up in a room where she had unwanted anal sex. He recalled that ▮▮ told him that he took her to the Women's Center.

▮▮▮▮

The investigators interviewed ▮▮ via Zoom on May 22, 2020, from 3:33 to 3:44 p.m.

▮▮ was a first-year student in January 2018. He said he met ▮▮ on January 19, 2018. He stated he did not know ▮▮

▮▮ stated that at approximately 1:00 or 2:00 a.m. on January 19, 2018, he and ▮▮ were passing the Randolph Building on East Campus when they saw ▮▮ He recalled that ▮▮ appeared to be happy and that she told them that she was going to ▮▮ room. He said that he and ▮▮ went to ▮▮ room. ▮▮ stated that at approximately 3:00 or 3:30 a.m., ▮▮ came to ▮▮ room and was crying and sobbing. He recalled that later that morning or the following day, ▮▮ told him that someone forced ▮▮ to have anal sex.

▮▮▮▮

The investigators interviewed ███ ████ via Zoom on May 25, 2020, from 6:00 to 6:37 p.m.

████████ was a first-year student in January 2018. She said she met ███ during their first year and she noted that they are friends. ████████ stated that she met ███ during their first year, but noted that they had not spoken in two years.

████████ stated that on January 19, 2018, she was in her residence hall with ███ when she received a call from ███ at 2:00 or 3:00 a.m. She said that ███ was "rambling." She recalled that ███ cried and asked to come to her room.

████████ stated that when ███ arrived at her room, two males were holding ███ up because she appeared to be unable to walk on her own. She recalled the males told her that they found ███ in an archway. She said that she put ███ in ███ roommate's bed and called ███ friend, ███ She said that ███ appeared to be in "shock" and that her eyes looked "big." She stated that ███ agreed to take ███ to ███ room to take care of her.

████████ stated that she had to support ███ down the stairs to her room. She recalled ███ was "wailing" loudly. She said that she helped ███ and ███ to ███ room. She said that ███ appeared to be "hyperventilating." She stated that ███ told them that she had consensual vaginal sex with ███ and that he penetrated her anus with his fingers. She said that ███ also told her that she told ███ she would not have anal sex unless he had lube, but ███ penetrated her anally. She said that ███ told her that she yelled for ███ to stop, and he stopped and she got away.[8]

████████ stated that after ███ shared her account, ███████ called ███ an RA, and ████████ suggested they call the Women's Center. She recalled that ███ decided to get a police escort to Duke University Hospital. She said that she and ███ accompanied ███

████████ stated that sometime in January 2018, ███ asked her to prepare a written statement, which she prepared and provided to ███ via text and email on February 2, 2018. (Attachment K)[9]

████████

The investigators interviewed ███ via Zoom on May 27, 2020, from 5:02 to 5:21 p.m.

████████ was a first-year student in January 2018. He said he met ███ during his first year and he said they are friends. He stated he does not know ███

████████ stated that at 3:31 a.m. on January 19, 2018, he received a call from ███ He noted he did not know ███ the time. He recalled that ███ told him he needed to come over, and that he heard ███ screaming and crying in the background.

---

[8] This information is not contained in the written statement ███ provided ███ in February 2018.
[9] The text message and email contain identical information.

Case 1:20-cv-00996   Document 1-3   Filed 11/02/20   Page 57 of 178

██████ stated that when he arrived at ██████ he saw ████ in the common room. He said that ████ was screaming and crying. He recalled he and ████████ helped ████ to her room and called an RA.

██████ ated that ████ told him that while having sex with someone she had met, the male asked about anal sex and she said no. He said ████ told him that the male penetrated her anally. He said ████ ndicated that she felt uncomfortable with somethings because the male's roommate was asleep below them. He said she told him that she called ████ and requested ████ call him.

██████ tated that per ████████ request, he prepared a written statement in 2018 regarding the alleged incident. He said he did not provide the statement to ████ Attachment L)

████████████

The investigators interviewed ████ a Zoom on May 29, 2020, from 1:02 to 1:07 p.m.

████ was a first-year student in January 2018. He said that he and ████ ived two to three rooms apart in ████████ He stated he did not know ████

██████ tated that on January 19, 2018, he observed a female enter ████ room. He stated that he did not see either of them leave ████ oom.

████████████

The investigators interviewed ████ ia Zoom on June 1, 2020, from 4:00 to 4:37 p.m.

██████ was a first-year student in January 2018. He said that ████ was his roommate during the 2017-2018 academic year. He noted he did not know ████

████████ tated that ████ usually went to sleep at 10:00 p.m., but on January 18, 2018, ████ was not home at that time. He recalled that at approximately 2:00 a.m., on January 19, 2018, he was in his room doing math homework when ████ ntered their room with a female. ████ tated that the room lights were off, but his lamp was on. He said that neither ████ nor the female said anything to him. He stated that soon afte ████ and the female entered the room, they climbed up into ████ bed.

██████ stated that he was listening to music, but the music was not loud enough that he could not hear ████ and the female's voices and activity. He said that at first he heard the female suggest that they go to her room since she had a single room, but that ████ decline the offer due to the distance to her residence hall. He said that he thought that ████ and the female were cuddling and sleeping until ████ bed started "shaking." ████████ stated that he did not observe any sexual activity between ████ and the female because ████ bed was higher than five feet from the floor and close to the ceiling. He said he saw the female's clothes on the floor. ████████ tated that he believed the female raised her voice at ████ before she got off the bed.

█████ tated that the female appeared to be angry with ████ when she got off the bed. He noted that he did not know why the female was angry. He said that he left the room after the female left. He recalled that while leaving his room, he told his RA, ███████ that ████ had sex in their room.

█████ recalled that two weeks later, ████ informed him that there were allegations that ████ exually assaulted the female. He said that ████ asked him to "vouch" for him. █████ tated that he told ████ hat he did not know what happened between him and the female.

██████████

The investigators interviewed ████ via Zoom on June 4, 2020, from 5:30 to 5:50 p.m.

██████ was a first-year student in January 2018. He stated that he met ████ at a semiformal event a few day before January 19, 2018. He stated that he met ████ during their first year and that they both lived in ██████████

██████ tated that on January 18, 2018, he saw ████ at Devine's. He recalled that ████ told him that he planned to "hook up" with ████. He stated that at 2:16 a.m., on January 19, 2018, after he returned to ████ he texted ████ because he observed ████ in his underwear ████ walking to a vending machine to purchase a condom. (Attachment M) Investigator Lewis asked ████ if he observed ████ at ██████████ and he said he did not.

██████ stated that at 3:24 p.m. on January 19, 2018, he received a text message from ████ asking if anything bad happened hours earlier. (Attachment M). He recalled that ████ told him that a fraternity and student life group told him to stop attending their events. He stated that later that day, ████ told him that ████ accused him of sexual assault, but that ████ thought the sexual encounter was consensual. He said that ████ told him that ████ asked if he wanted to perform anal sex and that they had anal sex. ████ recalled that someone told him that ████ was crying when she left ████ room, but he could not recall who shared that information with him.

 **ADV CATE**

**Your Information**

**Your name**

**What is
your
affiliation?**
Resident
Assistant

**Incident**

**Nature of incident**

Sexual Misconduct/Title IX-Related

**How did you
learn of the
incident?** Phone
Call

**Student involved
in the incident**

**Factual account
of the incident**

Case 1:20-cv-00996  Document 1-3  Filed 11/02/20  Page 60 of 178

▮▮▮▮ last name unknown), a friend of ▮▮▮▮▮▮▮▮▮▮ called ▮▮▮▮▮ the RA on call at 3:43am. ▮▮▮▮ t name unknown) was also in ▮▮▮ room at this time. ▮▮▮told ▮▮▮ that ▮▮▮ had been engaged in consensual, vaginal sex. ▮▮▮ told ▮▮▮hat then, the male ▮▮▮ was with asked ▮▮▮ if she wanted to have anal sex. ▮▮▮ said no, but the male had anal sex with her while ▮▮▮ was trying to get away. ▮▮▮ aid ▮▮▮ was drunk. When ▮▮▮▮▮ saw ▮▮▮ ppeared slightly intoxicated but more emotionally distressed than anything else. ▮▮▮ as not physically harmed but looking for sources of information to help navigate next steps. At that point, ▮▮▮ alled the RC on call to help sort through anonymous, emergency options for ▮▮▮ Since ▮▮▮ was still somewhat intoxicated, ▮▮▮▮▮ and ▮▮▮ did not want her to make legally binding decisions. ▮▮▮ paged the RC on call 3 times (3:46am, 3:52am, and 3:57am) with 2 different cellphone numbers but did not receive any callbacks (as of 4:55am). At that point, ▮▮▮ searched for the Women's Center website and called the emergency page number to reach nurse Sheila. Nurse Sheila talked to ▮▮▮ directly and recommended ▮▮▮ o come to the emergency room for a physical examination. ▮▮▮ called 911 initially for a hospital transport and was re-routed to Duke University Police Department (DUPD). DUPD began asking questions about ▮▮▮ and ▮▮▮▮▮ formed the DUPD that ▮▮▮ had been raped. ▮▮▮▮▮ did not feel comfortable with the number of questions DUPD was asking. DUPD said okay, and they would call back later. ▮▮▮ alled nurse ▮▮▮ o confirm this was a good, legal option. Nurse ▮▮▮ confirmed this option and told ▮▮▮ did not need to answer any questions if she was not comfortable. At that point, DUPD called ▮▮▮ back and informed ▮▮▮ hat Officer Weaver was on her way to pick up ▮▮▮ n front of Pegram dorm. ▮▮▮ outside to the waiting police cars.

**IR#**

00079-2018

**Reported On**

January 19, 2018 5:04 AM

**Additional Incident and Student Information**

**Date/Time of incident**

January 19, 2018 2:30 am

**Wa**
**DUPD**

invol
ved?
Yes

**Incident location**

On-Campus Residential Pegram

**Room**



Case 1:20-cv-00996   Document 1-3   Filed 11/02/20   Page 62 of 178

**Attachment B** ███████████████████████

I came to ████████ born ████████ at around 2:30AM on the morning of Friday, January 19, 2018, although it was still Thursday night to us as we had been out that night at a first "pregame" and then Devine's. Upon arriving at ████████ ████ of me in the building and I was under the impression that he and I would be alone in his room after earlier conversation. I came to ████ com with the explicit intention of having sexual relations with him including oral and vaginal sex, if consensual. I had no intentions of participating in anal sex that night.

When we arrived in his room, his roommate was present and I expressed that I was uncomfortable with this, and brought up that we could have been alone in my room instead, as I have a single. He complained about the distance of my dorm and said his roommate had on headphones and was too concentrated to notice us. His roommate never looked at me to my knowledge.

After uncomfortably agreeing to stay in his room, only because his bed was fully lofted (high and out of eyesight of his roommate, who was playing a computer game at the desk), I struggled to climb up his lofted bed, as my coordination was impaired due to the alcohol. I explicitly told ████ I'm drunk. Like really drunk. I wouldn't be here if I were sober. Sober me knows better because you have been a jerk to me all night. You were rude about having to pay cash for me at Devine's even though I Venmo-ed you the money before we even got in, and I had been telling you since right before the pregame that ████ ad my cash and if I took the Uber with you, I wouldn't have cash. You still told me to leave my friend and it would be fine, you'd take care of it. Then you left me in Devine's. Totally disappeared. And when I wanted to come over tonight, you rushed me and made me come after lying about your roommate not being here. But I'm here now so whatever I guess."

████████ gued that he hadn't been a "jerk" and that Devine's hadn't been a big deal. He said he can't think his roommate would be in the room because he was supposed to be tenting. We started to kiss shortly after this argument. I didn't proceed further with my side of the argument because I saw he wouldn't agree with me.

As things progressed, he undressed me. He was already only in his boxer-briefs. He threw both my pants and my shirt off the bed and onto the floor, even when I asked him not to because then I would be forced to be only in my bralette and thong in front of his roommate when I got dressed later. I managed to keep my bralette and thong on the bed. After heated kissing of mouth and body, ████ performed consensual oral sex on me, and consensually penetrated my vagina with his fingers. I asked for a condom and he proceeded to get one and put it on. He next penetrated my anus with his fingers, which I was uncomfortable with, but allowed to happen and I am qualifying as consensual exploration, although there was no verbal discussion of this.

We then had penile-vaginal sex in the missionary position. He stopped after a bit and said I had ripped the condom, to which I replied, "Do you have another?" I pulled off the one he had on, which seemed to upset him, although I didn't understand why since he had just said to me it had ripped. He left the bed, got another, and climbed back up. I asked if we could switch to doggy-style then, and he put on the new condom. We continued to have penile-vaginal sex in the doggy-style position and he again pushed his fingers into my anus. I tried to be receptive to

the fact that he seemed interested in anal, so while still in the doggy-style position, I nervously said, "I've never tried anal before, but if you have lube, I am willing to possibly try it." He replied, "Spit."

We had used "spit" as an additional lubricant to natural secretions once or twice to get things started with the penile-vaginal sex, but I was not okay with using spit as the sole lubricant for anal. I would not have even brought up trying anal sex if he had not seemed to want to so aggressively through his penetration of my anus with his fingers (without asking me). I answered him, "No. Spit is not okay. If you don't have real lube, I don't want to." We were still in position for doggy style during this conversation, but the penile-vaginal and finger penetration had ceased mid-way through my sentence about considering trying anal.

Despite this, ▮▮▮ roceeded to penetrate my anus with his penis. He continued for several thrusts, and the entire time I was expressing that it hurt and I did not want to be participating. "Ow. This hurts. Stop! I said not Ow, Ow, Ow." I looked down to my belly and wished it to stop with all of my might. I was pressed against the end of the bed and trapped. His penis slipped out of my anus after several thrusts, although I do not think it was purposeful. The manner seemed more similar to an accidental slip that is common with broad thrusts in penile-vaginal sex, in my experience. I immediately rolled over at the opportunity to escape, to a sitting position so he could not reach my anus again. I immediately stated, "I want to leave. Right now. I want to leave." He said something along the lines of "You've been difficult all night. LEAVE if you want to."

I located my bralette and thong while on the bed and quickly put them back on. I said, "Let's talk about this. I want to talk about it." My intentions were to again express that I did not consent to what had just happened, but he only told me, "No. Just fucking leave." He climbed off of the bed and I followed, immediately locating my shirt and pants and dressing, I repeated several times, "You're such a fucking asshole. I can't believe you. What a fucking dick." He stood in the doorway as I quickly walked out. There was a boy brushing his teeth in the bathroom down the hall; I looked him in the eye while I was on the verge of tears, gestured to ▮▮▮ who was still in the doorway of his room down the hall, and said, "He is a fucking asshole."

I began to pick up my pace with every step, trying to navigate to the stairs and out of the building while intoxicated and panicking. I pulled on my jacket just as I found the stairs, and made it halfway down one flight before bursting into tears. I sat down as the weight of what had just happened hit me even harder. I called the first person who came to mind, ▮▮▮ She lives in my building and I figured she would be awake. I needed help. I needed someone. I pulled myself together the best I could, enough to stand up and leave the building. On my way back to Pegram, I was crying so hard I could not stand upright for more than a few seconds. When I had made it to the Blackwell arch, ▮▮▮ and his frien ▮ ound me. They asked me if I was okay, but I could not articulate my thoughts over my sobs. They both helped physically support me and led me back to ▮▮▮ all the way to ▮▮▮ room. I could only say, "I can't believe what just happened. How could this happen?" Once I got to ▮▮▮ room, I continued to cry while she held me. I collapsed onto her on her roommate's bed. She and ▮▮▮ ▮▮▮ ried to comfort me, and she eventually began calling other friends of mine to come help. ▮▮▮ ▮▮▮ was the first to answer the phone. He came over from ▮▮▮ o ▮▮▮ It was approximately 3AM.

Case 1:20-cv-00996   Document 1-3   Filed 11/02/20   Page 64 of 178

They tried to lead me back to my room, but I couldn't make it. I collapsed in the hallway, unable to get up because of the emotional stress. I was crying as hard as I ever have before. I laid on the floor screaming, trying to process how this could have happened to me, but I couldn't process any real, coherent thoughts. Somehow they got me to a standing position and ██ unlocked my room. I collapsed again. I lay on the floor in a ball crying, screaming, exclaiming, until ████ ██ she had no option but to call the Resident Assistant on-call, ████

I remember ████ ██ ████ talking while ████ held my head in his lap, but I could only catch a few words here and there. I was too consumed by the tears and the emotional and physical pain that kept me on the floor. Somehow, I ended up on the phone with Sheila Broderick from the Women's Center who talked me through some options. I tried to calm down enough to process what she was saying, but it was difficult. I weighed my options as best I could, given that I was in such distress, and decided to go to the hospital to have an exam done. ████ called for transport while ████ frantically tried to prepare a bag to take with us. I was able to stand at this point, as the anger was hitting me. I hit my bed several times, so frustrated by the events of the night. I became too exhausted to continue.

████ helped me change clothes because I told her I could not stand to stay in the clothes from that night; she went with me to the bathroom and helped me clean up as best as we could. ████ stayed at Pegram and I requested that ████ and ████ both accompany me to the hospital; I absolutely needed them both. I could not go without them. I could not do this by myself and they both knew different pieces of me. They made me feel safer and were helping to ground me. The tears finally mostly stopped, and the numbness set in. I started to feel the pain in my anus more and tried to respond when people spoke to me. I went emotionally numb then. All I could feel was the physical pain. My brain had stopped. I became a shell of a person. I remained in this state until late the next morning, when we returned to the dorm from the hospital.

We arrived at the hospital around 4:30AM. While there, I slept for a short period, but only after they administered Tylenol to help my physical pain subside, and only because I was too exhausted to stay awake. I was terrified to sleep because I feared my brain would make me relive the events of the night. Make me relive how I had been violated. Although moments kept flashing through my head that caused me to cry for a short time again or send me into an internal panic, if I stayed awake, I could focus on ████ ████ ████ They were there to make things better. They kept me holding on.

This is an account of the events of the morning of January 19th, 2018 as best that I, ████ ████ could remember and recount them as of January 20th, 2018.

## Attachment C ( ███ Written Statement)

Dear Ms. Krebs,

Please accept the following as my written statement in response to your revised letter dated May 7, 2020.

I am from ███ a small town in ███ where many of the things I value at Duke are ███ to my freshman ███ believed that my future and what I could accomplish had limits. However, soon after joining Duke's class of 2021, I realized that there were no limits – at least so I thought – to what I could accomplish.

Just last week, I was asked specifically about what I believe to be the real value in a school like Duke and without a doubt, it is the ambition of the students, faculty, and administration. My exposure to the exceptional level of ambition present at Duke completely changed the way I saw the world and my place in it. The limits I previously believed existed suddenly disappeared when I joined Duke and a new frontier of opportunity and possibility emerged.



I say all of this not to revel in my own accomplishments but as an expression of my gratitude for Duke and my appreciation for the education and the opportunities – an appreciation that I would never jeopardize by committing a violation of a university policy particularly in the manner that was alleged.

My experience at Duke has not been all positive. In fact, I'm now realizing that all of the accomplishments described above have been shadowed by a false allegation that has unbeknownst to me, followed me over the last 28 months. While I have certainly had my share of low points, none have impacted me more or persisted longer than the false allegations stemming from a consensual encounter with the Complainant in January of 2018. Not only did this false allegation prompt the letter that led to this written statement, it also alienated me from my peers, paralyzed me in fear when I humbly ███████████████████████████████████ ut now, more than two years after the consensual encounter with the Complainant, the false allegation has invaded my home during a tumultuous time when students are no longer present on Duke's campus and I will be unable to adequately defend myself against such false yet damaging allegations, the repercussions of which touch many more people than just myself.

Case 1:20-cv-00996   Document 1-3   Filed 11/02/20   Page 66 of 178

In the spring of 2018 when fraternity rush began, I was out of my comfort zone. I had never been to large parties, but in an effort to fit the mold of what many of my friends valued, I joined in. At the time, I was romantically involved with a classmate and the two of us had plans for the coming weeks. However, on one of these evenings, my date was unavailable and because a date is custom at these rush events, I asked a friend of a friend if she would join as my plus one to the event. It was at this event that I believe I first met the Complainant. The Complainant was the date of one of my friends and we ended up talking briefly. I later learned the Complainant was also a friend of my date. I saw the Complainant briefly throughout the rest of the evening. Two days later, I ran into the Complainant at a party in the basement of a house. Because the basement was small and we were all in close quarters, we spoke a few times that evening. Eventually, we ended up making our way to Devine's. The Complainant repeatedly came up to me asking me to come back to her dorm with her. I left Devine's in an Uber with a few other guys. I did not leave with the Complainant. When I got back to my dorm, I had brushed my teeth and was ready for bed. I even recall putting my retainer in because I had no plans of seeing anyone after returning to my dorm. The Complainant was texting me repeatedly and calling. I believe it was the third call that I actually answered and then finally went to let her in my ████ dorm. After briefly engaging in small talk, we got into my bed and had consensual sex using a condom. In the midst of having consensual sex with her facing away from me, the Complainant explicitly stated "stick it in my ass" referencing my penis which despite being uneasy about the request, I figured I was more inexperienced than most, and did so until she told me to stop which I immediately complied with as soon as she told me to. We resumed consensual vaginal intercourse and afterwards I told the Complainant that I had class in the morning, and it was best if she didn't stay the night. A statement that I now realize was insensitive with far-reaching ramifications given the present false allegations lodged against me.

The following day, I received numerous texts indicating that I was no longer welcome in certain groups with friends I had built great relationships with. I was alienated from many of my friends as a result of a false allegation because I made the wrong decision and engaged in consensual sex with someone who used our consensual encounter as a means to attempt to socially ostracize me and has continued to try to use the consensual encounter a year later when I tried to join ████████ and two years later after a project that I've been working on ███████████

While I appreciate Duke giving me the opportunity to respond to the allegations prior to determining whether to officially charge me with a university policy violation, I am discouraged by the vindictiveness of a fellow Duke student. I have strived during my time at Duke to help as many other students on our campus as I possibly can, and I am first and foremost disappointed in myself for participating in a consensual encounter with a female student I didn't know well enough to have consensual sex with because had I known who she really was, I would never be in this position, and secondly, I'm disappointed in the Complainant for what she is trying to do to me when she is aware of her actions and her words during our consensual encounter and is now hurting the true Complainants who exist on our campus by making false allegations of misconduct.

I appreciate your consideration of the information herein.

Sincerely,

████████



Case 1:20-cv-00996   Document 1-3   Filed 11/02/20   Page 68 of 178

Where are you

I'm still here



I left

Dude

I'm so mad

I wanted t hook up with tu

I wanted t hook up with tu

You

Come to my dorm then

Come to my dorm then

What dorm/room?

I'll be there in like in hour

Lmk lol

Bet

I'm ready for ya

But you're not coming I bet

If you don't come soon I'm gonzo

      

Case 1:20-cv-00996   Document 1-3   Filed 11/02/20   Page 70 of 178



If you don't come soon I'm gonzo

I'm coming rn

You here?

No no

4min away

Cmonn

I'm comingggg

It's been 5 min

I'm going to bed if you Lyon

Case 1:20-cv-00996   Document 1-3   Filed 11/02/20   Page 71 of 178

**Attachment E**



Not to scale. Drawn to the best of my memory May 20, 2020

## Attachment F ( ▮▮▮ Medical Records)



Race: Patient: Hispanic
Assailant: White or Caucasian
Number of Assailants: 1

County/City Where Offense Occurred: Durham City
Offense Reported to: Anonymous
Case Number: N/A

Date of most recent consensual sexual contact: 1/19/2018
   Was condom used? Yes
Consensual sexual contact after the assault: No

Vitals:
Vitals

| | 01/10/18 0948 |
|---|---|
| BP: | (1) 112/57 |
| Pulse: | 89 |
| Resp: | 16 |
| Temp: | 36.5 °C (97.8 °F) |

Medical History:
Past Medical History:

Current Outpatient Prescriptions:

Allergies: Patient has no known allergies
Immunizations:
Immunization History:
Administered

Generated on 6/19/20  8:16 AM



**HISTORY**
Any recent illnesses or trauma? Periorbital abscess drained in december, yeast infection (stll taking medication for it)
Any serious medical conditions/hospitalizations? no
Parity: Gravida 0  Para 0
Last Menstrual Period: IUD 09/21/2017
Pregnant: Negative UPT this visit
Currently Menstruating: No
Tampon use in the last 24 hours: No
Routine contraceptives used: Yes
Contraceptive Type: IUD and condoms
Recent history of None
Anal genital injuries, surgeries, diagnostic procedures or medical treatment will in past 60 days which may affect findings? Taking fluconazole for yeast infection
Pre-existing physical injuries: denies
Loss of consciousness: No

Patient's General Appearance: Clean/neat

Patient's Behavior/Affect/Orientation: cooperative and quiet

SANE Medical Forensic Interview occurs in SANE room with Crystal Cinder and patient

**PATIENT'S ACCOUNT OF INCIDENT:** Assailant ▮▮▮▮
We got to his room around ▮▮▮ and his room mate was there in the room with head phones in. Which I wasn't comfortable with but I was pretty drunk. I said I was uncomfortable with it but whatever I was really drunk. I expressed to him several times that I was really drunk. There was an argument about him leaving me or dennes. I also had a single (room) so I don't understand why I had to come to his place if I have a single. I don't have a roommate. He has a loft bed so I climbed up. He was not very concerned. He climbed up after me. I explicitly said that I wouldn't be there I was sober because he was such a jerk. We had consensual vaginal sex with a condom. At some point during that he shoved his fingers up my ass without consent. I didn't say anything. That was missionary. And then I asked to switch to doggie style. When was fine for awhile. I had never tried anal sex but I said if he had lubricant I would try it but he said he didn't have lubricant so I said I was not comfortable with it. I said I did not want to do it. To which he said "spit" to quote him and I said no that wasn't ok I didn't want to. Then he proceeded to penetrate me anally anyways. Then I yelled because it isn't I expressed that it hurt and I was not ok with it at all. I pulled away and rolled over and started grabbing my clothes and saying I wanted to leave because it wasn't ok. He just got angry and expected that I should leave. I said I wanted to talk about what happened and why it wasn't ok. He told me no just leave. He threw my shirt and pants off so I had to crawl down off the bed in my bra and underwear in front of his roommate to find my

Generated on 6/13/20 8:31 AM



**SANE Note by Crider, Crystal Hunt, RN at 1/19/2018 10:00 AM [continued]**

clothes. There was someone in the bathroom who saw me leave. I barely made it out of the building before I collapsed and started crying



1. Orifices Involved: Vagina and Rectum

2. Did penetration take place, however slight? Yes. Describe: Penile vaginal and penile anal Object: Penis How far into orifice: into vagina and anus

3. Ejaculation? No

4. Condom Used? Yes

5. Since offense, patient has: Changed Clothing and Urinated

6. Since offense, patient has not: Bathed, Brushed teeth, Douched, Eaten, Had bowel movement, Showered, Sponge bath to genital area, Used mouthwash and Vomited

7. Any oral ext injuries resulting in bleeding? No

8. Did you scratch assailant? Yes (collect fingernail swab). Location scratched: I scratched his back

9. Did assailant bleed? No

10. Were any medications, drugs, or alcohol taken before assault? Yes. Amount: 4 shots of vodka and 1 beer Type: vodka and beer

11. Were any medications, drugs, or alcohol taken after assault? No

## SEXUAL ASSAULT EXAM REPORT
Source of information: Patient

Acts described by patient:
Offender to Patient: oral copulation of genitals and kissing patient
Patient to Offender: none

Patient's state of dress during reported assault: nude

Approximate size of assailant relative to patient: He is taller [redacted] am not the best as guessing
Physical erection: N/A
Other forms of coercion: alcohol/drug facilitated assault (voluntarily drank vodka and beer)
Strangulation during assault? No

Methods of Concealment by Assailant(s)
Gloves? No

Generated on 6/18/20 6:36 AM

Case 1:20-cv-00996   Document 1-3   Filed 11/02/20   Page 75 of 178



Mass? No
Washed Self? No
Washed Out? No
Other? No

### PRESENT PHYSICIAL FINDINGS

Denies any pain or injury since incident, tenderness to right side of anus, no tears, bruises or bleeding noted.

Body Diagram: see physical diagram

Injuries noted prior to speculum insertion: speculum insertion not performed

Genital Diagram: No findings noted

Injuries noted after speculum insertion: no speculum insertion performed

Genital Assessment
**Female Genital**
Tanner Stage
Adult: yes
Breasts: V Mature breast
Pubic Hair: shaved
Perineum: No noted findings at this time
Labia Majora: No noted findings at this time
Clitoris: No noted findings at this time
Labia Minor: No noted findings at this time
Periurethral tissue/urethral meatus: No noted findings at this time
Hymen: not visualized
Posterior Fourchette: Not visualized
Vagina: Not visualized
Vaginal discharge: Yes, describe (red in color, Pt reports she has had some light bleeding for 1 month.)
Vaginal vault: Not visualized
Cervix: Not visualized

Position used for genital examination: Frog Leg

Anal Assessment:
Buttocks: No noted findings at this time
Perianal skin: No noted findings at this time
Anal findings: findings include tenderness to right side
Anal tags: No
Anal fissures: No

Position used for anal examination: Knee Chest

Assessment of Fluorescence:
Alternative Light Source (High Spectrum Four Light) used: No

Assessment of Toluidine Blue Dye:
Toluidine Blue dye used: No

Case 1:20-cv-00996   Document 1-3   Filed 11/02/20   Page 76 of 178



## FORENSIC SPECIMENS

UPT: Yes  Results: Negative

Pubic Hair Combing: Not collected. Reason: No pubic hair
Blood (DNA): Collected
Buccal swab (DNA): Collected
Swabs for semen/sperm Collected: Vaginal and Rectal
Swabs for saliva on skin: Collected: Vulva
Other specimens/evidence collected: Debris (curly hair from pt's t raccoat)

Drug Facilitated Rape Drug Screen (includes alcohol) - Blood: Not collected
Drug Facilitated Rape Drug Screen - Urine: Not collected

Photographs taken: Yes
Photo type: Digital Picture Standards
Inventory of photographs:
Patient ID (photo # 1,2)
SANE ID (photo # 1)
Patient's face (photo # 3)
Front of patient (photo # 4 5)
Left side of patient (photo # 10, 11)
Right side of patient (photo # 6 7)
Patient ID (photo # 12)
Disposition of film: Digital macro lens pictures uploaded to SharePoint

Clothing Obtained as evidence. None  patient instructed how to preserve clothing for evidence

PERSONNEL INVOLVED
Interpreter Used? No
DCRC notified? no; not present - patient declined

## PLAN

Consultation, ED Staff Physician

Prophylactic/Antibiotics given: None
Pregnancy Prevention given: No  IUD in place and condom used
HIV Counseling: Discussed relatively low risk of HIV with this assault.
Follow-up Instructions to Patient: Preprinted discharge instructions reviewed with patient. Discussed need to
return to ED if patient becomes depressed or suicidal

Disposition: Discharge by SANE. Time 1200 To: Care returned to Primary Care Provider in ED for discharge

Accompanied by (Name and Relationship): PT had two friends in room with her.

Case 1:20-cv-00996   Document 1-3   Filed 11/02/20   Page 77 of 178

**I. Description of the Incident**

1. Brief account of the assault:

During consensual penile-vaginal sex the assailant penetrated anus after pt said no.

2. Date of assault: 1/19/18   3. Time: 0230-0300

4. Location:

5. No. of Assailants: 1   6. Race: Caucasian   7. Sex: M

6. Attacker: Known ☑   Unknown ☐   Relative ☐

9. Were any threats used?   Yes ☐   No ☑
If yes,   knife ☐   gun ☐   choke ☐   fists ☐
verbal threats ☐   restraints ☐   blindfold ☐
other: _____

10. Was there penetration of

| | Attempted | Actual | No | | Ejaculation | | |
| | | | | Yes | No | Unsure |
| Vagina | ☐ | ☑ | ☐ | ☐ | ☑ | ☐ |
| Anus | ☐ | ☑ | ☐ | ☐ | ☑ | ☐ |
| Mouth | ☐ | ☐ | ☑ | ☐ | ☑ | ☐ |

11. Was a condom used during assault?   Yes ☑   No ☐   Not sure ☐

12. Did other types of penetration occur?

| | Yes | No | Not sure |
| Digital | ☑ | ☐ | ☐ |
| Foreign object | ☐ | ☑ | ☐ |
| Oral Penetration of Vagina | ☑ | ☐ | ☐ *If yes, collect external genitalia swabs — swabs not provided in kit) |

Other (specify): _____

13. Since the assault, has the victim?

| | Yes | No | | Yes | No |
| Douched | ☐ | ☑ | Bathed or showered | ☐ | ☑ |
| Urinated | ☑ | ☐ | Eaten | ☐ | ☑ |
| Gargled | ☐ | ☑ | Drunk | ☑ | ☐ |
| Defecated | ☐ | ☑ | Changed clothes | ☑ | ☐ |

14. Were any medications, drugs, or alcohol taken before or after the assault? (Include non-voluntary consumption)
Yes ☑   No ☐   Not known ☐   Amount: 1 can   Type: beer

15. Current Menses   Yes ☐   No ☑   Tampon ☐   Pad ☐
(Air dry, place in paper bag, label, and seal.)



Fri, Jan 19, 3:08 PM

What'd you tell people

Dude what'd you do

What'd you tell people

Dude what'd you do

Are you okay??

Please don't tell people I raped
you ████ I have no idea what

happened and I'm hearing a lot
of stuff

Fri, Jan 19, 7:07 PM

talk to me please

My name is ▮▮▮▮ and I really
do not think that is a good idea.

Delivered

I am just so confused, I
want to know what you're
saving



1:39 PM    ◐ @ ✈ ≭ 65% ▭

Case 1:20-cv-00996   Document 1-3   Filed 11/02/20   Page 80 of 178

Please don't tell people I raped you ███████ I have no idea what happened and I'm hearing a lot of stuff

███████ talk to me please

My name is ███████ and I really do not think that is a good idea.

Delivered

███████ am just so confused, I want to know what you're saying

I've heard some terrible things and I don't know where they're coming from I just need to talk to you

   

**Attachment H (⬛ Sketch of ⬛ Room)**



## Attachment I (Dean Victoria Krebs' February 12, 2019 notes (redacted)

Incident Report  2019: Note "Update/Close File"



## Attachment J (Text Messages between  )



≑ 27% ⏻

What's going on

Where's

Please talk to me

> Hey right now it's probably best if you don't talk to her or do anything you may regret, I know it's frustrating and hard to hear but the best thing to do right now is wait and not make contact with people or react to anything you hear

Okay can you please just tell her if what's going on is all true I really had no idea what was going on and if I did that I fucked up bad but I really don't think I would do that

Can I talk to her

> Yeah I'll tell her

> Probably not the best idea today

Why? Is she okay?

> Just lay low right now that's the best thing

Okay but is she okay?

> I don't know how to respond to that, of course she's not okay

But last night after she was totally fine we talk a little bit and then she left I'm still so confused where it went wrong

She made fun of me alittle bit and we laughed and then she left

> I'm not really in a position to say anything but if i



⟳ 27% 🔋

I'm not really in a position to say anything but if i were you I'd stop talking to people about this whole thing

Why?

It's just what I would do, it's the smartest option for yourself right now

But why? Like it's not fair if she can just tell people I raped her, there's way more to the story than that

Thanks

How is doing

if you want to meet with her to ask her a few questions she's willing to do that, but don't text her about it just talk through me

it's nice that you asked

Yeah id really appreciate that

when are u free?

Tomorrow after 4:10. Wednesday morning or after 4:10

I'll let her know

Thank you

Wednesday morning at 9?

Case 1:20-cv-00996   Document 1-3   Filed 11/02/20   Page 85 of 178

But why. Like it's not fair if she can just tell people I raped her, there's way more to the story than that

Thanks

How is ▮▮▮ doing

if you want to meet with her to ask her a few questions she's willing to do that, but don't text her about it just talk through me

it's nice that you asked

Yeah id really appreciate that

when are u free?

Tomorrow after 4:10, Wednesday morning or after 4:10

I'll let her know

Thank you

Wednesday morning at 9?

She needs to know.

Thanks for the texts and the offer to meet with ▮▮▮ I don't think it would be a good idea for us to sit down and talk right now. Maybe after sometime has passed we could sit down. Thanks again for offering.

Case 1:20-cv-00996   Document 1-3   Filed 11/02/20   Page 86 of 178

**From:**
**To:** Erikia Lleex
**Subject:** FW: Statement
**Date:** Wednesday, May 27, 2020 1:22:30 PM

I also emailed it to her that same day in February. I've forwarded that email to you.

Sincerely,

███████

Date: Friday, February 2, 2018 at 8:17 PM

### Subject: Statement

On the morning of Friday, January 17th at 2:51 am, ███████ texted me. She was sobbing and speaking incoherently. I then heard a knock on the door and opened it to find ███████ and two boys who I knew. They were practically carrying her as she was essentially limp. They asked me to take her and I put her arms around my shoulders and we climbed up onto my roommate's bed. Between sobs she informed me that she had just left ███████ dorm. I knew ███████ pretty well because I had accompanied him to ███████ state functions. She proceeded to tell me that earlier they were having consensual vaginal sex in his room while his roommate was there. She said that she had expressed reluctance to begin sexual activities with ███████ while his roommate was there but ███████ told her he had headphones in and didn't care. Then she told me they proceeded to have vaginal sex and he threw her clothes on the ground far away from the bed. She then told me that they talked about doing anal sex and she said she would've done it if he had had lube but he did not. She told me he expressed that to him but he entered her anus anyway. This is as much information as I gathered at that time, calling her friend ███████ and her came to my dorm room. I had planned to leave her with him but as I was walking up the stairs I could still hear her sobs and I knew that I could not leave her. I went back downstairs and saw her lying in the middle of the hallway unable to walk more than 10 feet at a time without collapsing. We made it to her room and ███████ started hyperventilating repeatedly. This concerned me from a medical standpoint as it kept happening every 5 minutes. I called the RA on call and ███████ came to the door. I informed her of what happened and ███████ made the decision to go to the hospital after talking to the Duke Women's Center. I rode in the car with ███████ and arrived at the hospital sometime early in the morning.

⚡ 40% ▮



1 ∗ 2, 2014    03:27

On the morning of Friday, January 17th at 2:51 am ▮▮▮▮▮ called me. She was sobbing and speaking incoherently. I then heard a knock on the door and opened it to find ▮▮ and two boys who I knew. They were practically carrying her as she was essentially limp. They asked me to take her and I put her arms around my shoulders and we climbed up onto my roommate's bed. Between sobs she informed me that she had just left ▮▮▮▮▮ room. I knew ▮▮ pretty well because I had accompanied him to ▮▮▮▮▮ late functions. She proceeded to tell me that earlier they were having consensual, vaginal sex in his room while his roommate was there. She said that she had expressed reluctance to begin sexual activities with ▮▮ while his roommate was there but ▮▮ told her he had headphones in and didn't care. Then she told me they proceeded to have vaginal sex and he threw her clothes on the ground far away from the bed. She then told me that they talked about doing anal sex and she said she would've done it if he had had lube but he did not. She told me he expressed this to him but he entered her anus anyway. This is as much information I gathered at that time. I called her friend ▮▮ and he came to my dorm room. I had planned to leave her with him but as I was walking up the stairs I could still hear her sobs and knew that I could not leave her. I went back downstairs and saw her laying in the middle of the hallway, unable to walk more than 10 feet at a time without ▮▮ collapsing. We made it to her room and ▮▮ started hyperventilating repeatedly. This concerned me from a medical standpoint as it kept happening every 5 minutes. I called the RA on call and ▮▮ came to the door. I informed her of what happened and ▮▮ made the decision to go to the hospital after talking to the

## Attachment L (

Very early Friday morning around 3 am, I was lying in bed getting ready to fall asleep when I got a call from ▮▮▮ phone and on the other end line was ▮▮▮ asking for me to come over to ▮▮▮ dorm immediately. I hopped out of my ▮▮▮ ▮▮▮ at 3:31, texting ▮▮▮ again through ▮▮▮ phone to let me into the dorm. Once inside I heard and saw ▮▮▮ sobbing in the common room with mascara running down her face. I have never seen ▮▮▮ his hysterical before ▮▮▮ tried to catch me up on what exactly was going on and what had happened earlier that night (morning). From what I heard from ▮▮▮ earlier that night (morning) around 2.30 am ▮▮▮ as having consensual vaginal sex with a guy in ▮▮▮ I do not remember his name. Then, he began to anally rape her after she had said no a few times and was very clearly not having any of it, and he continued to do so. While ▮▮▮ as in the ▮▮▮ room, his roommate was also in the room as well, listening to music. The roommate became more of an issue when the guy she was having sex with threw down her clothes so she had to walk poorly clothed in front of him as well. Then, she broke down crying in the hallway and could not walk far without breaking down in tears. After getting most the story, ▮▮▮ and I walked ▮▮▮ up to her room where she continued to cry and scream for a while. At that point, ▮▮▮ found the RA on call and then the two of them came over into ▮▮▮ room. Once the RA was there we were debating different actions we could take, and ▮▮▮ went to the bathroom and changed out of her clothes. Then we called the women's clinic, I am not sure exactly what they called first, but I know that ▮▮▮ lked with a nurse for a while on the other end of the phone and they ▮▮▮ as talked into going to the hospital. Also, the RA called RC and never really got a response, so we got the Duke police to drive us over to the emergency room. ▮▮▮ went in one car and I went in another. At the hospital, we got a room rather quickly around 5:00 am, and talked with medical staff. The medical professional who specializes in these types of situations did not show up until around 10 am the next morning. The time in between 5 am and 10 am is a bit hazy as I was passing in and out of sleep. Around 10 am ▮▮▮ was examined and ▮▮▮ came back to the room. Finally, we received the discharge papers to go home. I think I returned around 11 am, maybe 12 pm

Case 1:20-cv-00996   Document 1-3   Filed 11/02/20   Page 89 of 178

**Attachment M (Text Messages Between** 



# Exhibit D

Duke UNIVERSITY

October 7, 2020



Dear Mr. ▮▮▮▮,

A panel of the Appellate Board comprised of Dr. Carmen Rawls, Pratt School of Engineering Assistant Dean; Tasha Curry-Corcoran, Student Affairs Education and Training Associate Director; and me, reviewed the appeal of the hearing panel decision in case 00079-2018, dated August 16, 2020. The panel found you responsible for Sexual Misconduct, namely Sexual Violence.

You raised an appeal on the basis that there were procedural errors that materially impacted the hearing panel's decision. In support of your appeal, you submitted a written statement on September 2, 2020. The Complainant declined to submit a written response. The appellate panel convened a hearing on September 30, 2020, which you attended, accompanied by your advisor, via Zoom. The Complainant did not attend.

After conducting a thorough evaluation of the issues you raised in your appeal and reviewing the hearing panel record, the appeal statements, and the information presented at the meeting, we determined, by a 3-0 vote, that the appeal grounds were not substantiated.

You alleged seven procedural errors that materially impacted the hearing panel's decision.

1. You argued that you were unable to prepare for and question a key witness, Dean Victoria Krebs. Specifically, you assert that you were denied access to "essential information," namely the full, unredacted, notes from your February 2019 meeting with Dean Krebs and that you were not informed that Dean Krebs would be a witness at the Student Conduct Board hearing.

   The appellate panel concluded that there was no "procedural error that materially impacted the hearing panel's decision." First, the panel observed that Dean Krebs was on the witness list provided to you more than 120 hours in advance of the hearing, as is required under the policy. Thus, you had adequate opportunity to prepare to question her as a witness. Second, the appellate panel was unpersuaded that you were denied access to the full unredacted note. You had the opportunity to review the investigator's report, but did not object to the inclusion of only a redacted version of the notes, nor did you request in writing the notes in preparation for the hearing. While you maintain that you requested the notes in a pre-hearing meeting with Dean McCullers, she denies that request was made and there's no documentary evidence to support it. When you did request the notes to prepare for your appeal, the Office of Student Conduct supplied them promptly. Third, there is no evidence to support the conclusion that the unredacted notes would have "materially impacted the hearing panel's decision." Importantly, despite the fact that you now have the unredacted notes, you did not provide the notes to the appellate panel. Nor did you provide any explanation of why the notes would have been relevant to the hearing panel's decision.

2. You argued that Dean Krebs, as a witness, "made decisions on what evidence was relevant, what would be provided to [you], and what information would be included in

the hearing packet provided to the panel." However, we determined that only the Office of Institutional Equity investigator in this case made the determination as to what would be included in the Investigative Report and which portions of Dean Krebs' notes would be redacted. As a result, we found no evidence of a conflict of interest.

3. You also argued that it was a conflict of interest for Dean Krebs to both be a witness and determine what portion of her notes were included in the investigative report. Because the investigator made the decision about the notes, we found no evidence to substantiate this basis for the appeal.

4. You argued that "had [your] hearing been moved to the following week as [you] requested, [you] would have been entitled to have [your] case resolved under the new Title IX grievance procedures adopted by Duke on August 14, 2020." According to a technical assistance document issued by the Department of Education's Office for Civil Rights, the new Title IX regulations do "not apply to schools' responses to sexual harassment that allegedly occurred prior to August 14, 2020." Because the allegations against you concerned conduct in January 2018, it was not a procedural error for the Office of Student Conduct to use the procedures set forth in the 2019-2020 Student Sexual Misconduct Policy.

5. You argued that witnesses who testified to the Complainant's "emotional capacity" were prejudicial. The calling of witnesses and the admission of evidence is left to the discretion of the hearing panel, and the appellate panel found no evidence that the witnesses' testimony was prejudicial.

6. You argued that "the virtual nature of Zoom did not provide an adequate opportunity for the panel to properly evaluate the credibility of the witnesses, Complainant, or Respondent." Nothing in the policy prohibits the use of Zoom for a hearing, and you have pointed to procedural error in the administration of the virtual hearing.[1]

7. You argued that the panel did not apply the preponderance of the evidence standard. However, the hearing panel's decision clearly states it applied the preponderance of evidence standard. To the extent that this ground for appeal asks the appellate panel to reweigh the evidence, that is not an appropriate ground for appeal.

For the reasons explained above, the appellate panel voted to uphold the hearing panel's decision and deny the appeal. We know you will be disappointed in this outcome, and we want you to know that we reviewed the case thoroughly before reaching our decision.

Sincerely,

Tenth A Bunds

Tim Bounds
Division of Student Affairs
Chair, Appellate Board

---

[1] Your appeal notes that the Complainant and her advisor made a claim that your advisor rolled his eyes, and you imply this was only possible due to the virtual nature of the hearing. Even if true, this would not be a procedural error, and there is no evidence that the alleged eyerolling had any impact on the hearing panel's decision.

# Exhibit E



The Duke Community Standard in Practice:
A Guide for Undergraduates
2017-2018





## UNIVERSITY'S MISSION STATEMENT

James B. Duke's founding Indenture of Duke University directed the members of the University to "provide real leadership in the educational world" by choosing individuals of "outstanding character, ability, and vision" to serve as its officers, trustees and faculty; by carefully selecting students of "character, determination and application;" and by pursuing those areas of teaching and scholarship that would "most help to develop our resources, increase our wisdom, and promote human happiness."

To these ends, the mission of Duke University is to provide a superior liberal education to undergraduate students, attending not only to their intellectual growth but also to their development as adults committed to high ethical standards and full participation as leaders in their communities; to prepare future members of the learned professions for lives of skilled and ethical service by providing excellent graduate and professional education; to advance the frontiers of knowledge and contribute boldly to the international community of scholarship; to promote an intellectual environment built on a commitment to free and open inquiry; to help those who suffer, cure disease, and promote health, through sophisticated medical research and thoughtful patient care; to provide wide ranging educational opportunities, on and beyond our campuses, for traditional students, active professionals and life-long learners using the power of information technologies; and to promote a deep appreciation for the range of human difference and potential, a sense of the obligations and rewards of citizenship, and a commitment to learning, freedom and truth.

By pursuing these objectives with vision and integrity, Duke University seeks to engage the mind, elevate the spirit, and stimulate the best effort of all who are associated with the University; to contribute in diverse ways to the local community, the state, the nation and the world; and to attain and maintain a place of real leadership in all that we do.

- Adopted by the Board of Trustees on February 23, 2001

The information in this bulletin applies to the academic year 2017-2018 and is accurate and current, to the extent possible, as of July 2017. The university reserves the right to change programs of study, academic requirements, teaching staff, the calendar, and other matters described herein without prior notice, in accordance with established procedures.

Duke University is committed to encouraging and sustaining a learning and work community that is free from harassment and prohibited discrimination. The university prohibits discrimination on the basis of race, color, religion, national origin, disability, veteran status, sexual orientation, gender identity, sex, genetic information, or age in the administration of its educational policies, admission policies, financial aid, employment, or any other university program or activity. The university also makes good faith efforts to recruit, employ, and promote qualified minorities, women, individuals with disabilities, and veterans. It admits qualified students to all the rights, privileges, programs, and activities generally accorded or made available to students. Duke University has designated Dr. Benjamin D. Reese, Vice President for Institutional Equity, as the individual responsible for the coordination and administration of its nondiscrimination and harassment policies generally. The Office for Institutional Equity is located in Smith Warehouse, 114 S. Buchanan Blvd., Bay 8, Durham, North Carolina 27708; 919-684-8222; ben.reese@duke.edu.

The university also does not tolerate harassment of any kind. Sexual harassment and sexual misconduct are forms of sex discrimination and prohibited. Duke University has designated Howard Kallem as its Director of Title IX Compliance and Age Discrimination Act Coordinator. He is also with the Office for Institutional Equity and can be contacted at 919-684-1437 or howard.kallem@duke.edu.

Questions or comments about discrimination, harassment, domestic violence, dating violence, and stalking can be directed to the Office for Institutional Equity, 919-684-8222. Questions or comments about sex-based and sexual harassment, domestic violence, dating violence, and stalking committed by a student can be directed to the Office of Student Conduct at 919-684-6938. Additional information, including the complete text of the university's discrimination and harassment policies and appropriate complaint procedures, may be obtained by contacting the Office for Institutional Equity at oie.duke.edu or the Office of Student Conduct at studentaffairs.duke.edu/conduct.

The Family Educational Rights and Privacy Act (FERPA), 20 U.S.C § 1232g; 34 CFR Part 99, is a federal law that guides the release of students' education records, of which disciplinary records are a part. For additional information about FERPA, see www.ed.gov/policy/gen/guid/fpco/ferpa/index.html.

Duke University is prepared to make reasonable academic adjustments and accommodations to allow students with disabilities full participation in the same programs and activities available to students without disabilities. The Student Disability Access Office assists students with disabilities who are enrolled in Trinity College and the Pratt School of Engineering. In order to receive consideration for reasonable accommodations under Section 504 of the Rehabilitation Act or the Americans with Disabilities Act (ADA), a student must have a physical or mental impairment that substantially limits one or more major life activities such as, but not limited to, hearing, seeing, speaking, breathing, performing manual tasks, walking, caring for oneself, and learning. Substantially limiting refers to an impairment that prevents an individual from performing a major life activity or significantly restricts the condition, manner, or duration under which an individual can perform a major life activity.

Students requesting accommodations under the provisions of Section 504 or the ADA (e.g., academic, housing, etc.) must consult Dot Mishoe, director, Student Disability Access Office, 919-684-8231 or 919-668-1329 TTY, to explore possible coverage. Students with medical conditions not covered under the provisions of ADA must consult Duke Student Health Services at 919-681-9355 for further information.

Duke University recognizes and utilizes electronic mail as a medium for official communications. The university provides all students with e-mail accounts as well as access to e-mail services from public clusters if students do not have personal computers of their own. All students are expected to access their e-mail accounts on a regular basis to check for and respond as necessary to such communications. Students are also required to provide an accurate local physical address and a cell phone number through DukeHub.

Information that the university is required to make available under the Student Right to Know and Campus Security Acts may be obtained from the Office of News and Communications at 919-684-2823 or in writing to 614 Chapel Drive, Box 90563, Duke University, Durham, North Carolina 27708.

Duke University is accredited by the Commission on Colleges of the Southern Association of Colleges and Schools to award baccalaureate, masters, doctorate, and professional degrees. Contact the Commission on Colleges at 1866 Southern Lane, Decatur, Georgia 30033-4097 or call 404-679-4500 for questions about the accreditation of Duke University.

This publication may be accessed online at registrar.duke.edu/university-bulletins.

# TABLE OF CONTENTS

## DUKE COMMUNITY STANDARD                                              11

Students' Obligation to Act with Respect to the Duke Community Standard    12
The Context of the Duke Community Standard                                 12
The History of the Duke Community Standard                                 13
A Statement of Principles                                                  14


## UNDERGRADUATE POLICIES                                               15

Academic Dishonesty                                                       16
Academic Freedom                                                          18
Advertisements                                                            18
Alcohol                                                                   19
Animals on Campus                                                         23
Bridge Painting                                                           23
Classroom Disruption                                                      26
Computing and Electronic Communications                                   26
Disorderly Conduct                                                        27
Drones                                                                    27
Drugs and Drug Paraphernalia                                              28
DukeCard                                                                  28
Failure to Comply                                                         28
Falsification/Fraud                                                       28
Fire Safety                                                               29
Gambling                                                                  30
Guests                                                                    30
Harassment                                                                30
Hazing                                                                    31
Noise                                                                     34
Physical Abuse, Fighting, and Endangerment                                35
Pickets, Protests, and Demonstrations                                     35
Property/Facilities/Services                                              36
Smoking                                                                   36
Solicitation                                                              37
Stalking                                                                  37
Unauthorized Surveillance/Photography                                     37
Weapons/Firearms/Explosives                                               38
Other Violations                                                          38

Case 1:20-cv-00996   Document 1-3   Filed 11/02/20   Page 98 of 178

## STUDENT SEXUAL MISCONDUCT POLICY AND PROCEDURES    39

I. Introduction    40

II. Scope    41

III. Prohibited Conduct    42

IV. Consent    43

V. Complaint Resolution    44

VI. Hearing Procedures    46

Getting Help    48

Examples of Sexual Misconduct    50

Student Conduct Process for Sexual Misconduct Allegations Flow Chart    52


## RESOLUTION OF STUDENT CONFLICT AND ALLEGED VIOLATIONS OF UNIVERSITY POLICY    53

Filing a Report Involving a Student or Group    54

Types of Resolution    54

The Undergraduate Disciplinary System    55

Sanctions    60

Appeals    63


## APPENDICES    65

Appendix A — The Judicial System of Duke University    66

Appendix B — Optional, One-time Faculty-Student Resolution Process for Cases of Academic Dishonesty Involving Undergraduates    69

Appendix C — Administrative Action Policy    69

Appendix D — Fraternity and Sorority Recognition    70

Appendix E — Recognized Student Organizations    71

Appendix F — Information and Resources Concerning Substance Use    72

Resources for Alcohol, Drug, and Tobacco Concerns    74

Appendix G — Patient Privacy    78

Appendix H — Theme Parties and Decorations    78

Appendix I — Patents and Intellectual Property    80

Appendix J — Missing Student Notification    80

Appendix K — Consequences of Copyright Infringement    80

# ACADEMIC CALENDAR 2017-2018

Trinity College of Arts and Sciences; the Pratt School of Engineering; the Nicholas School of the Environment; the Graduate School; the Sanford School of Public Policy; the School of Nursing. Consult the calendars of the various schools for additional information.

## SUMMER 2017

| | |
|---|---|
| Monday, February 20 | Registration begins for all Summer sessions |
| Wednesday, May 17 | Term I classes begin. The Monday class meeting schedule is in effect on this day. (Therefore, all summer classes meet this day.) Regular class meeting schedule begins on Thursday, May 18; Drop/Add continues |
| Thursday, May 18 | Regular class meeting schedule begins |
| Friday, May 19 | Drop/Add for Term I ends |
| Monday, May 29 | Memorial Day holiday. No classes are held. |
| Wednesday, June 14 | Last day to withdraw with W from Term I classes (Undergraduates) |
| Monday, June 26 | Term I classes end |
| Tuesday, June 27 | Reading period |
| Wednesday, June 28 | Term I final examinations begin |
| Thursday, June 29 | Term I final examinations end |
| Monday, July 3 | Term II classes begin |
| Tuesday, July 4 | Independence Day holiday. No classes are held. |
| Thursday, July 6 | Drop/Add for Term II ends |
| Monday, July 31 | Last day to withdraw with W from Term II classes (Undergraduates) |
| Thursday, August 10 | Term II classes end |
| Friday, August 11 | Reading period (Until 7:00 PM) |
| Friday, August 11 | Term II final examinations begin, 7:00 PM |
| Sunday, August 13 | Term II final examinations end |

## FALL 2017

| | |
|---|---|
| Tuesday, August 22 | New graduate student orientation begins |
| Tuesday, August 22 | New undergraduate student orientation begins |
| Wednesday, August 23 | 11:00 AM. Convocation for new undergraduate students; 4:00 PM. Convocation for graduate and professional school students |
| Monday, August 28 | 8:30 AM. Fall semester classes begin; Drop/Add continues |
| Monday, September 4 | Labor Day. Classes in session |
| Friday, September 8 | Drop/Add ends |
| Thursday or Friday, October 5 or 6 | 5:30 PM. Founders' Day Convocation |
| Friday, October 6 | Last day for reporting midsemester grades |
| Friday, October 6 | 7:00 PM. Fall break begins |
| Sunday, October 8 | Founders' Day |
| Wednesday, October 11 | 8:30 AM. Classes resume |
| Monday, October 23 | Bookbagging begins for Spring 2018 |
| Wednesday, November 1 | Registration begins for Spring 2018 |

Case 1:20-cv-00996   Document 1-3   Filed 11/02/20   Page 100 of 178

| | |
|---|---|
| Friday, November 10 | Last day to withdraw with W from Fall 2017 classes (Undergraduates Only) |
| Wednesday, November 15 | Registration ends for Spring 2018 |
| Thursday, November 16 | Drop/Add begins for Spring 2018 |
| Tuesday, November 21 | 10:30 PM. Thanksgiving recess begins |
| Monday, November 27 | 8:30 AM. Classes resume |
| Friday, December 1 | Graduate classes end |
| Saturday - Tuesday, December 2 - 12 | Graduate reading period |
| Friday, December 8 | Undergraduate classes end |
| Saturday - Tuesday, December 9 - 12 | Undergraduate reading period |
| Wednesday, December 13 | Final examinations begin (9:00 AM.) |
| Monday, December 18 | 10:00 PM. Final examinations end |

## SPRING 2018

| | |
|---|---|
| Sunday - Tuesday, January 7 - 9 | Undergraduate Winter Forum |
| Wednesday, January 10 | 8:30 AM. Spring semester begins: The Monday class meeting schedule is in effect on this day; Regular class meeting schedule begins on Thursday, January 11; Classes meeting in a Wednesday/Friday meeting pattern begin January 12; Drop/Add continues |
| Thursday, January 11 | Regular class meeting schedule begins |
| Monday, January 15 | Martin Luther King, Jr. Day holiday: classes are rescheduled on Wednesday, January 10 |
| Wednesday, January 24 | Drop/Add ends |
| Monday, February 19 | Registration begins for Summer 2018 |
| Friday, February 23 | Last day for reporting midsemester grades |
| Friday, March 9 | 7:00 PM. Spring recess begins |
| Monday, March 19 | 8:30 AM. Classes resume |
| Monday, March 26 | Bookbagging begins for Fall 2018 |
| Wednesday, March 28 | Last day to withdraw with W from Spring 2018 classes (Undergraduates Only) |
| Wednesday, April 4 | Registration begins for Fall 2018; Summer 2018 registration continues |
| Friday, April 13 | Registration ends for Fall 2018; Summer 2018 registration continues |
| Saturday, April 14 | Drop/Add begins for Fall 2018 |
| Wednesday, April 18 | Graduate classes end |
| Thursday - Sunday, April 19 - 29 | Graduate reading period |
| Wednesday, April 25 | Undergraduate classes end |
| Thursday - Sunday, April 26 - 29 | Undergraduate reading period |
| Monday, April 30 | Final examinations begin |
| Saturday, May 5 | 10:00 PM. Final examinations end |
| Friday, May 11 | Commencement begins |
| Sunday, May 13 | Graduation exercises; conferring of degrees |
| April 27 - 30 | Thursday-Sunday. Undergraduate reading period |
| May 1 | Monday. Final examinations begin |
| May 6 | Saturday. 10 p.m. Final examinations end |
| May 12 | Friday. Commencement begins |
| May 14 | Sunday. Graduation exercises: conferring of degrees |

# UNIVERSITY ADMINISTRATION

## GENERAL ADMINISTRATION

Vincent Price, PhD, President
Sally Kornbluth, PhD, Provost
Tallman Trask III, MBA, PhD, Executive Vice President
A. Eugene Washington, MD, Chancellor for Health Affairs and the President and
      Chief Executive Officer of the Duke University Health System
Pamela J. Bernard, JD, Vice President and General Counsel
Kyle Cavanaugh, MBA, Vice President for Administration
Tracy Futhey, MS, Vice President, Information Technology and Chief Information Officer
Michael Merson, MD, Vice President and Vice Provost, Global Strategy and Programs
Larry Moneta, EdD, Vice President, Student Affairs
John J. Noonan, MBA, Vice President, Facilities
Benjamin Reese, PsyD, Vice President, Office for Institutional Equity
Richard Riddell, PhD, Vice President and University Secretary
Michael J. Schoenfeld, MS, Vice President, Public Affairs and Government Relations
Robert Shepard, PhD, Vice President, Alumni Affairs and Development
Timothy Walsh, MBA, Vice President for Finance
Kevin M. White, PhD, Vice President and Director of Athletics
Phail Wynn, Jr., MBA, EdD, Vice President, Durham and Regional Affairs
Ravi V. Bellamkonda, PhD, Dean, Pratt School of Engineering
William Boulding, PhD, Dean, Fuqua School of Business
Marion E. Broome, PhD, RN, FAAN, Dean, School of Nursing
Kelly Brownell, PhD, Dean, Sanford School of Public Policy
Elaine A. Heath, PhD, Dean, Divinity School
Mary E. Klotman, MD, Dean, School of Medicine
David F. Levi, JD, Dean, School of Law
Paula B. McClain, PhD, Dean, Graduate School
Stephen Nowicki, PhD, Dean and Vice Provost, Undergraduate Education
Valerie S. Ashby, PhD, Dean, Trinity College of Arts and Sciences
Luke A. Powery, ThD, Dean of Duke Chapel
Jeffrey Vincent, PhD, Interim Dean, Nicholas School of the Environment
Nancy Allen, MD, Vice Provost, Faculty Diversity and Faculty Development
Edward J. Balleisen, PhD, Vice Provost for Interdisciplinary Studies
Lawrence Carin, PhD, Vice Provost for Research
Deborah Jakubs, PhD, Vice Provost for Library Affairs
Scott Lindroth, PhD, Vice Provost for the Arts
James S. Roberts, PhD, Executive Vice Provost for Finance and Administration
Jennifer Francis, PhD, Vice Provost for Academic Affairs
Neal F. Triplett, MBA, President and CEO, Duke University Management Corporation

## GENERAL ACADEMIC ADMINISTRATION

Sally Kornbluth, PhD, Provost
Edward J. Balleisen, PhD, Vice Provost for Interdisciplinary Studies
Abbas Benmamoun, Vice Provost for Faculty Advancement
Lawrence Carin, PhD, Vice Provost for Research
Jennifer Francis, Vice Provost for Academic Affairs
Deborah Jakubs, PhD, University Librarian and Vice Provost
Scott Lindroth, PhD, Vice Provost for the Arts
Susan Lozier, PhD, Vice Provost for Strategic Planning
Michael Merson, MD, Vice Provost for Global Strategy and Programs

Case 1:20-cv-00996 Document 1-3 Filed 11/02/20 Page 102 of 178

Stephen Nowicki, PhD, Dean and Vice Provost for Undergraduate Education
James S. Roberts, PhD, Executive Vice Provost for Finance and Administration
*Search in Progress*, Vice Provost for Innovation & Entrepreneurship Initiative

## ARTS AND SCIENCES
Valerie S. Ashby, PhD, Dean of Trinity College of Arts and Sciences
Arlie Petters, PhD, Dean of Academic Affairs of Trinity College and Associate Vice Provost for Undergraduate Education
Gennifer Weisenfeld, PhD, Dean of the Humanities
Linda M. Burton, PhD, Dean of the Social Sciences
Daniel P. Kiehart, PhD, Dean of the Natural Sciences
Robert F. Barkhau, BS, Director, Arts and Sciences Facilities
Chris Clark, MS, Senior Assistant Vice President for Trinity College and Graduate School Development
Sandra P. Connolly, MS, Vice Dean for Finance and Administration
Edward D. Gomes, Jr., BS, Senior Associate Dean, Trinity Technology Services
Kevin W. Moore, PhD, Vice Dean for Faculty
Lee W. Willard, PhD, Senior Associate Dean for Academic Planning and Associate Vice Provost for Undergraduate Education

## TRINITY COLLEGE OF ARTS AND SCIENCES
Gerald L. Wilson, BD, PhD, Senior Associate Dean, CEO and Director of the Office of Pre-Law Advising
Milton A. Blackmon, EdD, Associate Dean and Graduate Business School Advisor
John Blackshear, PhD, Assistant Dean
Paula E. Gilbert, PhD, Senior Associate Dean and Director of Continuing Studies and Summer Session
Donna Kostyu, PhD, Associate Dean and Director of the Health Professions Advising Center
Rachel Murphey-Brown, PhD, Assistant Dean
Karen Murphy, PhD, Assistant Dean and Director of the Undergraduate Research Support Office
Minna Ng, PhD, Assistant Dean
Alyssa Perz, PhD, Assistant Dean and Director of the Cardea Fellows Program
David Rabiner, PhD, Senior Associate Dean and Director of the Academic Advising Center
Sarah Russell, PhD, Assistant Dean
Jesse Summers, PhD, Assistant Dean
Sabrina L. Thomas, PhD, Senior Associate Dean, Risk Management and Title IX Accommodations and
        Director of the Office of Student Returns
Jennifer Wood Crowley, PhD, Assistant Dean

## EDMUND T. PRATT JR. SCHOOL OF ENGINEERING
Ravi Bellamkonda, PhD, Dean
Linda Franzoni, PhD, Associate Dean for Undergraduate Education
James Gaston, MPM, Assistant Dean for Advising and Undergraduate Research
Lupita Temiquel-McMillian, MEd, Assistant Dean for Advising and Student Affairs
Carmen Rawls, PhD, Assistant Dean for Advising and Outreach

## STUDENT AFFAIRS
Larry Moneta, EdD, Vice President for Student Affairs
Zoila Airall, PhD, Associate Vice President of Student Affairs for Campus Life
Robert Coffey, Executive Director, Dining Services
Joe Gonzalez, MA, Interim Assistant Vice President, Housing and Residence Life
Caroline Nisbet, MA, Associate Vice President of Student Affairs for Resource Administration
Christopher Roby, MS, Assistant Vice President and Executive Director, University Center Activities & Events
Suzanne Wasiolek, JD, LLM, EdD, Associate Vice President of Student Affairs and Dean of Students
William Wright-Swadel, MEd, Assistant Vice President and Fannie Mitchell Executive Director, Career Center

## ADMISSIONS AND FINANCIAL AID
Christoph O. Guttentag, MA, Dean of Undergraduate Admissions
Alison Rabil, EdD, Assistant Vice Provost and Director of Financial Aid



DUKE COMMUNITY STANDARD



## DUKE COMMUNITY STANDARD

Duke University is a community dedicated to scholarship, leadership, and service and to the principles of honesty, fairness, respect, and accountability. Citizens of this community commit to reflect upon and uphold these principles in all academic and nonacademic endeavors, and to protect and promote a culture of integrity.

To uphold the Duke Community Standard:

- I will not lie, cheat, or steal in my academic endeavors;
- I will conduct myself honorably in all my endeavors; and
- I will act if the Standard is compromised.

# STUDENTS' OBLIGATION TO ACT WITH RESPECT TO THE DUKE COMMUNITY STANDARD

The Duke Community Standard (DCS) stresses the commitment that students share with all members of the community to enhance the climate for honesty, fairness, respect, and accountability at Duke University. Students affirm their commitment to foster this climate by signing a pledge that includes taking constructive action if they witness or know about behavior they perceive to be inconsistent with the DCS, which may include violation of university policies. Although there are no disciplinary sanctions associated with the failure to act, students are nonetheless expected to take action—to do *something*—as a responsibility of membership in the Duke community.

The university recognizes that it is not always easy to act in these situations, but several alternatives are available to suit a student's level of comfort and confidence. These alternatives are not mutually exclusive.

- Speaking directly with the individual exhibiting the behavior, both to gain clarity about the situation and to inform the individual about the concern.
- Publicly calling attention to the behavior as it is occurring.
- For incidents involving social behaviors, alerting residence hall, Student Affairs, or other university staff. The information provided will give staff an opportunity to address the matter informally or through appropriate formal channels.
- For cases involving academic integrity, alerting the instructor that cheating may be occurring in the course. This alert can be in any form, including anonymous notification, and the reporting student will not be identified. The information provided will allow the faculty member to consider corrective measures, in consultation with the Office of Student Conduct, and to address the topic with the class or suspected student(s).
- Directly alerting staff in the Office of Student Conduct (919-684-6938; conduct@duke.edu), who will confer with the faculty member involved, if an academic issue, or with the reporting student(s), strategizing next steps. Maintaining the confidentiality of the source is possible, but may limit the extent of action that can be taken.

# THE CONTEXT OF THE DUKE COMMUNITY STANDARD

The honor code at Duke is named the community standard because community is at the center of our conception of what it means to act honorably. Community entails a sense of connectedness to others and their welfare, feeling part of Duke University every day and being responsible for its continual improvement. Community refers as well to a feeling of connection to the city in which we are located. It posits the counterbalancing of group benefit with individual needs and wants, and a Duke identity with the many personal identities based on demographics and interest. The kind of environment we strive to achieve is one in which civility (but not docility) reigns; an environment in which ideas are promulgated, and challenged, in a stimulating give and take; an environment in which learning (whether from peers, faculty, administrators, or others in the Duke and broader communities) is accomplished with openness, honesty, and respect.

Citizens of the Duke community commit to acting with purpose, civility, and intention, both with personal decision-making and with interactions with each member of this community. Choosing to be a citizen of the Duke community means acknowledging the value of each member, participating in active reflection and asking the question: "How do my actions impact others?"

The honor code at Duke is named the community standard because it expresses our institution's core values and a concomitant set of expectations for behavior. Because behavior is derivative of fundamental values, the standard applies off campus as well as on. The principles it articulates, while lofty in one sense, are firmly grounded in individual decisions made on the ground every day about every aspect of undergraduate life, in academic and co-curricular activities alike: in the classroom, residence halls, K-ville, off-campus apartment complexes, Myrtle Beach, Paris, and wherever else students may go. In addition, the standard asks that students not only reflect on their own behavior, as important as that is, but that they also act to encourage the integrity of their peers. By inspiring and supporting each other, students can shape their environment so that it reflects the ideals expressed in the Duke Community Standard.

The Standard, therefore, expresses our goals for undergraduate education in the broadest sense and is foundational to undergraduate life at Duke. It is followed by an equally important pledge that students sign as members of the community.

Duke University seeks to engage all students in its tradition of honor, a tradition that defines the institution and helps to guide students during their college careers and beyond. The students here today, who are the beneficiaries of the efforts of those who preceded them, have an extraordinarily important role to play in perpetuating and strengthening this tradition. We welcome, and count on, your involvement.

# THE HISTORY OF THE DUKE COMMUNITY STANDARD

In 1999-2000, Duke participated in a national survey through the Center for Academic Integrity. Through responses from undergraduate students, as well as from faculty and staff, the survey assessed the climate of academic integrity at Duke in comparative context with other institutions. As a result of the findings, the provost formed the Academic Integrity Council (AIC) in 2001 by appointing representatives from across the community whose charge was and remains to review academic integrity policies and practices and make recommendations to improve the climate of integrity on campus.

An early goal of the AIC was to review the existing Honor Code, which had been in effect for the undergraduate community since 1993. The AIC determined that the Honor Code needed revision to make it shorter while embracing all aspects of a student's life at Duke. A major element of the revision was the inclusion of the fundamental values that must inform the definition of a community of honor.

This Duke Community Standard was proposed to the faculty councils of Trinity College of Arts and Sciences and the Pratt School of Engineering, as well as to the Duke Student Government. It was approved for the undergraduate community and implemented in the fall of 2003. The Standard was also incorporated into the code of each graduate and professional school of the university and, thus, represents the values we uphold as an institution.

Duke University is committed to ongoing evaluation of principles, policies, and practices, and to lively conversation about issues of integrity. Thus, Duke participated again in a national survey on academic integrity in the fall of 2005 and in intensive discussions of academic and social integrity from summer 2006 through spring 2007. The result of these continuing and broadened discussions was a revised Community Standard, put before the undergraduate student body in a student government referendum of April 2007 and overwhelmingly approved. Implemented in summer 2007, the new Duke Community Standard differs from its predecessor chiefly in its level of commitment to taking action (see "Students' Obligation to Act with Respect to the Duke Community Standard" on page 12).

In the spring of 2011, Duke University again surveyed undergraduate students about integrity, this time expanding beyond an academic focus to additional questions about integrity in other domains (i.e., social, work, and civic) inside and outside the classroom. In-depth focus interviews were also conducted with a sample of graduating seniors. Results showed a marked reduction in academic dishonesty in three key areas that were identified as problem areas in the 2005 survey: fabricating or falsifying a bibliography, falsifying or fabricating lab data, and copying or paraphrasing a few sentences without appropriate attribution. One area of concern that emerged from the 2011 survey was an increase in reported unauthorized collaboration. There was also a gap between students' perceptions of the prevalence of dishonesty across these multiple domains and students' self-reported rates of engaging in dishonest acts within these domains. Duke University will continue efforts to narrow students' perception of the frequency of academic dishonesty and actual self-reported rates of cheating and other dishonest acts.

Case 1:20-cv-00996   Document 1-3   Filed 11/02/20   Page 106 of 178

# GET INVOLVED

The Undergraduate Conduct Board is a pool of students, faculty and staff who are selected/appointed to hear referred cases of potential violations of university policy. A three- or five-member panel, typically chaired by a student, hears each case. About 10% of the total caseload of the Office of Student Conduct is referred to a hearing of the Undergraduate Conduct Board. The Board has the ability to issue any sanction available through the undergraduate disciplinary process for a finding of responsibility, including suspension or expulsion. Rising juniors and seniors are eligible to apply. See studentaffairs.duke.edu/conduct.

Disciplinary Advisors are students and staff trained in the undergraduate disciplinary process. They offer information about how the process works, advice on how to approach each stage of the process, and can support students in attendance at a formal Undergraduate Conduct Board hearing. Students of any undergraduate class year, including first-year students, may apply. See studentaffairs.duke.edu/conduct.

The Duke University Honor Council is a student-led organization focused on promoting the Duke Community Standard throughout campus. The Honor Council achieves this through outreach campaigns to familiarize students with the Standard as well as through discourse-focused events allowing students to discuss the Standard and its principles in the context of their own personal Duke experience. The Honor Council works closely with administration, the Kenan Institute of Ethics, and prominent student organizations to best create a campus community and culture that highlights values and ethics. For additional information, contact 2017-18 Honor Council Chair Kushal Kadakia T '19 at kushal.kadakia@duke.edu.

# A STATEMENT OF PRINCIPLES

The Duke Community Standard expresses a standard for behavior—a set of expectations of students who claim membership in Duke's learning community. All incoming undergraduates, upon admittance to Duke, are required to sign a pledge to adhere to these values and to conduct themselves in accordance with these values throughout their undergraduate careers. Likewise, upon completion of each academic assignment, students may be asked to reaffirm their commitment to the Duke Community Standard by signing a statement indicating that they have adhered to the Duke Community Standard in completing the assignment.

The Duke Community Standard, thus, is a statement of principles. The specific policies, or rules and regulations of the university, define the conduct for which students can be held accountable.



# HOW WILL YOU ACT?

"I will speak out against bigotry and sexism."

"I will do my best work on assignments and exams without cheating, and if I find myself in a time crunch, I will contact my instructor to discuss options."

"I will consider the impact of my actions on my neighbors."

"I will call for medical attention for an intoxicated friend."

"I will be a champion for academic integrity."

"I will refuse to participate in activities that conflict with my values and beliefs."



UNDERGRADUATE
POLICIES

Duke University has high expectations for students' scholarship and conduct. In accepting admission, students indicate their willingness to subscribe to and be governed by the rules and regulations of the university, which flow from the Duke Community Standard. These policies reflect the Duke Community Standard's fundamental values—honesty, fairness, respect, and accountability.

Undergraduates acknowledge the right of the university to take disciplinary action, including suspension or expulsion, for failure to abide by the regulations or for other conduct adjudged unsatisfactory or detrimental to the university community.

Students and groups may be held accountable for any violation of university policy that may or may not be included in this guide, whether on or off campus. In addition to local ordinances and state and federal laws, the following policies govern the undergraduate community.

# ACADEMIC DISHONESTY

## LYING

Lying is communicating untruths or misrepresentations in order to gain an unfair academic or employment advantage. *[Wording adopted from the Duke Fuqua School of Business code.]*

It includes, but is not limited to:

- falsifying information on a résumé;
- misrepresenting one's own research;
- providing false or misleading information in order to be excused from classes or assignments; or
- intentionally underperforming on a placement exam.

## CHEATING

Cheating is the act of wrongfully using or attempting to use unauthorized materials, information, study aids, or the ideas or work of another in order to gain an unfair advantage. It includes, but is not limited to:

- plagiarism on any assignment;
- giving unauthorized aid to another student or receiving unauthorized aid from another person on tests, quizzes, assignments, or examinations;
- using or consulting unauthorized materials or using unauthorized equipment or devices on tests, quizzes, assignments, or examinations;
- altering or falsifying any information on tests, quizzes, assignments, or examinations;
- using any material portion of a paper or project to fulfill the requirements of more than one course unless the student has received prior faculty permission to do so;
- working on any examination, test, quiz, or assignment outside of the time constraints imposed;
- the unauthorized use of prescription medication to enhance academic performance;
- submitting an altered examination or assignment to an instructor for re-grading; or
- failing to adhere to an instructor's specific directions with respect to the terms of academic integrity or academic honesty.

"Plagiarism" occurs when a student, with intent to deceive or with reckless disregard for proper scholarly procedures, presents any information, ideas, or phrasing of another as if they were his/her own and/or does not give appropriate credit to the original source. Proper scholarly procedures require that all quoted material be identified by quotation marks or indentation on the page, and the source of information and ideas, if from another, must be identified and be attributed to that source. Students are responsible for learning proper scholarly procedures.

The term "assignment" includes any work, required or volunteered, submitted for review, academic credit, and/or disciplinary sanction.

All academic work undertaken by a student must be completed independently unless the faculty member or other responsible authority expressly authorizes collaboration with another.



## STEALING

Stealing is the act of intentionally taking or appropriating the property of another, including academic work, without consent or permission and with the intent to keep or use the property without the permission of the owner or the rightful possessor.

# INFORMATION ABOUT PLAGIARISM AT DUKE

## INTRODUCTION: OUR IDEAS EMERGE AGAINST THE BACKDROP OF PREVIOUS FORMULATIONS

Rarely, if ever, do we develop ideas in our individual minds, free of the effects and influences of others' previous findings, claims, and analyses. This is not to suggest that writers never forge new ideas; rather, the majority of one's thoughts—and certainly the intellectual thinking that we do in university settings—is prompted, shaped, and changed in response to and in light of what has already been stated by others. Our ideas emerge in response to reading others' texts, in sites of conversation and verbal exchange, with and against the grain of the words and formulations of others.

It is appropriate to think of the university as a vast society of influences, composed of various formal sites of critical discussion, reporting, and debate, both verbal and written. University persons—both scholars and students—gain status and authority by dint of their intellectual involvement in written and verbal exchange (detailing their findings, casting written arguments, offering careful analyses of their objects of study). Since the university values the public thinking of its faculty and students, it requires that its members formally recognize who has made which sorts of statements in what settings. Scrupulously citing the origin of quotations, summaries, and other borrowed material included in your paper enables the social value of respect to exist within intellectual circles of research and scholarship around the globe. Not to formally recognize the work and influences of others in your writing is to plagiarize, violating an ethic of mutual regard.

## THE ACADEMIC COMMUNITY'S GUIDELINES: THE PRACTICE OF DOCUMENTATION

It has become commonplace to envision the verbal and written exchanges between speakers and listeners, readers and writers, researchers and their sources, as interactions constituting communities of discourse. Discourse communities share interpretive, analytic, and argumentative conventions. Academic discourse communities (often shaped as "disciplines" or "fields of inquiry") agree to refer scrupulously to one another's writings and research findings by explicitly linking quoted materials to the name of the person or persons who uttered or wrote them, and by carefully describing the influence others have had upon them.

In fact, a mark of strong academic writing is the practice of situating one's claims and findings within a tradition of inquiry into the subject, detailing the nature of the exchanges that have preceded the present foray into the ongoing conversation, at times indicating one's affinities or disagreement with one or another avenue of thought. Ethos and authority are enhanced when writers demonstrate their uses of others' statements, texts, and representations, and when they appropriately identify these sources in their arguments and analyses. This practice is called documentation. Guidelines for how to correctly cite materials used within your writing and rules for assembling the list of works that you cite in your paper are compiled by academic organizations which produce style manuals. Information from these style manuals can be accessed in the Citing Sources section of the Library web page.

## PLAGIARISM DEFINED

Academic communities, then, demand that writers credit others for their work, and that the source of their material clearly be acknowledged. Not to do so is to plagiarize, to intentionally or unintentionally appropriate the ideas, language, key terms, or findings of another without sufficient acknowledgment that such material is not one's own. As the Modern Language Association defines this transgression:

Case 1:20-cv-00996   Document 1-3   Filed 11/02/20   Page 110 of 178

*Scholarly authors generously acknowledge their debts to predecessors by carefully giving credit to each source. Whenever you draw on another's work, you must specify what you borrowed whether facts, opinions, or quotations and where you borrowed it from. Using another person's ideas or expressions in your writing without acknowledging the source constitutes plagiarism. Derived from the Latin plagiarius ("kidnapper"), plagiarism refers to a form of intellectual theft. . . In short, to plagiarize is to give the impression that you wrote or thought something that you in fact borrowed from someone, and to do so is a violation of professional ethics. (Joseph Gibaldi, MLA Style Manual and Guide to Scholarly Publishing. 2nd. ed., New York: MLA, 1998: 151).*

Plagiarism encompasses a range of errors and violations. Though the charge of plagiarism can be leveled against writers who incorrectly or neglect to cite borrowed materials, it most often tempts students who find themselves in the dire straits of having to complete a written assignment without previously having undertaken the laborious and time-consuming process of research, reading, note-taking, interpretation, and analysis. Wholesale copying from sources is an easy way to fill up the page and to turn something—anything—in on time. In all cases, it is far better to contact one's instructor and honestly to discuss with him or her a strategy for completing an assignment rather than to risk humiliation and disciplinary consequences. Instructors will, within reason and to the best of their abilities, help you to get your papers started and help you to make progress with your work. You will do yourself and your instructors justice if you openly and squarely discuss the circumstances of your progress or lack thereof.

On occasion, students accused of plagiarism have claimed that their plagiarism has occurred without their knowledge or intent. Since ignorance of convention is not a reasonable defense, it is best to become thoroughly acquainted both with the various ways in which plagiarism is construed, and with the conventions of source attribution and proper documentation. Some students seem to believe that there are different degrees of plagiarism, some not as a bad as others. No distinctions are made between any of the following acts. All constitute instances of plagiarism as outlined in *The Duke Community Standard in Practice: A Guide for Undergraduates*, and all constitute transgression of the university's Community Standard. You will be charged with plagiarism if you:

- Copy from published sources without adequate documentation.
- Purchase a pre-written paper (either by mail or electronically).
- Let someone else write a paper for you.
- Pay someone else to write a paper for you.
- Submit as your own someone else's unpublished work, either with or without permission.

If the work you submit is not yours, it does not matter how you came by it. If you use another person's work to further your own understanding of a subject, you must credit the source. (Adapted from Hillard, V. Plagiarism: Its Nature and Consequences. Duke Libraries: Citing Sources.)

# ACADEMIC FREEDOM

Freedom of inquiry and the free exchange of ideas are essential for the fulfillment of the university's mission. Academic freedom is a right and responsibility of students as well as faculty. Students who believe that their academic freedom has been abridged should submit a written complaint to their academic dean. The dean may enlist the faculty in establishing the merits or extent of the complaint by appointing a disinterested two-person subcommittee of the Faculty Hearing Committee to provide advice. Cases not resolved by the dean may be brought to the attention of the provost. Students may also seek advice of the student ombudsperson in resolving a complaint.

# ADVERTISEMENTS

## BANNERS

Banners on the exterior or interior of the Brodhead Center, East Union Building, Bryan Center, and the Plaza are approved and installed by University Center Activities and Events. Housing and Residence Life approves banners on the exterior/interior of residence halls (contact the appropriate Residence Coordinator). Banners attached to residential buildings are limited to five feet by five feet in dimension (or smaller) and may not cover the windows of a room in a manner that impedes egress. Banners may not have objects hanging from them (normally used to weigh banner down). Only banners or flags can be hung outside of windows. Requests for hanging banners on all other university buildings and light poles must be approved by Facilities



Management located at Smith Warehouse, Bay 1 (919-684-2122). Contact Facilities Management, University Center Activities and Events, or Housing and Residence Life for specific guidelines. All exterior banners (including flags) in residential areas must be removed by the last day of classes each semester.

## CHALKING

Chalking is prohibited on any surface, including, but not limited to, sidewalks, archways, and benches.

## POSTERS, ANNOUNCEMENTS, AND BULLETIN BOARDS

The following is a checklist of procedures with reference to the posting of notices on university bulletin boards, building doors, containers, light posts, trees, and sidewalks:

- Posters/flyers must provide information regarding student activities, give information of an academic nature, make announcements pertinent to the business of the university, or supply information to members of the Duke community regarding available campus services or products.
- Posters/flyers must state the name of the sponsoring organization, business, department, or person responsible.
- As appropriate for the surface, staples, thumbtacks, magnets, masking tape, or transparent tape may be used to attach posters/flyers to approved bulletin boards or posting areas. The use of glue, nails, and duct tape or any other heavy-duty tape is prohibited.
- Posters/flyers must never be attached to doors, windows, trashcans, entryways, exteriors of buildings, interior walls, stairway railings, floors, benches or ceilings, nor may they be placed on the windshields of parked automobiles or on sidewalks.
- Posters/flyers may NOT be attached or affixed to any tree or utility pole.
- Posters/flyers (and the fasteners used to attach them) must be removed within three days after the advertised event.
- All posters/flyers may be periodically removed from bulletin boards as part of routine maintenance.

# ALCOHOL

## UNIVERSITY-WIDE POLICY

As a community of scholars and learners, Duke University expects those within its community to be responsible with the use of alcohol. This policy shall guide the role of alcohol everywhere on the Duke campus and at all events sponsored by Duke organizations, schools, or administrative units. Students, staff, and faculty members are encouraged to learn about the social, physiological, and psychological consequences of drinking and alcohol abuse. Excessive and high-risk drinking can lead to negative consequences for the Duke community, including assault, illness, injury, litter, noise, property damage, and driving under the influence. All members of the Duke community share responsibility for creating an environment that limits dangerous drinking behaviors and, therefore, reduces the likelihood of these negative outcomes.

The following shall guide the role of alcohol in the Duke community:

- All possession, consumption, and distribution of alcohol at Duke University shall be in accordance with applicable North Carolina state laws.
- Members of the Duke community are responsible for behaving in a manner that is not disruptive or endangering to themselves or others. Being under the influence of alcohol shall not be a mitigating factor for an individual's behavior.
- When persons under 21 years of age can reasonably be expected to be present at an event, proper precautions must be taken to restrict distribution and consumption of alcohol to persons of legal drinking age. Student organizations shall also adhere to the specific guidelines for events outlined in *The Duke Community Standard in Practice: A Guide for Undergraduates* (for student organizations that cater primarily to undergraduates) or the Graduate and Professional Student Alcohol Policy (for student organizations that cater primarily to graduate/professional students).
- Advertising or other communication that references the availability of alcohol at a function may neither promote alcohol as the focus of the event nor promote excessive drinking.
- Each community (e.g., Undergraduate, Fuqua, Law) may establish additional guidelines and policies governing the possession, consumption, and distribution of alcohol that reach beyond these minimal expectations. Violations of policies shall be adjudicated using existing procedures within each segment of the university.

Case 1:20-cv-00996   Document 1-3   Filed 11/02/20   Page 112 of 178



## UNDERGRADUATE POLICY

The remainder of this policy, specifically for undergraduates, augments Duke's university-wide alcohol policy. For individuals as well as groups, whether on campus or off, prohibited behavior includes:

- underage possession/consumption;
- unsafe/irresponsible behavior;
- violation of community expectations;
- general provisions violation; and,
- violation(s) of expectations for group-sponsored social functions.

Sanctions for violations of any of these prohibited behaviors are outlined in this Guide (see "Sanctions" on page 60). Parents of students under the age of 21 may be notified of alcohol-related disciplinary violations when a student's health or safety has been/is at risk.

See "Appendix F — Information and Resources Concerning Substance Use" on page 72 for health effects associated with alcohol and other drug use, helpful resources for assistance, and legal ramifications of illicit possession, use, or distribution.

## UNDERAGE POSSESSION/CONSUMPTION

Students under 21 years of age are not permitted to purchase, possess, or consume alcoholic beverages. Being under the influence of any amount of alcohol while underage is considered a violation of this provision. Groups are considered in violation of this provision if they facilitate the acquisition of alcohol by anyone under the age of 21.

## UNSAFE/IRRESPONSIBLE BEHAVIOR

Unsafe or irresponsible behavior is defined as actions that are harmful or potentially harmful to one's self or others involving the use of alcohol. Such behavior includes, but is not limited to:

- consuming an excessive quantity in a short amount of time, including, but not limited to, shotgunning, shots, and chugging;
- participating in or facilitating drinking games or progressive parties;
- consuming through beer bongs;
- use or attempted use of fraudulent identification or another's identification to obtain alcohol; and
- making alcohol available to underage drinkers.

## COMMUNITY EXPECTATIONS VIOLATION

It shall be a violation of the alcohol policy to engage in an action while under the influence of alcohol that is disruptive to the community. Such behavior includes, but is not limited to:

- driving;
- exhibiting disorderly conduct, damaging property, and/or fighting;
- littering;
- running away or hiding from university or public officials, including law enforcement;
- vomiting and/or urinating in public; and
- cursing and/or shouting at others.

# HEALTH AND SAFETY INTERVENTION

Because health and safety of students are of primary importance, students are encouraged not only to look out for their own health and safety but also for that of their peers. When a person's health and/or safety is/ are threatened or appear(s) to be in jeopardy, immediate action should be taken to prevent injury/illness/ danger. Dial 911 (or 919-684-2444 if you are on campus) for help. Whatever the particular need/problem, it is important to respond in a responsible and timely manner.

Formal disciplinary action for a violation of the alcohol policy will not be taken against students for whom medical assistance is sought, or against those who seek medical assistance for themselves or for others, provided that the student/group has not violated other university policies that warrant formal disciplinary action.

A student who receives medical assistance may be required to meet with a substance abuse specialist in DuWell for education, assessment, and possible referral for treatment. The student may also be required to complete an educational assignment. Parents of such students under the legal drinking age may also be notified. A group that facilitates the acquisition of alcohol may also be required to notify its advisor, provide an educational program for members, and/or change its processes for hosting events.

In the event that a student fails to meet with the specialist, chooses not to participate in the treatment program outlined, or exhibits a pattern of abusive behavior with alcohol, the student may be subject to formal disciplinary action and/or placed on a Medical Leave of Absence or Administrative Action until he/ she produces documentation that appropriate treatment has been successfully sought.

A panel of the Undergraduate Conduct Board will be informed of a student who has received "amnesty" under this provision of the Alcohol Policy should the student be subsequently found responsible for a violation of policy related to substance use for purposes of effective sanctioning.

## GENERAL PROVISIONS VIOLATION

Duke University has established the following general provisions regarding alcohol on campus:

- No kegs or other common-source containers are permitted on campus in private rooms, student apartments, commons rooms, or other public space. (University-approved bartenders, who will be responsible for carding, may distribute alcohol from kegs in public space at events.) Common-source containers, include, but are not limited to, trashcans, recycling bins, kiddie pools, cases of beer, and coolers.

- Only university-approved bartenders are permitted to distribute alcohol on campus, including alcohol from common-source containers.

- Except at events in a licensed facility providing a cash bar, no spirituous liquor or fortified wines may be served to undergraduates.

- All students on university property consuming or possessing alcohol must carry a valid driver's license, state identification card, military identification card, or passport.

- Alcohol may not be brought in glass containers to on-campus Bring Your Own Beverage ("BYOB") events.

- No individual may possess more than six cans at a BYOB event. Each can may not exceed 12 ounces.

- Containers holding more than 24 ounces are prohibited from BYOB events.

- No alcoholic beverages are permitted in first-year houses (or the surrounding grounds) on East Campus.

- No alcoholic beverages are permitted within the confines of campus athletic facilities during sporting events.

- The use of alcoholic beverages as a prize is prohibited.

Case 1:20-cv-00996   Document 1-3   Filed 11/02/20   Page 114 of 178

## EXPECTATIONS FOR GROUP-SPONSORED SOCIAL FUNCTIONS

Recognized groups may be held accountable for violations of the alcohol policy that occur during a group-sponsored event on campus. To ensure that such violations do not occur, a group will be held accountable if the group failed to take appropriate precautions. Appropriate precautions must include:

- a trained, sober party monitor for every 25 persons expected to attend the event;
- adequate and accessible non-alcoholic beverages and food;
- compliance with all fire safety regulations;
- adequate control of access to event;
- enforcing occupancy limits for the venue, including commons rooms, hallways, and stairwells;
- calling for medical/police assistance as needed; and
- serving of alcohol by university-approved bartenders only.

Expectations for and obligations of student party monitors are communicated online through DuWell. Duties of party monitors include, but are not limited to, prevention of alcohol policy violations, intervention and care of inebriated, at-risk individuals, elimination of safety hazards, and attention to group precautions. Checking identification will be the responsibility of university-approved bartenders. Groups may be held accountable for the actions of individual party monitors.

Party monitors and university officials may deny access to events to anyone who is visibly intoxicated and/or disruptive.

Social events that fail to meet any of these expectations may be shut down immediately.



## PROMOTION OF EVENTS WITH ALCOHOL

By choosing to serve beverages containing alcohol as part of a social function, you and your group or organization assume responsibilities beyond direct university regulation.

Test cases involving common law precedents and the dispensation of alcoholic beverages are changing the definition of who is liable for a drinker's actions to include the general category of "social hosts." A social host may be a fraternity, a residence hall organization, a private citizen, or any combination of the preceding. For example, serving alcohol to a minor who subsequently breaks his leg could render an individual or group liable for the minor's medical bills. Serving an individual who is "already" or "obviously" drunk and who subsequently has an automobile accident could render an individual or group liable for the injury or death of third party victims of the accident, or any property damage resulting from the accidents.

In general, creating or promoting any set of circumstances that encourages your guests to consume alcohol, especially to the point of intoxication, can have far-reaching negative consequences.

Legal proof of negligence in the dispensation of alcohol usually involves the consideration of wide variety of factors, including the manner in which hosts promote social functions where alcohol is served.

In addition to the responsible monitoring of the social event itself, it is imperative that you and your group or organization do not promote your event in such a manner that a potential guest might reasonably believe your social event is an invitation to become intoxicated. **Specifically, flyers, banners, signs, and social media that advertise social events where alcohol will be served must not overtly or covertly state or imply an invitation to participate in excessive drinking.** *Publicity on East Campus or targeted to first-year students may NOT include a reference to alcohol.*

Case 1:20-cv-00996   Document 1-3   Filed 11/02/20   Page 115 of 178



All student events at which alcohol will be present, whether there is a university-approved bartender or the party is BYOB, are required to have trained party monitors.

Party monitor trainings allow students to talk with other student leaders and learn:

- The goals of hosting events
- The roles of the party monitor
- The risks associated with alcohol use
- How to promote safe social behaviors
- Resources and support for your group
- How to develop skills to address potentially dangerous and questionable behavior among your guests, including overconsumption of alcohol

Register for trainings at bit.ly/dukepartymonitor.

# ANIMALS ON CAMPUS

Any animal brought on campus by students or guests may not be unrestrained. With the exception of service animals, animals are prohibited inside any university facility, unless authorized by the space manager responsible for that facility/space. Any type of animal abuse is prohibited, including but not limited to abandonment of or failure to properly care for an animal. Animals, live or dead, may not be used in pranks or otherwise for amusement or ceremony in connection with any institutional or student group function or activity. For purposes of this policy, the term "animal" includes any wild or domesticated, warm-blooded or cold-blooded animal.

Animals may not be brought to campus for large-scale student events and activities including, but not limited to, Homecoming, Duke Reunions, Last Day of Classes, Springternational, Joe College Day, Old Duke Concert, etc. For more information, contact University Center Activities and Events at 919-684-4741.

# BRIDGE PAINTING

The purpose of this policy is to ensure an aesthetically pleasing campus, protect university facilities, and allow for students to use the "Free Expression" bridge/tunnel without damaging neighboring property. Individuals and groups may express opinions within this area that are not restricted by content, except by legal standards.

The surface of the "Free Expression" bridge/tunnel (located on Campus Drive under Main Street) may be painted within the span of the ceiling of the tunnel (but not the ceiling itself), as well as on the outer edge of the Pettigrew Bridge facing Campus Drive and, the exterior (inner) face of the concrete Campus Drive tunnel walls. However, painting is not allowed on the sidewalks or roadways inside or outside the tunnel. Supplies are the responsibility of the painter(s). Painter(s) may not impede the flow of traffic. Any ladders used may not exceed six feet.

There is no restriction regarding painting over the sections of the tunnel that other people or organizations have painted—no matter how recently they have been painted. However, animosity is often generated toward groups who paint over sections that are advertising events not yet held or sections painted very recently. Please use courtesy and common sense when selecting an area of the tunnel to paint.

Any person may remove non-conforming material. Policy violations resulting in the need for restoration should be reported to Duke University Police. Reimbursement for any restoration costs (i.e., paint removal, cleaning, removal of residual substances, and so on) will be the responsibility of the violating party.

**No painting will be allowed at any other locations on the campus of Duke University, including these areas near the tunnel:**

Undergraduate Policies



Painting is permitted on the outer edge of the Pettigrew Bridge facing Campus Drive and the exterior (inner) face of the concrete Campus Drive tunnel walls.

- the Main Street bridge and the railroad trestle (see right);



- the Duke stone walls (see right);



- the Pettigrew Street Bridge (side of the bridge on Pettigrew Street not overlooking Campus Drive; see right);



- on any light poles, signs or sign posts (see right);



- the steps and handrails from Campus Drive to Pettigrew Street (see right);



- any handrails, roadways or sidewalks, even if located inside the tunnel (see right); or



- fencing along the Main Street bridge.

Students who violate these expectations will be held accountable through the university's disciplinary process and may also be arrested and/or cited for violation of NC law. Note that defacement of any public property (i.e., property not owned by Duke) is a violation of North Carolina law.

Case 1:20-cv-00996 Document 1-3 Filed 11/02/20 Page 118 of 178

Although there is no restriction on the content painted on the Free Expression tunnel and the Pettigrew Bridge (except by legal standards), painters should consider the broad effect of what is depicted/written on the walls on the overall campus climate.

Consider these questions as you plan to paint:

- Is the content in generally good taste?
- Does the content offend or target a specific person or group of people?
- Is the content something that could be taken out of context and appear harmful?
- Is it something that visitors to Duke can appreciate?

# CLASSROOM DISRUPTION

Students who behave in the classroom in such a way that the educational experiences of other students and/or the instructor's course objectives are disrupted are subject to disciplinary action, including possible exclusion from a course. Such behavior impedes students' ability to learn or an instructor's ability to teach. Disruptive behavior may include, but is not limited to: non-approved use of electronic devices (including cellular telephones); cursing or shouting at others in such a way as to be disruptive; or, other violations of an instructor's expectations for classroom conduct.

# COMPUTING AND ELECTRONIC COMMUNICATIONS

## SECURITY AND PRIVACY

The purpose of this policy is to establish and promote the ethical, legal, and secure use of computing and electronic communications for all members of the university community.

The university cherishes freedom of expression, the diversity of values and perspectives inherent in an academic institution, the right to acknowledgment, and the value of privacy for all members of the Duke community. At the same time, the university may find it necessary to access and disclose information from computer and network users' accounts to the extent required by law, to uphold contractual obligations or other applicable university policies, or to diagnose and correct technical problems. For this reason, the ultimate privacy of messages and files cannot be ensured. In addition, system failures may lead to loss of data, so users should not assume that their messages and files are secure.

Neither the university nor its agents restrict the content of material transported across its networks. While the university does not position itself as a censor, it reserves the right to limit access to its networks or to remove material stored or posted on university computers when applicable university policies, contractual obligations, or state or federal laws are violated. Alleged violations will receive the same academic due process as any other alleged violation of university policy, contractual obligations, or state or federal laws.

## ACCEPTABLE USE

In making acceptable use of resources you must:

- Use resources only for authorized purposes.
- Protect your userid and system from unauthorized use. You are responsible for all activities on your userid or that originate from your system. Your userid and password act together as your electronic signature.
- Access only information that is your own, that is publicly available, or to which you have been given authorized access.
- Use only legal versions of copyrighted software in compliance with vendor license requirements.
- Be considerate in your use of shared resources. Refrain from monopolizing systems, overloading networks with excessive data, degrading services, or wasting computer time, connection time, disk space, printer paper, manuals, or other resources.

- Seek pre-approval from OIT before deploying/using code that potentially impacts server resources or automates processes (e.g., in registering for classes).

In making acceptable use of resources you must not:

- Use another person's system, files, or data without permission (note that permission from an individual user may not be sufficient—some systems may require additional authority).
- Give your password to another person (including to your parents). Contact the OIT Help Desk if you need assistance with giving other people authority to access your files or e-mail.
- Use computer programs to decode passwords or access-control information.
- Attempt to circumvent or subvert system or network security measures.
- Engage in any activity that might be purposefully harmful to systems or to any information stored thereon, such as creating or propagating viruses, worms, or "Trojan horse" programs; disrupting services; damaging files; or making unauthorized modifications to university data.
- Make or use illegal copies of copyrighted software or other copyrighted works, store such copies on university systems, or transmit them over university networks.
- Use mail or messaging services to harass another person.
- Waste shared computing or network resources, for example, by intentionally placing a program in an endless loop, printing excessive amounts of paper, or by sending chain letters or unsolicited mass mailings.
- Use the university's systems or networks for commercial purposes; for example, by selling access to your userid or by performing work for profit with university resources in a manner not authorized by the university.

The above list only addresses some of the most common issues that arise with regard to computing. All prohibitions found in applicable law and other university policies also apply to the computer systems.

## GROUP E-MAIL

Large-scale e-mail communications within groups or units, including surveys, announcements, etc., require the implicit or explicit prior approval of that group or unit. In the case of such communications from outside the unit, the approval must always be explicit. Visit the OIT web site for full information at oit.duke.edu/about/policies/group-email-policy.

Note that the above computing policies are subject to change. For current policies, visit oit.duke.edu.

# DISORDERLY CONDUCT

Disorderly conduct is contrary to the mission of the university and will be addressed through the disciplinary process. Disorderly conduct is defined as:

- any unreasonable or reckless conduct by an individual or group that is inherently or potentially unsafe to other persons or their real or personal property; and/or
- any behavior by an individual or group that disrupts the peace or interferes with the normal operation of the university or university-sponsored activities.

Disorderly conduct includes, but is not limited to: reckless driving; interrupting or interfering with the carrying out of the duties of a university or public official, including law enforcement; vomiting and/or urinating in public; and, indecent exposure.

# DRONES

Unmanned Aerial Systems (UAS), or "drones," have emerged as a new technology of interest both for hobbyists, and more importantly for possible research, academic, and commercial uses at Duke. For the full and latest Duke policy on drones, visit drones.duke.edu/policies.

Case 1:20-cv-00996   Document 1-3   Filed 11/02/20   Page 120 of 178

# DRUGS AND DRUG PARAPHERNALIA

Duke University prohibits members of its community, both individuals and groups, from manufacturing, selling, delivering, possessing, using, or being under the influence of a controlled substance without legal authorization. A controlled substance includes any drug, substance or immediate precursor covered under the North Carolina Controlled Substances Act, including but not limited to opiates, barbiturates, amphetamines, marijuana, and hallucinogens.

The possession of drug paraphernalia is also prohibited under North Carolina state law and university policy. Drug paraphernalia includes all equipment, products and material of any kind that are used to facilitate, or intended or designed to facilitate, violations of the North Carolina Controlled Substances Act.

In addition to disciplinary action, the conduct officer, or designee, may require a student to take a leave of absence, and return to campus may be conditional upon proof of completion of a substance abuse treatment program.

(See "Appendix F — Information and Resources Concerning Substance Use" on page 72.)



Did you know that a finding of responsibility for a student's first-time possession or use of marijuana may result in a sanction of disciplinary probation? This could prevent a student from studying abroad or participating in programs such as DukeEngage.

# DUKECARD

As stated on the back of the DukeCard, the card "should be carried at all times and presented upon request to any university official. [It] is not transferable. The transfer of an ID card to another person, or the possession of another person's ID card, may result in confiscation of the card and [disciplinary] action."

# FAILURE TO COMPLY

A student or group may be held accountable for failure to comply with:

- directions, requests, or orders of any university representative or body acting in an official capacity, or impeding with the carrying out of such directives;
- instructions of law enforcement officials acting in an official capacity;
- specified protocols and policies for protected research data; and/or
- sanctions rendered during the disciplinary process (including sanctions issued by a residential staff member).

# FALSIFICATION/FRAUD

Honesty and integrity are critical components of the Duke Community Standard. A student or group may be subject to disciplinary action for any of the following actions:

- any intentional misrepresentation of fact (by action or concealment), including furnishing false information, to any university official;
- any intentional misrepresentation of fact (by action or concealment) to obtain or attempt to induce another to surrender a right, benefit or property; and/or
- forgery, alteration, or misuse of any official document, record, key, access code or instrument of identification, or possession of such forgery.

# FIRE SAFETY

It is a violation of university policy to light any material on fire on campus. Candles, other open flame devices, and incense are strictly forbidden for use inside university facilities except during official religious ceremonies such as the observance of Chanukah. Those individuals or groups wishing to utilize candles in observance of a religious holiday or any other event shall contact OESO-Fire & Life Safety Division to obtain permission and information concerning fire prevention. Students and groups will be held financially accountable for any damage they cause as a result of violating this policy and will be referred to the disciplinary process. Additionally, students may be subject to a revocation of their Housing License for any violation of the Fire Safety policy.

Electrical Wiring/Appliances. Tampering with electrical wiring, including, but not limited to, the installation of direct-wired ceiling fans and unauthorized entry into electrical panel boxes, is prohibited. Residents are responsible for any damages caused by electrical appliances that are not owned by Duke University.

All electrical appliances shall be UL approved and maintained in good condition. Numerous electrical devices plugged into one outlet through an outlet cube or extension cord may cause a circuit overload or may cause overheating of the electrical appliances, resulting in a fire. Therefore, the use of outlet cubes or extension cords is prohibited. Use a power strip with a built-in circuit breaker.

Heat-producing appliances (e.g., hair dryers, coffee pots, irons, etc.) should never be plugged into multi-plug adaptors, extension cords, or power strips, and should never be left unattended.

Fire Alarms/Drills. Never assume that a fire alarm is a drill or false alarm. Remain calm and evacuate the facility. Evacuation is mandatory for all individuals when the fire alarm is sounding. Anyone who fails to evacuate may face disciplinary action. Remember to follow the instructions of the emergency responders. Do not re-enter the facility until authorized. If you have any information regarding the alarm, present that information immediately to the responding emergency personnel.

Fire Extinguishers, Sprinklers, and Other Fire-Fighting/Detecting Equipment. Relocating, removing, tampering with, or destroying smoke detectors or fire-fighting equipment is strictly prohibited. Damage and/or theft of fire equipment also is punishable under North Carolina state law.

Fireworks. Students may not possess/use fireworks of any kind on campus. Anyone who sees a person with these materials should immediately report it to Duke Police.

Flammable/Combustible Materials in the Residential Areas. Flammable/combustible materials, including but not limited to gasoline, lighter fluid, and propane lanterns, are not permitted in residential areas.

Grills. North Carolina state law prohibits the use of portable charcoal, gas, or electric grills within 10 feet of all residence halls/ apartments. Storage of grills not in use, which are cool, is permitted on the exterior of the structure or in approved locations. Failure to abide by this ordinance may result in a fine as determined by the Durham Fire Marshal in addition to disciplinary action.

Halogen Lamps. Fire & Life Safety and Housing and Residence Life (HRL) prohibit halogen lamps in residential areas. The very high temperatures reached by their bulbs constitute a fire hazard and a potential source of burns. In addition, the geometry of the floor model lamp tends to make them very unstable and easily tipped over.



Duke takes matters of fire safety very seriously. Please contact Duke Police, Fire Safety, residence hall team members, or other university staff if you spot any of the following

- broken or beeping smoke detectors
- fire extinguishers that have been removed from their posts
- brush or other uncontained fires
- downed electrical wires

DUPD: 919-684-2444

Fire Safety: 919-684-5609

RC on-call: 919-970-4466

Tampering with fire safety equipment often results in revocation of a student's Housing License.

Case 1:20-cv-00996   Document 1-3   Filed 11/02/20   Page 122 of 178

Obstruction of Hallways, Stairwells, Sidewalks, and Lawns. North Carolina fire safety codes prohibit the obstruction of hallways and stairwells. The Durham Fire Marshal mandates the immediate removal of all items obstructing hallways and stairwells. HRL, Facilities Management, Fire & Life Safety, or Duke Police will remove without warning or reimbursement furniture, bicycles, lumber, and all other items found obstructing hallways or stairwells. University furniture will be removed from hallways and stairwells and residents may be charged for missing furniture. Sidewalks, stairways, and entryways must not be used for purposes other than ingress or egress. Bicycles may not be left in these areas or other locations where they may cause harm to persons or groundskeeping equipment.

Motorcycles must be parked in parking lots. Delivery trucks, automobiles, motorcycles, scooters, and mini-bikes are not permitted on lawns and walkways, patios, or stairwells. These vehicles must be parked in legal parking spaces.

Open Fires on Campus. Open fires, including bonfires, are not permitted on Duke University property except as approved by the OESO Fire & Life Safety Division and the Durham Fire Marshal. Students who either provide or contribute materials to burn or who ignite or attempt to ignite flammable materials will be considered in violation of this policy. Students also should realize that such actions violate state law and may result in a citation for unlawful burning.

Open Flames. It is a violation of university policy to light any material on fire on campus. Candles, other open flame devices, grills, incense, and any other flame/heat producing items are strictly forbidden for use inside university facilities except during official religious ceremonies, such as the observance of Chanukah. Permission for use of any open flame devices (including those used for religious ceremonies) must be obtained from OESO Fire & Life Safety Division prior to use. A copy of the signed approval letter must be maintained at the location approved for an open flame device.

Students will be held financially accountable for any damage they or the open flame device causes as a result of violating this policy and may be referred for disciplinary action.

(See "Appendix H — Theme Parties and Decorations" on page 78.)

# GAMBLING

It is against North Carolina state law and Duke University policy to gamble, with the exception of the state lottery. A person/organization is gambling if he/she/it operates, plays, or bets at any game of chance at which any money, property, or other thing of value is bet. Raffles of any kind, including those sponsored by student groups, are also prohibited. A "raffle" is defined as "a game in which the prize is won by random drawing of the name or number of one or more persons purchasing chances" (N.C.G.S. §14-309.15). Poker nights and casino games are permitted only if no admission is charged, no buy-in is required, and no real money is wagered.

# GUESTS

Students and groups are responsible for notifying their guests of university rules and regulations and may be held accountable for the conduct of their guests. Guests can be Duke University students or non-students. Guests on campus who do not abide by university policies are subject to being trespassed.

Students are responsible for the behavior of visitors to their room/apartment and may be found responsible for behavior that occurs there whether or not the occupant(s) is/are present.

# HARASSMENT

Harassment of any individual for any reason is not acceptable at Duke University. Harassment is unwelcome verbal or physical conduct that, because of its severity, pervasiveness, and/or persistence, interferes significantly with an individual's work or education, or adversely affects an individual's living conditions. (See the "Student Sexual Misconduct Policy and Procedures" on page 42 for the definition of and procedures related to sex/gender-based harassment by an undergraduate or graduate student.) The Office for Institutional Equity responds to allegations of harassment in which an accused is not an undergraduate student; see oie.duke.edu/we-can-help/complaints-and-concerns/harassment for the university's full Harassment Policy.

)

# HAZING

Hazing is a serious infraction of university regulations. The potential for hazing typically arises as part of a student's introduction to or initiation in an organization (fraternity, sorority, athletic team, or other group) in which there is often a perceived or real power differential between members of the organization and those newly joining it.

Hazing defined. Hazing is defined as any action taken or situation created, whether on or off university premises, that is harmful or potentially harmful to an individual's physical, emotional, or psychological well-being, regardless of an individual's willingness to participate or its bearing on his/her membership status. Such activities and situations include, but are not limited to:

## LEVEL I VIOLATIONS

- marching in line
- road trips
- wearing apparel which is conspicuous and not normally in good taste, and/or inappropriate for the time of year
- calisthenics
- line-ups
- pledge/signature books
- periods of silence
- standing for a length of time
- personal servitude
- activities that would not normally construe hazing but because of time, place, or manner make them inappropriate

## LEVEL II VIOLATIONS

- sleep deprivation or interruption of consecutive sleep hours
- expected or forced consumption of food, drink (including alcohol), or other substance
- acts of humiliation or degradation (including streaking or wearing degrading or humiliating apparel)
- restrictions on eating or bathing
- acts that disrupt academic instruction or learning of others
- interruption or interference of academic commitments

## LEVEL III VIOLATIONS

- branding
- paddling in any form
- compromising (sexual) situations

Any individual or group found responsible for hazing will be subject to sanctions outlined in the disciplinary process, including, but not limited to: disciplinary probation, social suspension, suspension of charter, restrictions on member recruitment and/or group activity, removal of the individual from the group, loss of housing privileges, suspension, and/or expulsion. Sanctioning will increase with the level of violation and any previous hazing violations. (Levels of violation listed above are guidelines only and may change given particular circumstances of a violation.) Students should also be aware that hazing is a misdemeanor under North Carolina state law.

Acts or potential acts of hazing may be reported to the Office of Student Conduct (919-684-6938) or Duke Police (911 or 919-684-2444). In addition, concerns may be reported confidentially via voicemail to the university's Hazing Hotline at 919-684-5766. Maintaining the confidentiality of the source is possible, but may limit the extent of action that can be taken.

Case 1:20-cv-00996   Document 1-3   Filed 11/02/20   Page 124 of 178

# WHAT IS HAZING? WHAT IS NOT HAZING?

## ROAD TRIPS

Zeta Gamma fraternity plans a group outing to enhance the sense of brotherhood among its associates and new members during the pledging period. The new member educator uses the group listserv to announce a weekend camping trip three weeks in advance. In the email, all members are notified that the group will spend two nights sleeping in tents at Jordan Lake, and the email includes details such as departure/return times and a list of planned activities. The email asks the members to respond with their availability and invites them to pitch in $10 for food and non-alcoholic beverages. The email makes explicit that no alcohol will be served on this trip, and that all members are encouraged to attend but that attendance is not required.

*This is NOT a violation of the Hazing Policy. All members of the Zeta Gamma fraternity are invited to participate in the camping trip and contribute an equal amount of money. The trip includes a specific agenda and sets detailed expectations for a member's time commitment.*

The recruitment chair of the Lambda Pi Psi fraternity planned a surprise getaway for its new members. A few associates were asked to help plan the event, and the recruitment chair secured the DukeCard of a first-year student in order to enter the East Campus residence halls. At 3 o'clock on a Saturday morning, current members stormed into the new members' rooms and yelled at them, stating they had 15 minutes to get dressed and meet at the East Campus Bus Stop, but that this was an optional activity. They were not given any further instructions. New members put their clothes on and ran to the bus stop, where cars were waiting for them. After they got into the cars, the new members were blindfolded and were driven approximately 20 minutes to an undisclosed location. They were made to get out of the car and hand in their cell phones and wallets to an associate. The new member educator then told the new members that they needed to make their way back to campus by 10 o'clock in the morning for mandatory physical training.

*This IS a violation of the Hazing Policy. Regardless of the new members' willingness to participate, the activity was harmful to their physical and emotional well-being. The new members engaged in this activity under the watch of associates. In addition to Hazing, the group may be charged with potential policy violations of Noise, Disorderly Conduct, and Property/Facilities/Services – Unauthorized Access. Lambda Pi Psi's president, new member educator, and current members who participated in the activity by driving or waking up the new members may also be held individually accountable for policy violations.*

## SCAVENGER HUNTS

The business fraternity Epsilon Delta Omega has developed a scavenger hunt to help create a sense of belonging and brotherhood. Teams consisting of both new and associate members are given a list of tasks to be completed on the Duke campus that engage them in learning more about the university and each other. Such tasks include visiting the Duke Chapel crypt and getting the names of the former Duke presidents who are buried there, finding out who the "Griffith" is in the name "Griffith Board Room" and what his role was at Duke, and meeting one of the directors of academic engagement at the Academic Advising Center. A specific time limit is set for the scavenger hunt during the day, and the members of the team who have completed the most tasks each win a gift certificate to The Parlour in Durham.

*This is NOT a violation of the Hazing Policy. There is no penalty for not completing tasks. Members are not required to complete ridiculous or dangerous tasks. Current members are asked to participate equally in the activity.*

A highly regarded a cappella group has auditioned a large number of students and is ready to accept a few new members, but wants to make sure they are committed to the long practice hours and tight-knit friendship. They distribute a list of required tasks the new members must complete between the hours of 10 PM and 8 AM the following morning. The new members are split into teams based on which students have access to cars, and the returning members gather at a member's off-campus house to watch a basketball game. The task sheet, which includes activities like stealing a parking gate arm, taking a selfie while riding the mechanical bull at a local bar, and bringing a pizza to the house, also notes that for each task the team does not complete, a team member will have to run a circuit around the East Campus loop.

Case 1:20-cv-00996   Document 1-3   Filed 11/02/20   Page 125 of 178

*This IS a violation of the Hazing Policy. The new members are subjected to absurd requirements that offer no substantial, meaningful engagement with either the group members or the university. New members are put under additional pressure with physical penalties, and the current members are not participating equally in the event. Further, the new members are required to violate university policy by taking a parking gate arm, which may result in additional disciplinary charges for the group.*

## COSTUMES/APPAREL

The Marketing Club is considering creative ways to market its annual Library Party to the Duke community. One member suggests that during the week before the party, members dress up during the day in costumes that lend themselves to this year's theme, "Heroes and Villains." The group asks for volunteers from the planning committee to participate, and gives them flyers to pass out on the Bryan Center Plaza and around campus to passersby. Throughout the week before the party, Superman, Darth Vader, Black Widow, and Buffy the Vampire Slayer are spotted on campus talking to people about the party.

*This is NOT a violation of the Hazing Policy. Students are invited to volunteer to dress up to promote the party, and wearing a costume is not a condition of membership or joining the group.*

The women's gymnastics team is trying to gather interest from the Duke community in attending its only home meet of the season. Each year, the freshman members of the team are required to don silly costumes such as a cow with udders, a monkey suit, and a cowgirl. The older members of the team instruct the freshmen to ride the East-West campus bus for hour-long shifts wearing their costumes and handing out flyers for the meet.

*This IS a violation of the Hazing Policy. First-year team members are singled out and are made to promote the meet without the older members of the team. Even if upperclassmen had to do the same activity when they were freshmen (which still is considered a violation of the Hazing Policy), new members may not be required to do so.*

Making an activity optional does not change the fact that it may be construed as hazing. The culture of joining new groups creates a tacit understanding that those who want to join will participate in any way possible to gain acceptance. Consent to being a participant in or perpetrator of hazing is not justification for violating this policy.

## OTHER EXAMPLES OF HAZING:

- Physical training, calisthenics, exercise (Level I): New members may neither be asked nor required to participate in any physical activity except in the context of club sports, intramurals, etc.
- Being required to have on one's person specific objects, food, or beverages (Level I)
- Texting or calling new members at various times of day and night in order to run errands (Level I)
- Requiring new members to clean up following group parties (unless all members of the group are asked to participate) (Level I)
- Mandatory study hours at unusual times or that interrupt a student's academic schedule (Level II)
- "Kidnapping" new members at any time of the day (Level I or II)
- Torturing animals (Level II or III)
- Requiring new members to serve as designated drivers (Level I or II)

## COMMON ACTIVITIES THAT ARE NOT CONSTRUED AS HAZING:

- Requesting that new members wear more formal attire, such as blazers and ties, on a certain day of the week (apparel that is not conspicuous or inappropriate)
- Requesting that new members wear a specific color to an event for members of the group (apparel that is not conspicuous or inappropriate)
- Tenting in Krzyzewskiville. Students who sign up to participate in tenting are given explicit instructions and expectations for attendance before getting involved. Tent checks and sleeping in cold weather are not construed as hazing; those who choose to tent are not seeking membership or initiation into an organization

Case 1:20-cv-00996   Document 1-3   Filed 11/02/20   Page 126 of 178



Both individuals and groups may be held accountable under the Hazing Policy. The action of even one member of a group may result in both individual and group responsibility. The following questions can help individuals/groups assess the appropriateness of an activity:

- Does the activity promote and conform to the ideals, values, and mission of both the university and organization?
- Is it an activity that all members (current and initiates) engage in together?
- Would the group's advisor, the national headquarters of a fraternity/sorority, and/or other university officials approve of the activity?
- Will this activity increase new members' respect for the group and all members of the group?
- Is the activity free of mental anguish or physical discomfort?
- Does the activity have inherent value in and of itself?

*[Adapted from the Fraternity Executive Association, the North American Interfraternity Conference, Inc., and Washington University.]*

# NOISE

Students and groups are expected to respect the rights of others at all times. During specified hours, higher noise levels are permitted but must remain at a level considerate of those students who wish to study or sleep:

## CENTRAL AND WEST CAMPUSES:

Quiet hours are in effect at all times other than as noted below, when reasonable levels of noise will be permitted:

> 5:00 p.m.–7:00 p.m. Monday-Thursday
>
> 5:00 p.m.–2:00 a.m. Friday
>
> 1:00 p.m.–2:00 a.m. Saturday
>
> 1:00 p.m.–6:00 p.m. Sunday

Additionally, amplified sound is permitted on the Plaza between noon and 1 p.m. on weekdays.

## EAST CAMPUS:

Quiet hours are in effect at all times other than as noted below, when reasonable levels of noise will be permitted:

> 5:00 p.m.–midnight. Friday
>
> Noon–midnight. Saturday
>
> Noon–6:00 p.m. Sunday

## ALL CAMPUSES:

From reading day(s) through the end of finals, quiet hours are in effect 24 hours a day.

Students who are disturbed by noise should attempt to resolve the situation by contacting the other party(ies) involved; or, if needed, seek the assistance of living group officers, resident assistants, graduate residents, or residence coordinators. If necessary, persistent complaints may be registered by calling Duke Police at 919-684-2444. Students are responsible for the actions of their guests; cohesive units, as a whole, may be held responsible for violations of this policy by their individual members or their guests. Initial complaints will be referred to appropriate residential staff. Depending on the nature and severity of the violation, as well as the existence of prior violations, the complaint may be forwarded to the Office of Student Conduct for disciplinary action.

Case 1:20-cv-00996   Document 1-3   Filed 11/02/20   Page 127 of 178

# PHYSICAL ABUSE, FIGHTING, AND ENDANGERMENT

Any physical abuse, fighting, and/or endangerment to an individual or group is specifically prohibited. This behavior includes, but is not limited to:

- physical violence (initiating or responding to) or attempted physical violence against a person or group. This includes fighting.
- threat of physical violence against a person or group.
- any action that endangers the health, safety, or welfare of a person or group.

*[Wording adopted from Eastern Michigan Student Conduct Code.]*

# PICKETS, PROTESTS, AND DEMONSTRATIONS

Statement of Policy. Duke University respects the right of all members of the academic community to explore and to discuss questions which interest them, to express opinions publicly and privately, and to join together to demonstrate their concern by orderly means. It is the policy of the university to protect the right of voluntary assembly, to make its facilities available for peaceful assembly, to welcome guest speakers, to protect the exercise of these rights from disruption or interference.

The university also respects the right of each member of the academic community to be free from coercion and harassment. It recognizes that academic freedom is no less dependent on ordered liberty than any other freedom, and it understands that the harassment of others is especially reprehensible in a community of scholars. The substitution of noise for speech and force for reason is a rejection and not an application of academic freedom. A determination to discourage conduct which is disruptive and disorderly does not threaten academic freedom; it is rather, a necessary condition of its very existence. Therefore, Duke University will not allow disruptive or disorderly conduct on its premises to interrupt its proper operation. Persons engaging in disruptive action or disorderly conduct shall be subject to disciplinary action, including expulsion or separation, and also charges of violations of law.

Students planning a picket, protest, or demonstration should contact University Center Activities and Events (919-684-4741) for guidance and further information.

Rule. Disruptive picketing, protesting, or demonstrating on Duke University property or at any place in use for an authorized university purpose is prohibited.

While Duke University recognizes the right to voluntary assembly, members of the university community must recognize that the Medical Center provides care for individuals needing uninterrupted medical services in tranquil surroundings. Accordingly, all pickets, demonstrations, mass assemblies, and protests shall be confined to campus areas and are strictly prohibited in or around any Medical Center building.

Hearing and Appeal. Cases arising out of violations of the Pickets and Protests Regulations will be heard by the University Judicial Board, in accordance with the procedures outlined herein. The University Judicial Board shall have jurisdiction over members of the student body, members of the faculty, and administrative personnel of the university not subject to the personnel policy handbook. Hearings will be conducted with regard for academic due process. The decision of the University Judicial Board shall be final if the accused is exonerated or if there is no appeal. In other cases, students may appeal to the president, or, in his/her absence, the provost, in which case such appeal shall be solely on the record of the proceedings before the Hearing Committee of the University Judicial Board. Argument on appeal shall be on written submission, but the president may, in addition, require oral argument.

A Hearing Committee will consist of two faculty members, one dean, and two students. These students will be selected from members of the judicial boards or governments in the undergraduate, graduate, or professional colleges or schools. The chair of the Hearing Committee will be designated by its members. The Hearing Committee will conduct its proceedings in accordance with academic due process.

Amendments. These regulations on pickets, protests, and demonstrations may be changed or amended by the university at any time but any such change or amendment shall be effective only after publication or other notice. These regulations supersede any regulations heretofore issued on the subject.

Case 1:20-cv-00996   Document 1-3   Filed 11/02/20   Page 128 of 178



Students may be held accountable by the university for their behavior off campus, from Durham to Dubai.

Undergraduates are commonly issued citations by local law enforcement for such behavior as possessing a container of alcohol while under the age of 21 and playing loud music and/or having loud guests after 11:00 p.m. (the time at which the Durham Noise Ordinance goes into effect each night).

Students who live off campus are encouraged to meet their Durham neighbors and be considerate of them. All undergraduates should become familiar with local ordinances and laws before leaving the Duke campus.

# PROPERTY/FACILITIES/SERVICES

Students and groups are expected to respect the property of others (including that of the university) and may be subject to disciplinary action for the following:

- theft of the property and/or services of another;
- damage, destruction, or defacement of the property of another, including littering or chalking of university property;
- wrongful appropriation of the property and/or services of another;
- unauthorized possession and/or use of the property of another, including knowingly being in possession of stolen goods (this includes unauthorized use of vehicles, equipment, services, the Duke University name and logo);
- unauthorized access, entry, and/or use of university or non-university facilities or property, including but not limited to buildings, classrooms, residential rooms, athletic areas, Central Campus pool, parking areas, roofs, ledges, and tunnels; and/or
- violation of any policy or guidelines pertaining to specific usage of a university facility.

*[Wording adopted from Eastern Michigan Student Conduct Code.]*

# SEXUAL MISCONDUCT

See "Student Sexual Misconduct Policy and Procedures" on page 39.

# SMOKING

Duke University seeks to preserve a living and working environment supportive of behaviors that contribute to the physical health and well-being of all community members. Smoking any substance is not permitted in any university building, including residence halls and apartments. Examples of prohibited smoking devices include, but are not limited to, cigarettes, e-cigarettes, and vaporizers.

Smoking is neither permitted within 10 feet of residential buildings, academic buildings, and dining facilities, nor anywhere on the campus of the Medical Center. Smoking is prohibited in specifically designated outdoor areas as determined by the manager of those spaces (e.g., the Plaza).

Case 1:20-cv-00996   Document 1-3   Filed 11/02/20   Page 129 of 178

## SOLICITATION

Recognized student organizations may use the Plaza for the purpose of sales, distribution, or promotion of events (also known as "tabling"). Tabling is administered by University Center Activities and Events (UCAE). Contact UCAE at 919-684-4741, 036 Bryan Center, or visit studentaffairs.duke.edu/ucae for more information and detailed guidelines.

Solicitation is prohibited within a 200-foot radius of the West and East Campus bus stops.

Commercial or outside solicitors (including student employees of outside vendors) are prohibited without permission of the appropriate space manager.

## STALKING

Stalking is a course of conduct (including cyberstalking) directed at a specific person that would cause a reasonable person to fear for her, his, or others' safety, or to offer substantial emotional distress. Sex/gender-based stalking falls under the Student Sexual Misconduct Policy (see page 43).

## UNAUTHORIZED SURVEILLANCE/PHOTOGRAPHY

Capturing or recording audio, video, or photographic images of an individual in a location or under circumstances in which that person has a reasonable expectation of privacy, including, but not limited to, shower/locker rooms, residence hall rooms, and restrooms, is prohibited. Also prohibited is the storing, sharing, and/or other distribution of such unauthorized surveillance/photography (no matter whether directly or indirectly obtained) by any means, electronic or non-electronic.

*[Wording adopted from Rice University.]*

Alumni or current students who are applying to law school, medical school or other graduate programs, or, who want to work for the government, will likely be asked to report their disciplinary history. If you have a form for us to complete as part of the application (often called a "Dean's Certification" form), send it to us at:

Office of Student Conduct
Box 90893
Durham, NC 27708-0893
conduct@duke.edu
fax: 919-681-7390

Please allow 5 - 7 business days for your request to be processed. Because of the volume of requests received, we cannot guarantee a response earlier than five business days, though we do our best to process requests sooner.

It is critically important that students/alumni be honest in sharing information about their disciplinary history, as universities/the government do follow up with us. Perhaps the worst thing you can do is minimize or even lie about an incident in which you were involved. Often, a student's forthrightness about an incident, and an explanation of what he/she has learned from the incident, can be a plus factor for a student.

# WEAPONS/FIREARMS/EXPLOSIVES

Although North Carolina law permits weapons on public university campuses under certain parameters, Duke University policy has not changed and continues to prohibit weapons on campus.

It is against university policy to possess and/or use a gun, rifle, pistol, or other firearm of any kind, or any powerful explosive on university property. Additionally, other than when permitted by the Vice President for Student Affairs (or his/her designee) for legitimate educational purposes, students are not permitted to possess and/or use on campus any weapon, including but not limited to pepper spray, mace, BB gun, stun gun, paintball gun, potato gun, realistic-looking toy gun, air rifle, air pistol, sword, bowie knife, dagger, slingshot, switchblade knife, blackjack, and metallic knuckles.

# OTHER VIOLATIONS

Other violations for which students or groups may be subject to disciplinary action include, but are not limited to:

- violating any other published or posted university regulation not specifically mentioned in this section, including the Housing License, Housing and Residence Life regulations, student activities regulations, guidelines for organizations, parking regulations, etc.;
- acting as an accomplice through action or negligence to the commission of any prohibited act;
- attempting or intending to commit any violation of laws and/or university policies; and
- violating local ordinances or state or federal laws (as determined through the university's disciplinary process), including those related to noise, housing occupancy, and/or the use or distribution of alcohol.

Case 1:20-cv-00996   Document 1-3   Filed 11/02/20   Page 131 of 178



# STUDENT SEXUAL MISCONDUCT POLICY AND PROCEDURES:
## DUKE'S COMMITMENT TO TITLE IX

# I. INTRODUCTION

Duke University is committed to encouraging and sustaining a learning and living community that is free from harassment, violence, and prohibited discrimination. In that regard and consistent with federal law (e.g., Title IX of the Education Amendments of 1972 and the Violence Against Women Act), Duke has developed this comprehensive Student Sexual Misconduct Policy, applicable to all students (undergraduate, graduate, and professional, or any student enrolled in any Duke program). Further, Duke conducts extensive education and awareness programs with the goal of preventing and discouraging sexual/gender violence and other forms of sexual misconduct.

As discussed more fully below, this Student Sexual Misconduct Policy prohibits all forms of sex/gender-based harassment, sexual/gender violence, sexual exploitation, relationship violence (domestic violence and dating violence), and stalking. Collectively, these terms are referred to in this policy as "Sexual Misconduct." They are defined below under "Prohibited Conduct." (Note that non-sex/gender-based harassment is also a violation of university policy, as described under the university's Harassment Policy, available at bit.ly/dukeharassment.)

The Student Sexual Misconduct Policy serves three principal purposes. First, it establishes conduct standards—namely, prohibited sexual misconduct—for all Duke students. Note that a violation of this policy may also constitute a crime, which can be independently reported to Duke Police, Durham Police, or other appropriate law enforcement agency.

Second, the Student Sexual Misconduct Policy outlines reporting, investigation, and complaint resolution procedures in cases where it is alleged that a Duke student has engaged in sexual misconduct. This policy refers to the individual who is the alleged victim of the behavior(s) in question as the "complainant" and the student alleged to have committed the violation of the policy as the "respondent." Both the complainant and the respondent will be treated fairly and with respect throughout the process. Respondents are entitled to a presumption that there is not a violation of this policy throughout the disciplinary process unless and until they are found responsible for a violation of this policy.

In the paragraphs that follow, the Student Sexual Misconduct Policy specifies to whom violations of this policy should be reported, the availability of confidential reporting, administrative actions available to the complainant and the respondent, how the university will investigate and resolve alleged violations, possible sanctions, and appeals.

The Office of Student Conduct is primarily responsible for implementing these procedures; the Office for Institutional Equity assists by investigating reports that the Office of Student Conduct refers to it. Anyone with concerns about a possible violation of the Student Sexual Misconduct Policy by a student is encouraged to contact the Office of Student Conduct at 919-684-6938, conduct@duke.edu, or via studentaffairs.duke.edu/conduct/report-incident.

Third, the Student Sexual Misconduct Policy describes resources available on campus and in the community to assist students in dealing with the impact of sexual misconduct, whether it happened recently or in the past. Such services include, for example, the Office of Gender Violence Prevention and Intervention (GVPI) in the Women's Center, Counseling and Psychological Services (CAPS), DukeReach, Duke Police (for possible criminal conduct), and administrative actions arranged or issued by the Office of Student Conduct, the Office for Institutional Equity, GVPI, and/or the Vice President for Student Affairs (or designee). In addition, resources are available to respondents during and, in some cases, after the complaint process.

Dr. Benjamin D. Reese (919-684-8222, ben.reese@duke.edu), Vice President of the Office for Institutional Equity (oie.duke. edu), is the individual responsible for the coordination and administration of Duke's nondiscrimination and harassment policies generally. Howard Kallem (919-684-1437, howard.kallem@duke.edu), also in the Office for Institutional Equity, is the Director of Title IX Compliance (Title IX Coordinator). In this role, Mr. Kallem is responsible for overseeing the university's Title IX compliance, including this policy and its complaint-resolution procedures; as such, Mr. Kallem receives comments/concerns from students about this policy's implementation. The Office for Institutional Equity is located in Smith Warehouse, 114 S. Buchanan Blvd., Bay 8, Durham, North Carolina, 27708.

## CONFIDENTIALITY

A student may discuss an alleged violation of this policy without the information being reported to the Office of Student Conduct with those who serve in a professional role in which communication is privileged under North Carolina law and to those whom the university has designated as a confidential resource consistent with Title IX. Those persons include:

- Student Health staff
- Counseling & Psychological Services (CAPS) staff
- Women's Center staff
- Clergy who are acting as such in their professional role at Duke
- Ombudsperson

Students should be aware that, with the exception of these confidential resources, all employees who become aware of conduct that might fall under this policy are expected to notify the Office of Student Conduct with the names of the parties involved and the details of the report. Students who serve in an ongoing peer-advising role (such as Resident Assistants) are also expected to file such reports with the Office of Student Conduct.

## INFORMATION FOR COMPLAINANTS

Complainants will be treated with respect before, during, and after the disciplinary process. During an initial meeting, the Office of Student Conduct will inform the complainant of the university's disciplinary process and possible outcomes. The Office of Student Conduct will communicate substantive and, when warranted, procedural developments regarding an investigation. The alleged conduct may also be criminal in nature, and complainants have the right to report—or not to report—the conduct to Duke Police, Durham Police, or other appropriate law enforcement agency. A criminal report does not preclude university disciplinary action.

Complainants are strongly encouraged to seek counseling and support available through resources such as Gender Violence Prevention and Intervention (GVPI) in the Women's Center, Counseling and Psychological Services (CAPS), and Durham Crisis Response Center (DCRC). For more information on these resources, please see "Support Services and Options for Complainants" on page 48.

Regardless of whether a complainant pursues a criminal complaint and/or the university's complaint process through this policy, the university may investigate the incident(s) in question and will take appropriate responsive action to ensure that the educational environment is free of harassment and, to prevent the recurrence of a hostile environment—and, if appropriate, remedy the effects of the alleged harassment on the complainant. As discussed later in the policy, remedies available to a complainant may include, but are not limited to: reasonable academic accommodations, on-campus housing reassignment, a "no contact" directive between the respondent and the complainant, and disciplinary action against the respondent as determined through the disciplinary process outlined in this policy. Mediation is not appropriate for any allegation of sexual violence.

A complainant may request or the university may issue administrative actions and supports such as a "no contact" directive and changes to academic and living situations through the Office of Student Conduct, GVPI in the Women's Center, and/or the Title IX Coordinator regardless of whether a complainant files a formal report. A complainant will be notified as to what changes are reasonably available and/or are being implemented.

## INFORMATION FOR RESPONDENTS

Respondents will be treated with respect before, during, and after the disciplinary process. During an initial meeting, the Office of Student Conduct will inform the respondent of the university's disciplinary process and possible outcomes. The Office of Student Conduct will communicate substantive and, when warranted, procedural developments regarding an investigation. Note that alleged behavior may also be criminal in nature, and a respondent may be subject to a criminal investigation by the appropriate law enforcement agency at the same time as an investigation by the university under this policy; the respondent may wish to consult with a criminal lawyer as the Office of Student Conduct does not provide advice as to the criminal process. Respondents are entitled to a presumption that there is not a violation of this policy throughout the disciplinary process unless and until they are found responsible for a violation of this policy.

Respondents have the right to (and are strongly encouraged to seek) counseling and support available through resources such as CAPS, DukeReach, or other university and local resources.

A respondent may request, or the Office of Student Conduct and/or the Title IX Coordinator may change, academic and living situations and will be notified as to what changes are reasonably available and/or are being implemented.

# II. SCOPE

This Student Sexual Misconduct Policy applies to any instance in which any Duke student (undergraduate, graduate, professional, or any student enrolled in any Duke program) is alleged to have engaged in sexual misconduct against anyone (e.g., a student, employee, or third party such as a visiting athlete, guest speaker, or contractor), regardless of the complainant's or respondent's sex, gender, sexual orientation, or gender identity.[1] The university will respond to any complaint of sexual

[1] The Office for Institutional Equity (Smith Warehouse, Bay 8, 919-684-8222) receives reports and handles complaints alleging sexual misconduct by employees and all other non-Duke students under the Duke University Harassment Policy, oie.duke.edu/we-can-help/complaints-and-concerns/harassment.

Case 1:20-cv-00996   Document 1-3   Filed 11/02/20   Page 134 of 178

misconduct, including conduct alleged to have occurred during breaks, leaves of absence, or periods of dismissal, whether on or off campus. The disciplinary process is available as an option while a respondent remains a student at Duke. With the agreement of the Vice President for Student Affairs and the dean of the respondent's college or school, disciplinary action may be taken against a student who has graduated and is alleged to have committed a violation while a student.

# III. PROHIBITED CONDUCT

Rule. Duke University prohibits all forms of sex/gender-based harassment, sexual/gender violence, sexual exploitation, relationship violence (domestic violence and dating violence), and stalking.

Sex/Gender-Based Harassment. Sex- or gender-based harassment may take two forms:

One form of harassment is unwelcome verbal or physical conduct based on sex that, because of its severity, persistence, and/or pervasiveness, creates a hostile environment by interfering significantly with an individual's work or education, or adversely affecting an individual's living conditions.

The other form of harassment is a student's use of a position of authority (e.g., as a TA, RA, team captain, or officer in a fraternity or sorority) to engage in unwelcome sexual advances, requests for sexual favors, or other verbal or physical conduct of a sexual nature when:

- submission to such conduct is explicitly or implicitly made a term or condition of an individual's employment or education; or
- submission to or rejection of such conduct is used as a basis for decisions affecting an individual's education or employment.

The conduct alleged to constitute harassment under this policy must be sufficiently severe, persistent, and/or pervasive to actually interfere with the complainant's work, education, or living conditions to a significant degree. The severity, persistence, and/or pervasiveness of the alleged conduct will also be evaluated from the perspective of a reasonable person similarly situated to the complainant and in consideration of the context of the behavior.

Harassment must be distinguished from behavior that, even though unpleasant or disconcerting, is appropriate to the carrying out of certain instructional, advisory, or supervisory responsibilities or to legitimate academic and related discussions.

Sexual Violence. Sexual violence is a particularly severe form of harassment defined as any physical act of a sexual nature based on sex and perpetrated against an individual without consent or when an individual is unable to freely give consent. See Section IV of this policy (page 43) for more information about consent.

Physical acts of a sexual nature include, but are not limited to, touching or attempted touching of an unwilling person's breasts, buttocks, inner thighs, groin, or genitalia, either directly or indirectly; and/or sexual penetration (however slight) of another person's oral, anal, or genital opening with any body part or object.

Sexual Exploitation. Sexual exploitation includes taking sexual advantage of another without consent for one's benefit or the benefit of another party.

Examples of conduct that may constitute sex/gender-based harassment include:

- Continued unwelcome questioning about intimate or personal matters
- Unwelcome touching, or other physical acts of a sexual nature
- Severe, persistent, or pervasive comments or jokes of a sexual nature
- Severe, persistent, or pervasive unwelcome comments or conduct regarding an individual's sexual orientation or gender identity
- Sending emails that contain extreme or persistent sexual messages, images, or language
- Repeated derogatory comments of a non-sexual nature relating to a particular sex/gender generally and targeted to (a) specific individual(s) of that sex/gender
- Sex/gender-based violence—non-sexual physical assault of an individual because of the individual's sex or gender

Harassment may be verbal, nonverbal, or physical and the above list is not exhaustive, but intended only to provide general examples of possible prohibited conduct.

Case 1:20-cv-00996   Document 1-3   Filed 11/02/20   Page 135 of 178

Relationship Violence. Relationship violence is any act of violence or pattern of abusive behavior in an intimate relationship that is used by one partner to gain or maintain power and control over another partner. Relationship violence can be physical, sexual, emotional, economic, or psychological actions or threats of actions that influence another person. Relationship violence includes domestic violence and dating violence (adapted from the Office on Violence Against Women, U.S. Department of Justice, justice.gov/ovw/domestic-violence).

- **Domestic violence** is any act of violence or pattern of abusive behavior committed by a student against the student's current or former spouse/cohabitant, person similarly situated under domestic or family violence law, or anyone else protected under domestic or family violence law.

- **Dating violence** is any act of violence or pattern of abusive behavior committed by a student who has been in a social relationship of a romantic or intimate nature with the complainant. Whether there was such relationship will be gauged by its length, type, and frequency of interaction.

Sex/Gender-Based Stalking. Sex/gender-based stalking is a course of conduct (including cyberstalking) directed at a specific person that would cause a reasonable person to fear for her, his, or others' safety, or to suffer substantial emotional distress. Stalking by a student not based on sex or gender is addressed under the Stalking Policy.

## RETALIATION

Retaliation is prohibited under Title IX and this policy and is adjudicated under this policy and procedures. Retaliation is defined as words or acts taken in response to a good-faith reporting of sexual misconduct, or to an individual or group's participation in Duke's complaint process or the follow up to a Duke complaint. The policy's prohibition against retaliation also protects individuals who oppose through words or actions what they reasonably believe to be sexual misconduct. Retaliation will be a violation of this policy when it is sufficiently serious (e.g., severe, persistent, and/or pervasive) to discourage a reasonable person from further such activity. The protection against retaliation applies to the parties and to all witnesses. All persons who believe they have been subjected to misconduct under this policy are encouraged and have the option to seek support, utilize available resources, and come forward with their concern or complaint.

Fear of retaliation should never be an obstacle to reporting an incident of alleged sex/gender-based harassment, sexual/gender violence, sexual exploitation, relationship violence, or stalking.

# IV. CONSENT

Consent is an affirmative decision to engage in mutually acceptable sexual activity freely given by clear actions and/or words.

Consent is an informed decision made freely and actively by all parties. Relying solely upon nonverbal communication can lead to miscommunication. It is important not to make assumptions; if confusion or ambiguity on the issue of consent arises anytime during a sexual interaction, it is essential that each participant stops and clarifies, verbally, willingness to continue.

Students should understand that consent may not be inferred from silence, passivity, or lack of active resistance alone. Furthermore, a current or previous dating or sexual relationship is not sufficient to constitute consent, and consent to one form of sexual activity does not imply consent to other forms of sexual activity.

Conduct is "without consent" if no clear consent, verbal and/or nonverbal, is given. An individual is "unable to freely give consent" when the individual is incapacitated (arising, for example, from the use of alcohol or other drugs or when the individual is passed out, asleep, unconscious, or mentally or physically impaired). An individual is also unable to freely give consent when the individual is coerced into sexual activity, such as, for example, through the use of physical force, threat of physical or emotional harm, undue pressure, isolation, or confinement.

The perspective of a reasonable person will be the basis for determining whether a respondent knew, or reasonably should have known, whether a complainant was able to freely give consent and whether consent was given. Additionally, being

Case 1:20-cv-00996   Document 1-3   Filed 11/02/20   Page 136 of 178

intoxicated or incapacitated does not diminish one's responsibility to obtain consent and will not be an excuse for sexual misconduct.

## THE IMPACT OF ALCOHOL OR OTHER DRUGS

The use of alcohol or other drugs can impair effective communication about sexual activity and can hinder one's ability to pick up on danger cues and resist an assault. Alcohol or other drugs can also lower inhibitions and create an atmosphere of confusion over whether consent is freely and effectively given.

# V. COMPLAINT RESOLUTION

A flowchart illustrating the complaint resolution process can be found on page 52.

## REPORTING

Students are encouraged to report violations of this policy to the Office of Student Conduct, 200 Crowell Hall, conduct@duke.edu, 919-684-6938, studentaffairs.duke.edu/conduct/report-incident.

Once a report is received, an investigation and possible immediate and/or interim measures may occur, including adjudication through the disciplinary process described below, administrative actions (e.g., a "no contact" directive, trespass from campus, interim suspension), reasonable academic or housing modifications, or other measures designed to reasonably minimize the possible recurrence of, and mitigate the effects of, the alleged conduct.

The Office of Student Conduct handles an alleged violation of this policy when the person alleged to have committed a violation is a student. (The Office for Institutional Equity, Smith Warehouse, Bay 8, 919-684-8222, receives reports in which the person alleged to have committed a violation is an employee or third party.) Reports involving an alleged student respondent may be filed at any time while the respondent remains a student at Duke; prompt reporting can aid an investigation.

A complainant may request that the Office of Student Conduct not reveal the complainant's identity in responding to a report. (In some situations, it may be possible to proceed fully with an investigation without disclosing the name of the complainant.) A complainant may also request that the university take limited or no action in response to a report.

A request to preserve the confidentiality of any party involved in a report or that no action be taken should be made to the Office of Student Conduct, 919-684-6938, conduct@duke.edu. Staff in the Office of Student Conduct will confer with the Title IX Coordinator about the request and inform the party of the extent to which confidentiality may be maintained. The university will attempt to preserve the confidentiality of the complainant and/or respect a request for limited or no action in response to a report except when, in the university's judgment, doing so would jeopardize the safety of members of the university community (including the complainant) or where the university is required by law to disclose the information (such as in response to a legal process).

## IMMEDIATE AND/OR INTERIM MEASURES

The Office of Student Conduct may issue administrative actions immediately and/or on an interim basis as deemed appropriate, including but not limited to restrictions on contact between the complainant, the respondent, and/or other involved parties; exclusion from areas of campus; and, removal or relocation from residential areas. The Office of Student Conduct adjudicates alleged violations of such through its policies and procedures. The Vice President for Student Affairs, or designee, may impose an interim suspension.

4

## TIME FRAMES

The Office of Student Conduct seeks to resolve complaints under this policy within 60 business days from receipt of a report, excluding days classes are not in session (see additional information about Appeals, on page 47, for additional time frames). An investigation typically takes 21 to 45 business days to complete. Generally, within 15 business days after completion of an investigation, an administrative or panel hearing, if applicable, is scheduled. During this time, staff in the Office of Student Conduct may seek clarifying information and/or meet with a complainant, respondent, investigator, or others.

Circumstances may require the university to extend this overall time frame or any individual time frame discussed in this policy. Examples of reasons why time frames may need to be extended include the complexity of the case, delays due to fall/spring/summer/holiday breaks, inclement weather, and other extenuating circumstances. Exceptions to these time frames will be communicated to the complainant and respondent.

## ADVISORS

A complainant and a respondent have access to trained Disciplinary Advisors to guide them through the disciplinary process. Complainants and respondents may consult with anyone they wish (including an attorney) during any stage of this process. One advisor of the complainant's/respondent's choice (either the university-appointed Disciplinary Advisor or another advisor of their choice) may accompany the complainant/respondent to any meeting with Office of Student Conduct staff, the investigator, or to a hearing. The advisor's role in any meeting or hearing is limited to quietly conferring with the complainant or respondent through written correspondence or whisper, and the advisor may not address any other participant or the hearing panel. An advisor may not also be a witness.

## INVESTIGATION

After it receives a report, the Office of Student Conduct typically meets with a complainant and respondent separately in order to review the disciplinary process and to hear an overview of each party's account of the incident. Immediate, interim, and/or long-term measures may also be discussed. The Office of Student Conduct may use any information gleaned through this and/or subsequent meetings with the complainant/respondent in the disciplinary process.

If the Office of Student Conduct determines further investigation is warranted, it will refer the report to the Director of Title IX Compliance, who will assign the case to an investigator from the Office for Institutional Equity. The investigator interviews witnesses, collects additional information, and submits a written report of relevant information to the Office of Student Conduct. The Office of Student Conduct will review the report for completeness and relevance (as that term is defined in Section VI), and direct further investigation as necessary before the report is shared with the complainant and respondent.

The investigator's final report will be shared with the complainant and respondent, who then have five business days to respond in writing to the report with any clarifications, witness statements, or other information. The complainant and respondent must also submit in writing by that time the names of any material witnesses the complainant/respondent wishes to testify (should the matter proceed to a hearing) and a summary of information each witness would provide through his/her testimony. (Character witnesses are not permitted.) Names of witnesses provided by the complainant/respondent will be shared with the other party. After the five-business-day deadline, the complainant and respondent may not provide any additional information for the hearing packet (defined on page 46) and may not produce any additional material at the hearing, unless that information was not reasonably available prior to the closing of the five-day window. The hearing panel or the Office of Student Conduct, as appropriate, determines whether to grant exceptions to this five-day deadline.

The Office of Student Conduct will determine what, if any, changes or additions are made to the investigator's report based upon its review of the report and feedback as described above from the complainant and respondent.

The Office of Student Conduct will determine whether to proceed to a hearing based on its assessment of whether there is sufficient information to believe that a policy violation may have occurred. The Office of Student Conduct will convey this decision in writing to the complainant and respondent as applicable, who may ask that the Office of Student Conduct reconsider its decision.

# VI. HEARING PROCEDURES

When the Office of Student Conduct decides that a case should proceed to a hearing, the case may be resolved either through an administrative resolution or a hearing panel. Under both types of proceedings, the university will use a "preponderance of the evidence" (more likely than not) standard.

## ADMINISTRATIVE HEARING

At the discretion of the Office of Student Conduct, and with the agreement of both the complainant and respondent, a report may be resolved through an administrative hearing. The parties will be notified (typically via email) of the specific violations of the Student Sexual Misconduct Policy under consideration in advance of an administrative hearing. A designee of the Office of Student Conduct will review the information gathered during the investigation separately and in private with each party and give each party an opportunity to respond. The designee will determine if the respondent is responsible for the alleged policy violation(s), and, if so, issue (an) appropriate sanction(s). The parties will be notified in writing of the outcomes concurrently. If the respondent or complainant does not accept the administrative hearing resolution, either party may request by the stated deadline (typically 72 hours after notification of the outcome) a hearing before a hearing panel, as described below. If such a request is made, the Office of Student Conduct will then proceed in scheduling a hearing panel. The proposed outcome from the administrative hearing will not be disclosed to the hearing panel unless the complainant or respondent shares such information.

## HEARING PANEL

If the Office of Student Conduct decides the case should be resolved through a hearing panel, the Office of Student Conduct will appoint a specially trained three-person hearing panel (typically including two faculty or staff members and one student and, when possible, at least one representative of the complainant's and respondent's school(s)) to resolve a complaint under this policy. A finding of responsibility must be based on a unanimous vote. Sanctions of suspension or expulsion must also be supported by a unanimous vote. A majority vote is required for all other sanctions.

The following procedures apply to a complaint that proceeds to a hearing panel:

- Notice. Both the complainant and the respondent will be notified at least 120 hours in advance of the date and time of the hearing and the names of the hearing panelists.

- Hearing Packet. In advance of the hearing, the Office of Student Conduct finalizes a packet with information it deems relevant to the case to be shared with the hearing panel. The hearing packet typically includes the investigator's report (if applicable). The Office of Student Conduct will share a copy of that packet with both the complainant and the respondent at least 120 hours in advance of the hearing.

- Conflict of Interest. A complainant and/or respondent may challenge the participation of a panelist because of perceived conflict of interest, bias, or prejudice. Such challenges, including rationale, must be made to the Office of Student Conduct at least 72 hours prior to the commencement of the hearing. At its discretion, the Office of Student Conduct will determine whether such a conflict of interest exists and whether a panelist should be replaced. Postponement of a hearing may occur if a replacement panelist cannot be immediately identified.

- Witnesses. The hearing panel may, at its discretion, exclude witnesses or witness testimony the panel considers irrelevant or duplicative.

- Electronic Devices. A respondent, complainant, advisor, and/or witness may not bring electronic devices that capture or facilitate communication (e.g., computer, cell phone, audio/video recorder, etc.) into a hearing room, unless authorized by the hearing panel. The Office of Student Conduct will make an audio recording of the hearing to be kept on file for three years. Reasonable care will be taken to create a quality audio recording and minimize technical problems; however, technical problems that result in no recording or an inaudible one will not be a valid argument for appeal.

- Hearing Procedure. A hearing panel has general authority over the conduct of the hearing (e.g., it may set time frames for witness testimony and it may limit opening/closing statements or their length, etc.). The general course of procedure for a panel hearing is as follows: introductions; respondent's statement accepting or denying responsibility; opening comments from the complainant; opening comments from the respondent; questions from the panel; testimony/questions of other material witnesses (if applicable); closing comments from the complainant; and, closing comments from the respondent. A complainant or respondent may not question each other or other witnesses directly, but may raise questions to be asked of that party through the hearing panel, which will determine whether to ask them. The hearing panel determines the relevancy of any information presented/submitted at the hearing and can exclude irrelevant information.

Case 1:20-cv-00996   Document 1-3   Filed 11/02/20   Page 139 of 178

- Hearing Facilitator. A staff member from the Office of Student Conduct will serve as the non-voting hearing facilitator.
- Relevance.
  - In evaluating the relevance of information, the Office of Student Conduct, the investigator from the Office for Institutional Equity, or the hearing panel, as appropriate, considers, among other things, whether the information bears on a fact at issue in the case, is more prejudicial than probative, or is duplicative.
  - Polygraph examinations and/or their results are neither admissible nor considered in any part of the disciplinary process.
  - A complainant's or respondent's prior or subsequent sexual activity is typically not relevant and will only be considered as evidence when the previous or subsequent behavior was substantially similar to the conduct at issue or indicates a pattern of behavior and substantial conformity with that pattern.

The complainant and respondent will receive verbal notification of the decision of a hearing panel no later than five business days after the hearing. Notification will be individually given to the respondent and complainant at approximately the same time. A written hearing report outlining the decision and rationale of the hearing panel will be delivered to the respondent and the complainant typically within 10 business days of the hearing.

## SANCTIONS

Sanctions for a finding of responsibility include, but are not limited to, expulsion, suspension, disciplinary probation, recommended counseling, and/or other educational sanctions. The hearing body will determine the sanctions, first considering whether expulsion (permanent removal) from the university is appropriate. While expulsion is the starting point for consideration, the hearing body has discretion to decide that (a) different sanction(s) is (are) appropriate. Factors pertinent to the determination of what sanction applies include, but are not limited to, the nature of the conduct at issue, prior disciplinary history of the respondent (shared with a panel only upon a finding of responsibility for the allegation), previous university response to similar conduct, and university interests (e.g., in providing a safe environment for all).

## LONG-TERM/INDEFINITE MEASURES AND/OR REMEDIES

The Director of Title IX Compliance and/or staff in the Office of Student Conduct will work with the complainant and respondent as applicable to identify and implement any appropriate/necessary long-term or permanent measures/remedies. The Director of Title IX Compliance and/or staff in the Office of Student Conduct will also identify appropriate remedies/measures to address any effects of substantiated conduct on the university community. Long-term remedies/measures may include extending or making permanent any interim protective measures or implementing additional measures. The Director of Title IX Compliance and/or staff in the Office of Student Conduct will consider whether there is a need for additional measures/remedies, which may include "no contact" directives and reassignment or removal from a class or on-campus living area.

## APPEALS

A respondent or complainant may appeal the hearing panel's decision by submitting a written appeal statement within five business days of the date the hearing report is sent to the parties. Appeals are limited to five pages (12-point font, 1-inch margins). The two grounds for appeal are:

1. New information not reasonably available at the time of the hearing that is material to the hearing panel's decision; and/or
2. Procedural error(s) that materially impacted the hearing panel's decision.

The appeal statement must identify the ground(s) for appeal. Note that an appeal is not a re-hearing of the case.

The composition of the Appellate Board for cases arising under this policy includes specially trained members of the university community appointed by the Vice President for Student Affairs. The chair of the Appellate Board or the chair's designee is responsible for selecting three-person panels from membership of the Appellate Board to consider appeals.

If, by majority vote, the appellate panel determines that a ground of appeal is substantiated, the panel will return the case to the Office of Student Conduct. Otherwise, the decision of the hearing panel stands. When a case is returned to the Office of Student Conduct, the Office of Student Conduct may decide to drop the case (e.g., based on insufficient information to believe that a policy violation may have occurred), send the case to the original hearing panel for reconsideration, send the case to a new hearing panel with the same or different charges, and/or (re)implement any aspect of the disciplinary process. A different decision (i.e., the decision of responsibility and/or sanctions) may subsequently result.

Case 1:20-cv-00996   Document 1-3   Filed 11/02/20   Page 140 of 178

## Procedures

The Appellate Board's role is limited to reviewing the hearing panel record, the appealing party's ("**appellant**") written appeal statement, any response to that statement by the other party ("**appellee**"), and information presented at a meeting of the Appellate Board, if convened.

The appellate panel will typically notify the parties of its decision regarding an appeal in writing within 20 business days from receipt of the appeal statement. If the decision will take longer, the chair will inform the parties.

The following procedures guide the Appellate Board process:

- **Appeal Statement.** The written hearing report will include instructions for submitting an appeal. The chair may summarily deny an appeal if it is not based on one or both grounds of appeal.

- **Composition of Panel.** If the appeal is not summarily denied by the chair, the chair will convene a three-person panel and notify the appellant and appellee of the names of the panel members. When possible, the chair will select at least one Appellate Board member from the school community of the complainant and respondent. The appellant and/or appellee may challenge the participation of an appellate panelist because of perceived conflict of interest, bias, or prejudice. Such challenges, including rationale, must be submitted in writing to the chair no later than 24 hours after notification of the names of the appellate panel members. The chair will determine whether such a conflict of interest exists and whether a panelist should be replaced.

- **Response to Appeal.** The chair will provide written notice to the appellee that an appeal has been submitted and will give the appellee an opportunity to review the appeal statement. The appellee may submit a written response to the appeal ("response"). The response is due five business days from the date the chair provides written notice of the appeal to the appellee and is limited to five pages (12-point font, 1-inch margins). The chair will provide the appellant an opportunity to review the response, though no additional opportunity to respond in writing will be provided to the appellant.

- **Exceptions.** The appellant and appellee may submit to the chair requests for exceptions to page limits or deadlines. Exceptions must be requested in advance of any deadline by sending an email to appeals@duke.edu, with justification for such request(s). If either party fails to meet a deadline or exceeds page limits without receiving an exception, the chair has the discretion to summarily reject an appeal or the appellate panel may disregard the response.

- **Meetings.** On its own or at the request of the appellant or appellee, the appellate panel may convene a meeting to give the parties an opportunity to amplify the reason(s) for the appeal or the response. If a meeting is convened, the appellate panel will invite both the appellant and appellee, who may bring an advisor of their choice to the meeting. The advisor's role is limited to quietly conferring with their advisee, and may not address the appellate panel. In the event an appeal alleges a procedural error, the appellate panel may request that (a) staff member(s) in the Office of Student Conduct, the Office for Institutional Equity, and/or member(s) of the hearing panel attend the meeting to gather more information about the alleged procedural error.

- **Written Decision.** The Appellate Board will provide written notification of the final decision to the appellant and appellee at approximately the same time.

# GETTING HELP

Any student at Duke University who experiences sexual/gender violence—regardless of sex/gender—may contact the Women's Center at 919-684-3897 or email WCHelp@duke.edu. See "Support Services and Options for Complainants" below for additional information. In case of emergency or immediate threat, call 911 or Duke Police at 919-684-2444.

## SUPPORT SERVICES AND OPTIONS FOR COMPLAINANTS

A variety of support resources are available on campus and in the community to assist students in dealing with sexual misconduct, whether it happened recently or in the past. The following is a list of helpful resources. Additional resource information is available at studentaffairs.duke.edu/wc.

**Information, advocacy, counseling, and emotional support.** The Office of Gender Violence Prevention and Intervention (GVPI) provides education, advocacy, and support for students who experience sexual and relationship violence, sex/gender-based harassment, and sex/gender-based stalking, as well as for their friends and families.

Case 1:20-cv-00996   Document 1-3   Filed 11/02/20   Page 141 of 178

Students of any gender can receive information, support, and accompaniment regarding medical treatment, reporting options, academic and residential accommodations, referrals, legal options, and trauma-focused therapy. Walk-in or scheduled appointments with the GVPI Coordinator are available during business hours by calling 919-684-3897, emailing womenctr@duke.edu, or by visiting the Women's Center located at 001 Crowell Building (underneath the Coffeehouse) on East Campus. Emergency after-hours assistance is available via pager at 919-970-2108. All services are free and confidential and do not require making a formal report to the police or the university.

Counseling and Psychological Services (CAPS) also offers ongoing counseling services; call 919-660-1000 for an appointment. For 24-hour crisis information and referral, contact the GVPI information line at 919-681-6882, the Dean on-Call (pager number 919-970-4169), or the Durham Crisis Response Center at 919-403-6562 (for 24-hour hotline). All services are confidential and do not require making a formal report to the police or the university.

Medical concerns. Students should seek medical attention immediately to have the most options for the prevention of pregnancy and sexually transmitted infections. Even if physical injuries are not apparent, one may have injuries as a result of sexual assault that are not easily seen. For immediate and urgent medical concerns, students may go directly to the Emergency Department (ED) of Duke Medical Center (off Erwin Road near Trent Hall). Duke Police (911 or 919-684-2444 from non-campus phones) can provide transportation without students having to make a report. Services available at the Emergency Department are: medical care, evidence collection, emergency contraception, and sexually transmitted infection prevention.

Evidence can be collected anonymously. Evidence is best collected within 120 hours of the assault. Pursuing a criminal case is not necessary in order to have the evidence collected anonymously. A blind report can be filed that includes no identifying information other than a case number. A student may decide later whether to file a police report. Health insurance and the State of North Carolina may cover portions of the costs of medical care. The GVPI coordinator in the Women's Center will help students address any concerns they have about covering the costs of the medical exam or other related expenses. Both the Emergency Department and Student Health have Sexual Assault Nurse Examiners (SANE), who are specially trained to work with individuals who have been sexually assaulted.

For less immediate medical concerns, students may schedule an appointment at Student Health (919-681-WELL). The services available are: medical care, emergency contraception, and sexually transmitted infection prevention. The student health fee covers all services, except for a minimal charge for emergency contraception. Staff from GVPI can accompany students to the ED or Student Health.

Reporting to the police. Sexual misconduct may be criminal in nature, and a student may choose to file a report with law enforcement. Duke Police (911 or 919-684-2444 from non-campus phones) will respond to emergencies and non-emergencies to provide assistance by intervening in cases of assault, providing transportation to the Emergency Department, taking reports of an assault, and/or investigating and participating in legal or disciplinary action. They are responsible for notifying the community in a case of continuing danger, issuing a trespass order that requires an individual to stay away from campus or a particular area of campus when needed, and providing referrals and information including how to obtain a restraining order. Assaults that occur off campus may fall under the jurisdiction of the Durham Police Department or other law enforcement agency. Students may contact the Durham Police directly (911 off campus or 919-560-4427/560-4609) or the GVPI office or Duke Police can help facilitate reporting. Blind reporting—filing a report without one's name attached to it—is an available option with both Duke Police and Durham Police. Regardless of whether a complainant pursues a criminal complaint, the university will investigate the incident in question and take appropriate responsive action to ensure that the educational environment at Duke is free of harassment and to prevent the recurrence of a hostile environment, and, as appropriate, to remedy the effects of the harassment.

Case 1:20-cv-00996   Document 1-3   Filed 11/02/20   Page 142 of 178

# EXAMPLES OF SEXUAL MISCONDUCT

Angela and Aaron have been in an ongoing relationship for a year and a half and have engaged in consensual sexual intercourse. One night while becoming intimate, Angela stops and says she doesn't feel like having sex that night. Aaron continues to touch her, saying that she got him excited and it wasn't fair of her to lead him on like that. Again, Angela tells him she does not want to have sex, and then is silent. Aaron decides she has given in, and proceeds to have sexual intercourse with her.

*This is a violation of the Student Sexual Misconduct Policy. Aaron had sexual intercourse with Angela against her will. The fact that Angela has freely consented to sexual intercourse with Aaron in the past does NOT mean he has her consent in this situation.*

Erin is talking to several of her friends in the hallway at a crowded party. Ryan, a student she knows from chemistry class, comes up behind her and places his arms around her waist. She says hi to Ryan and continues her conversation. Ryan kisses Kristen passionately and leads her moves his hands up to her breasts. She turns to him and tells him to stop, saying she doesn't want to be touched in that way and that he should have more respect for her. He laughs, tells her she takes herself too seriously, and again begins to grope her.

*This is a violation of the Student Sexual Misconduct Policy. Ryan touched Erin in a sexual way without her consent, and continued to do so after she told him to stop. This behavior is a form of sexual/gender violence*

Kristen and Myra have been intimate for a few weeks. One night, Myra calls Kristen and asks her to come over. When she arrives, Myra kisses Kristen passionately and leads her into the bedroom. They each express their excitement and desire to "hook up," and are soon making out heavily in Myra's bed. After a while, Kristen tries to engage in oral sex with Myra. Myra tells Kristen that she really likes her, but that she doesn't feel ready for that. Kristen tells Myra she's just being shy, and ignores her when she repeats that she doesn't feel ready. Finally, Kristen threatens to reveal on the Internet that Myra is a lesbian. Because Myra has not yet come out to her friends and family, she becomes frightened and silent. Kristen proceeds with oral sex.

*This is a violation of the Student Sexual Misconduct Policy. Because of Kristen's manipulative and threatening arguments, Myra was afraid and unable to freely give her consent. Kristen did not receive consent from Myra and has committed sexual/gender violence.*

Liz and Tom have been together for six months. Liz often tells her friends stories of Tom's sexual prowess, and decides to prove it to them. One night, she and Tom engage in consensual sexual intercourse. Without Tom's knowledge, Liz sets up her digital camera to videotape them having sex. The next evening, she uploads the video to an online video-sharing site and discusses it with her friends online.

*This is a violation of the Student Sexual Misconduct Policy. Tom's consent to engage in sexual intercourse with Liz did NOT mean Liz had obtained his consent to videotape it. This is a form of sexual exploitation.*

Andrew and Felix have been flirting with each other all night at a party. Around 12:30 a.m., Felix excuses himself to find a bathroom. Andrew notices Felix slurring his speech. Andrew wonders if Felix went to the bathroom to vomit. When Felix returns, the two begin flirting more heavily and move to a couch. As the conversation continues, the two become more relaxed and more physically affectionate. Andrew soon suggests they go back to his room, and Felix agrees. As they walk down the stairs, Andrew notices that Felix looks unstable and offers his arm for support and balance. When they get back to his room, Andrew leads Felix to the bed and they begin to become intimate. Felix becomes increasingly passive and appears disoriented. Andrew soon begins to have sexual intercourse with him. The next morning, Felix thinks they had sex but cannot piece together the events leading up to it.

*This is a violation of the Student Sexual Misconduct Policy. Felix was passive, and the Policy states that consent may not be inferred from silence, passivity, or lack of active resistance. Moreover, Felix was clearly incapacitated by alcohol, and thus unable to freely consent to engage in sexual activity with Andrew. Although Andrew may not have known how much alcohol Felix had consumed, he saw indicators from which a reasonable person would conclude that Felix was incapacitated, and therefore unable to give consent. Andrew in no way had consent from Felix.*

Denise is a graduate teaching assistant in Paul's economics class. She notes that he has not been performing well on take-home assignments and exams. Both of them have come to a party, each with their own group of friends. Denise has consumed one can of beer, while Paul is rather intoxicated. Denise sees Paul and approaches him. She flirts with him, telling him that she can help him improve his grades if he will hook up with her. As Paul turns to walk away, Denise grabs his buttocks and squeezes them.

*This is a violation of the Student Sexual Misconduct Policy. Denise, in a position of power over Paul as his teaching assistant, attempted to arrange a quid pro quo sexual relationship. Additionally, she did not seek consent from Paul to touch him, even if a reasonable person could conclude that Paul was not too intoxicated in order to provide consent.*

A student had recently visited another country; on his return, he wrote an article for *The Chronicle* in which he used sexually explicit terms and examples to describe the treatment of women in that country. Other students are offended by the article.

*This would not be a violation of the Student Sexual Misconduct Policy. Sexual harassment is unwelcome conduct of a sexual nature that, because of its severity and/or persistence, interferes significantly with an individual's work or education. The conduct is evaluated from the perspective of a reasonable person and in consideration of the context of the behavior. It is not enough that other students are offended by the article for it to be a violation of the policy. Duke is committed to principles of academic freedom and conduct with a legitimate educational or related purpose will not be considered a policy violation.*

Abby and Mike are graduate students working in the same lab. They have been dating for a year. Abby often calls Mike names and damages his belongings when she's upset. She once poured a soda over his laptop after she saw him talking to another woman. Last week, she threw a cell phone at his head when he was late picking her up from work.

*This would be a violation of the Student Sexual Misconduct Policy. Relationship violence, including domestic and dating violence, includes physical, sexual, emotional, economic, or psychological actions or threats of actions that reasonable person in similar circumstances would find intimidating, frightening, terrorizing, or threatening.*

Monica filed a complaint with the Office of Student Conduct alleging that, after she broke up with Marcus, Marcus has been stalking her. Marcus has told his friends about the complaint and several of them have launched a Twitter campaign threatening Monica and the witnesses supporting her claim if Monica doesn't drop the complaint

*The conduct by Marcus's friends would be a violation of the Student Sexual Misconduct Policy. The policy prohibits retaliation against anyone who files a complaint or participates in the investigation of a complaint.*

Case 1:20-cv-00996   Document 1-3   Filed 11/02/20   Page 144 of 178

# STUDENT CONDUCT PROCESS FOR SEXUAL MISCONDUCT ALLEGATIONS



Student complainant or third party reports incident of Sexual Misconduct to a) Office of Student Conduct (OSC) or b) to a university employee, who informs OSC and provides names of the parties involved, if known. Note: Employees designated as a confidential resource (e.g., medical providers, therapists, clergy acting as such in their professional role at Duke, university ombudsperson) are exempt from reporting to OSC.

OSC sends the student complainant a letter requesting to meet and outlines resources for support, including the option to file a report with the appropriate law enforcement agency.

OSC forwards to Office of Gender Violence Prevention & Intervention (GVPI) in the Women's Center a copy of the report. GVPI reaches out to the complainant to provide confidential support. A student who declines to meet with OSC may still meet with GVPI staff.

Student complainant is informed of disciplinary option through the university. Student may participate in the disciplinary process or decline to do so. In some cases, if enough information is available to investigate or initiate some intervention with an accused student, the university will proceed even if the student declines to participate, keeping the complainant's request for confidentiality to extent possible. Campus environment is evaluated when appropriate. OSC will discuss the matter with the student complainant (if he/she chooses to meet with OSC) before deciding what to do.

A determination will be made by OSC whether sufficient information exists to move forward with a hearing.

An investigation may be conducted by the Office for Institutional Equity and a report of findings submitted to OSC. DukeReach will be offered as a resource for the respondent.

A "no contact" directive may be put into place between the complainant and the respondent. Additional interim measures may be considered.

At the discretion of OSC, an administrative hearing may be conducted to resolve the matter. If both complainant and respondent accept resolution, the matter is resolved. If one or both do not, a hearing panel is convened.

At the discretion of OSC, a three-person specially trained panel will consider the case. Respondent and complainant are invited to participate in hearing.

No later than five business days following the hearing, outcome will be conveyed individually to respondent and complainant at approximately the same time. Written notification will typically be made within 10 business days.

Both parties have right of appeal within grounds of appeal to Appellate Board.



RESOLUTION OF
STUDENT CONFLICT
AND ALLEGED
VIOLATIONS OF
UNIVERSITY POLICY

# FILING A REPORT INVOLVING A STUDENT OR GROUP

Reports regarding student or group behavior may be filed with the Office of Student Conduct, Duke Police, the Office for Institutional Equity, academic deans, and offices within Student Affairs offer additional resources for students to address concerns. These offices work together in order to determine the most appropriate venue for resolution. In any situation where a party is unsure of whom to call, he/she may contact the Office of Student Conduct.

Any alleged violation of university policy, including academic dishonesty, is within the scope of the Office of Student Conduct. If the Office of Student Conduct determines that another office is more appropriate to handle the situation, the case may be referred to that office. (Violations that occur within residential areas will often be referred to Housing and Residence Life [HRL].)

The Office of Student Conduct coordinates a mediation program, which may be accessed upon referral or at the request of a student to resolve disputes between students.

In general, residence life staff will handle complaints of conduct within residential areas unless the alleged behavior is of a serious nature or the student has had prior violations, in which case the case may be referred for disciplinary action through the Office of Student Conduct: 919-684-6938; studentaffairs.duke.edu/conduct.

# TYPES OF RESOLUTION

## MEDIATION

Mediation is a process that empowers students to resolve their own disputes. Through mediation, a neutral third party assists students in coming to a peaceful and agreeable solution. The university encourages informal mediation whenever practical or appropriate. Students interested in utilizing the mediation program to resolve a conflict should contact the Office of Student Conduct. Staff within the Office of Student Conduct may also refer cases to mediation as appropriate. Ultimately, all parties involved must agree to mediation. If one party does not agree to mediation, or if the mediation fails, the Office of Student Conduct may refer a case to arbitration and/or disciplinary resolution. Failure to comply with the results of mediation may be cause to commence the disciplinary process.

## ARBITRATION

Arbitration is a process by which students are given an opportunity to present information about a dispute to a neutral third party who renders a decision. Arbitration may be used in roommate conflicts or other relationship conflicts where residential status or participation/access privileges are at issue and mediation is not appropriate. The Office of Student Conduct or HRL may choose to send any case to arbitration. Arbitration will not result in a disciplinary record, but the arbitrator(s) may alter students' living status, limit privileges, or invoke restrictions on participants. Failure to comply with the results of arbitration may be cause to commence the disciplinary process.

## INFORMAL RESOLUTION

Generally, staff in Housing and Residence Life will resolve misconduct in the residence halls. Informal resolutions may include residential warnings or probation, relocation, community service, restitution, or educational initiatives. Students who are alleged to have committed serious infractions (e.g., drug or safety violations) or who repeatedly violate any residential and/or university policy will be subject to formal disciplinary action through the Office of Student Conduct. Staff within the Office of Student Conduct may also choose to utilize the informal resolution process to resolve minor issues of student behavior. Resolutions resulting from this process may include an educational assignment or community service. Failure to comply with the resolution may be cause to commence the disciplinary process. Records of informal resolution will be kept internally and will not be considered part of a student's externally reportable disciplinary record, unless otherwise specifically stated.

## DISCIPLINARY ACTION

Any case involving an alleged violation of community standards, Greek organization policies, or university rules and regulations by an undergraduate student or group may be resolved through the undergraduate disciplinary system.

Case 1:20-cv-00996   Document 1-3   Filed 11/02/20   Page 147 of 178

- Alleged violations of Duke student conduct policies which could be bias-/hate-related should be communicated to the Office of Student Conduct (OSC); and, for students outside of Trinity College or the Pratt School of Engineering, to the appropriate administrator in the student's school or college as well. Reports of alleged violations by undergraduates will be addressed through the undergraduate disciplinary process. For all other students, whichever entity—the school or OSC—learns of the allegation first will promptly notify the other and will schedule a conversation to determine how the allegation will be handled. The general expectation is that OSC will handle the case, though the school or college has the authority to take the lead in investigating and/or adjudicating any alleged behavior it feels it is best positioned to handle. If OSC handles the case, it will follow the investigation, hearing, and appellate procedures set forth in this guide; the college or school will implement any final sanction. If the case is handled by the college or school, it will follow the college's/school's procedures as published and disseminated by the college/school.

## THE DISCIPLINARY PROCESS

### Reports

Reports of behavior alleged to violate university policy should be filed with or forwarded to the Office of Student Conduct.

### Participation

The university invites students/groups to participate fully in all aspects of the disciplinary process. If a student/group elects not to participate in any part of the process (e.g., submitting a written statement or participating in a hearing), the conduct officer/hearing body may proceed without benefit of that student's/group's input. A student/group will be held accountable for any sanctions issued as a result of a hearing.

### Investigation

Office of Student Conduct staff and/or designee(s) will gather information regarding the alleged incident in order to determine the appropriate means of resolution.

Investigations may include interviews, a review of related documents, requests for written statements from any person involved in the alleged incident, and review of material available electronically. Polygraph examinations and/or their results are neither admissible nor considered in any part of the disciplinary process. Students and organizations are encouraged to be forthright and as specific as possible when offering information related to an investigation, but may choose the extent to which they share information.

Cases may be dropped for insufficient information, or referred for mediation, arbitration, informal resolution or disciplinary action. In order for a case to be referred for disciplinary action, there must be sufficient information to believe that a policy violation may have occurred and that the alleged individual/group may be responsible. See Appendix C on page 69 for the Administrative Action Policy, which may be implemented during the disciplinary process.

### Referral for Disciplinary Action

If a case is referred for disciplinary action, the student/group will be notified of the incident in question and the policy violation(s) under consideration, and will be given an opportunity to respond. There are several means by which to resolve disciplinary situations. The Office of Student Conduct will determine which avenue is most appropriate to pursue.

Disciplinary hearings are not trials and are not constrained by the same rules of procedure and evidence typically used in a court of law. The university disciplinary system operates under a standard of fairness, which includes an opportunity for the student/group to be notified of the alleged incident and policy violations under consideration and an opportunity to be heard.

### Resolution through a Disciplinary Hearing

Any case may be forwarded directly to a disciplinary hearing if there is sufficient information to believe that a policy violation may have occurred and that the alleged individual/group may be responsible. Most cases will be referred to administrative hearings. Cases that are serious in nature, involve complicated facts, and/or involve students/groups with previous disciplinary violations may be forwarded to the Undergraduate Conduct Board for resolution. (See "Student Sexual Misconduct Policy and Procedures" on page 39 for adjudication of allegations of sexual misconduct.)

Individuals or groups who deny responsibility for serious offenses of university policy and who face possible suspension or expulsion/dissolution from the university have the right to request a hearing before a five-person panel of the UCB. Individuals or groups who accept responsibility for alleged violations of university policy, but are unable to agree on a proposed sanction, which may include suspension or expulsion/dissolution, have the right to request a hearing before a three-person panel of the UCB. (The conduct officer may, due to the circumstances of the case, elect to utilize a five-person panel.)

Case 1:20-cv-00996   Document 1-3   Filed 11/02/20   Page 148 of 178



**I have received an e-mail from the Office of Student Conduct that says I have been scheduled for an administrative hearing. What does that mean?**

An administrative hearing is a conversation between you and a staff member to discuss your alleged involvement in reported behavior. The staff member is interested in hearing your perspective on what may have happened and will discuss with you how the matter might be resolved. The conversation may also focus on what you have learned or can take away from the incident.

Upon receiving the e-mail, review its contents carefully and ensure you are available at the time indicated in the message. If not, call the Office of Student Conduct at 919-684-6938 to schedule a new appointment. Next, familiarize yourself with the policies that may be at issue, which are also listed in your letter.

During an administrative hearing, listen carefully, share your perspective on the matter, and ask questions. Most often, the staff member is able to resolve the matter with you directly.

Following the administrative hearing, you will receive another e-mail describing the decision made by the staff member, sanctions (if appropriate), and details for having the matter reconsidered, if you wish.

## Resolution through Agreement

If a student/group accepts responsibility for (an) alleged violation(s), the conduct officer, or designee, may propose (an) appropriate sanction(s) based on the specifics of the case, precedent and university interests.

If the student/group accepts responsibility and agrees to the proposed sanction(s), the student/group waives his/her/its right to a hearing and/or appeal, the resolution becomes final, and the outcome is recorded on the student's/group's disciplinary record. If the student/group accepts responsibility, but is unable to agree to the proposed sanction(s), the case will be forwarded to a hearing to determine (an) appropriate sanction(s).

If the student/group denies responsibility, the case will be forwarded to a hearing to determine responsibility and (a) sanction(s) as appropriate.

## DISCIPLINARY HEARING TYPES

There are two types of hearings. Most cases are decided upon through an administrative hearing, which is a discussion between the student/group and a hearing officer. Cases that are serious in nature, involve complicated facts, and/or involve students/groups with previous disciplinary violations may be forwarded to the Undergraduate Conduct Board for resolution. Students who face a possible sanction of suspension or expulsion may request to have his/her case heard by a panel of the UCB. Groups who face possible dissolution may request a hearing by a panel of the UCB.

(See "Student Sexual Misconduct Policy and Procedures" on page 39 for adjudication of allegations of sexual misconduct.)

### Administrative Hearings

An administrative hearing is a discussion between a student/group alleged to be in violation of university policy and a hearing officer. Students/groups will be notified (typically via e-mail) of the specific violations under consideration in advance of an administrative hearing. The hearing officer will review the report with the student or group and give the student/group an opportunity to respond. The hearing officer will determine whether the student/group is responsible for the alleged policy violation, and, if so, issue (an) appropriate sanction(s). Administrative hearings are conducted in private, except under the Student Sexual Misconduct Policy, in which a student may be accompanied by an advisor of his/her choice.

Upon proper notice, if a student/group fails to attend an administrative hearing, the hearing officer may proceed to resolve the case without benefit of that student's/group's input.

All decisions of responsibility are based on clear and convincing information, except for allegations arising under the Harassment Policy and the Student Sexual Misconduct Policy, which are decided based on the standard of preponderance of evidence. In determining appropriate sanctions, consideration may be given to the nature of and circumstances surrounding the violation, the student's/group's acceptance of responsibility, prior disciplinary violations, the impact of a sanction on the student/group, precedent cases, university interests, and any other information deemed relevant by a hearing panel/officer. Should a hearing officer determine that a violation was motivated in part or whole by race, color, religion, national origin, disability, veteran status, sexual orientation, gender identity, sex, genetic information, or age, the hearing officer may consider this an aggravating factor that increases the stringency of the sanction(s).

Case 1:20-cv-00996   Document 1-3   Filed 11/02/20   Page 149 of 178

If a student/group does not accept the administrative hearing resolution, he/she/it may request by the stated deadline a hearing before a panel of the Undergraduate Conduct Board.

## Undergraduate Conduct Board Hearings

The Undergraduate Conduct Board is a group of students, faculty and staff appointed to hear alleged infractions of university policy. The board is charged with determining whether a student's/group's actions constitute a violation of university policy and, if so, an appropriate response. In determining an appropriate response, consideration is given to the student's/group's interests as well as the university's interest in maintaining high standards.

All UCB hearings are conducted in private. Any student whose presence is required by the conduct officer at a hearing will be excused from any other university responsibility.

Respondents, complainant, advisors, and/or witnesses may not bring devices that capture or facilitate communication (e.g., computer, cell phone, audio/video recorder, etc.) into a hearing room, unless authorized by the hearing panel.

Accused Students/Groups. Accused students/groups are entitled to the following procedural rights when facing a hearing before the Undergraduate Conduct Board:

- to be informed that he/she/it is under investigation;
- to seek advice from anyone;
- to seek advice from a trained advisor made available by the university;
- to be given an opportunity to respond to allegations;
- to choose the extent to which he/she/it shares information;
- to be notified of a hearing at least 120 hours (five days) in advance (notification will include the time, date and location of the hearing as well as names of hearing panel members and witnesses);
- to challenge any panel member if there is a significant conflict of interest;
- to know of and review in advance written information and allegations presented to the hearing panel;
- to be accompanied by an advisor to the hearing (who must be a member of the university community [defined below], except in cases arising under the Student Sexual Misconduct Policy, in which case a student can select any advisor of his/her choice);
- to a fair and impartial hearing;
- to rebut any witness testimony presented against him/her/it;
- to present additional witnesses or information at the hearing (the relevancy of which may be determined by the hearing panel);
- to be found responsible only if the evidence meets a clear and convincing burden of proof (or preponderance of evidence standard in cases arising under the Harassment Policy or Student Sexual Misconduct Policy); and
- to appeal based upon clearly stated grounds.

Advisors. Accused students/groups are encouraged to seek advice and support from whomever they choose throughout the disciplinary process. An advisor may accompany an accused student/group or a student complainant to a UCB hearing. The advisor may be from the designated list of trained student and staff advisors available through the Office of Student Conduct, or may be any member of the university community. A member of the university community is defined as a current student, or a faculty or staff member currently employed by the university. For Greek organizations, the advisor may also be the chapter advisor. The advisor may not be a member of the UCB and may not serve as a material or expert witness. The role of the advisor is to assist and support the student/group through the disciplinary process. The advisor's role in a hearing is limited to quietly conferring with the respondent through written correspondence or whisper, and the advisor may not address any other participant or the hearing panel.

An advisor may also accompany a complainant to a hearing in a case arising from the Student Sexual Misconduct Policy. See "Student Sexual Misconduct Policy and Procedures" on page 39 for additional information.

In a single hearing with multiple respondents and/or complainants, an advisor may attend the hearing with only one party (i.e., a unique advisor for each participant). The trained student and staff disciplinary advisors are valuable resources, thoroughly familiar with the conduct process. In the event that a recommended advisor is unavailable, an accused student/group may ask for the names of additional advisors from the Office of Student Conduct.

Hearing Panels. Hearing panels charged with determining an outcome and a sanction shall consist of three students and two members of the faculty or staff selected from the UCB. Hearing panels charged with determining only a sanction shall consist of two students and one faculty or staff member selected from the UCB. (In some circumstances, the conduct officer may

Case 1:20-cv-00996   Document 1-3   Filed 11/02/20   Page 150 of 178

choose to utilize a five-person panel consisting of three students and two faculty or staff members to determine a sanction.) A staff member from the Office of Student Conduct serves as a hearing facilitator and is a non-voting presence in the hearing.

(See "Student Sexual Misconduct Policy and Procedures" on page 39 for hearing panel composition of these cases.)

An accused student/group may agree to a smaller panel or different student-to-faculty/staff ratio in the event that a full panel is not available. The accused student/group also may challenge any panel member if there is a significant conflict of interest. Such a challenge must be made at least 72 hours prior to the hearing and will be granted only for sufficient cause.

At times of the year when regular panels are not available (e.g., during the summer or semester breaks), the conduct officer may appoint a special hearing panel, which may include members of the university community who are not part of the Undergraduate Conduct Board or may have a different composition of students/faculty/staff than panels held during the normal academic year.

Notice. An accused student/group will be notified of a UCB hearing at least 120 hours (five days) in advance. The notice will include the date and time of the hearing, the specific charges at issue, and the names of the panel members. At times of the year when 120 hours of notice is not practical due to a student's pending graduation, study abroad, or participation in a university-sponsored activity (e.g., DukeEngage), a student must either waive this right or not participate in the pending activity until the matter is resolved.

An accused student/group will also receive in advance of the hearing a copy of written information given to the hearing panel. The conduct officer may include information clarifying or noting any additional information gathered through the investigation without expressing any personal opinion about the merits of the case. In cases not involving an alleged violation of the Student Sexual Misconduct Policy, any additional material not included in a hearing packet that a complainant or respondent wishes to have reviewed by the hearing panel must be submitted to the Office of Student Conduct no later than 72 hours before the hearing. If deemed relevant by the Office of Student Conduct, that material will be shared with the complainant/respondent and the hearing panel.

The complainant will be notified of the hearing if his/her presence is required. At his/her request, the complainant may also receive a copy of the written information given to the hearing panel.

Upon proper notice, if the student/group fails to attend the hearing, the hearing panel may proceed in his/her/its absence.

Witnesses. The conduct officer may request the presence of any witness with pertinent information about a case. If a witness is unidentified or unavailable to attend the hearing, his/her statement may not constitute a sole or substantial basis for determining responsibility. If he/she is necessary and unidentified or unavailable, the conduct officer or the chair of the hearing panel may suspend or dismiss the proceedings.

The accused student/group and complainant may bring relevant material witnesses to speak on his/her/its behalf. Absent exceptional circumstances and for all alleged policy violations except that of the Student Sexual Misconduct Policy, the accused student/group and/or complainant should inform the conduct officer in writing at least 72 hours in advance of the hearing the names of the witnesses and to what they will attest. The panel may determine the extent to which witnesses will be permitted in the hearing, including relevancy of questioning and information presented.

Procedure. The general course of procedure for a UCB hearing is as follows: introductions; plea(s) from the accused; opening comments from complainant(s) (if applicable); opening comments from accused; questions: testimony/questions of other material witnesses (if applicable); closing comments from complainant (if applicable); closing comments from accused.

The panel may impose time limits on any stage of the procedure. The panel may also determine the relevance of any witness or information to be presented and/or considered by the hearing panel.



What does it mean when I am asked to enter a plea at a hearing of the Undergraduate Conduct Board?

A plea is your opportunity to formally state your acceptance or denial of responsibility for the alleged policy violation(s). You will be asked to enter a separate plea for each allegation. Your options are:

"Responsible," which means that you accept responsibility for the policy violation. The panel will consider whether to affirm your plea.

"Not responsible," which means that you do not accept responsibility for the policy violation. The panel will consider whether or not you are responsible.

"Responsible in part," which means that you accept responsibility for the policy violation, but you feel that there are additional factors for the panel to consider that mitigate full accountability for the violation. The panel will consider whether or not you are responsible. Note: You should not plead "responsible in part" if you truly do not feel you are responsible for the alleged policy violation.

**Information to be Considered by the Panel.** The panel may consider any information it deems relevant, including documentation and expressions of opinion. If the panel needs additional information during a hearing, such as verification of a fact at issue, an expert opinion, etc., the panel may request such information and may suspend its decision until such information is obtained. The accused student/group will have the right to respond to any additional information that is to be used in considering an outcome.



**What is "clear and convincing information?"**

Two phrases that help define "clear and convincing" are "reasonably certain" and "highly probable." It is information that produces a firm belief that the allegations of misconduct are true. It is a standard of evidence between the standards called "preponderance of evidence" and "beyond a reasonable doubt." Clear and convincing information requires proof sufficient to convince ordinarily prudent-minded people that an allegation of misconduct is true. The proof need not be fully conclusive, but should cause one to be convinced that the allegations are true.

*- Adapted from the Indiana University Judicial Officer Manual, 2002-2003*

**What is "preponderance of evidence?"**

A preponderance of evidence means that it is more likely than not that an allegation of misconduct occurred.

**Outcome.** Based on clear and convincing information (or preponderance of evidence in cases arising from the Harassment Policy and the Student Sexual Misconduct Policy) considered during the hearing, the panel may find a student/group responsible for an alleged violation by majority vote. (In cases arising from the Student Sexual Misconduct Policy, a finding of responsibility for a violation must be unanimous.) The panel, also by majority vote, may dismiss any charge.

Upon finding a student/group responsible for a violation of university policy, the panel may determine and impose (an) appropriate sanction(s). Consideration may be given to the nature of and circumstances surrounding the violation, the student's/group's acceptance of responsibility, prior disciplinary violations, the impact of a sanction on the student/group, precedent cases, university interests, and any other information deemed relevant by the hearing panel. Should a hearing panel determine that a violation was motivated in part or whole by race, color, religion, national origin, disability, veteran status, sexual orientation, gender identity, sex, genetic information, or age, the hearing panel may consider this an aggravating factor that increases the stringency of the sanction(s). All sanctions must be decided by majority vote with the exception of suspension or expulsion of an individual or dissolution of a group. These sanctions must be supported unanimously by a three-person panel or by four members of a five-person panel.

**Notification and Record of the Hearing Outcome.** The panel chair and/or the conduct officer will notify the accused student/ group of the outcome of the hearing. A written hearing report describing the outcome, with a brief explanation of the reasoning, will be given to the accused student/group.

The complainant will be informed of the outcome of a hearing in accordance with federal guidelines. Complainants in cases arising from the Student Sexual Misconduct Policy will receive a written report of the hearing outcome.

An audio recording of each hearing will be made by the conduct officer and kept on file for three years. Reasonable care will be taken to create a quality recording and minimize technical problems; however, technical problems that result in no recording or an inaudible one will not be a valid argument for appeal.

# SANCTIONS

Any disciplinary hearing may result in penalties (singly or in combination), including, but not limited to, those from the following list. In determining appropriate sanctions, consideration may be given to the nature of and circumstances surrounding the violation, the student's/group's acceptance of responsibility, prior disciplinary violations, the impact of a sanction on the student/group, precedent cases, university interests and any other information deemed relevant by a hearing panel/officer. Should a hearing panel/officer determine at any point during the investigation or adjudication of a violation that a violation was motivated in part or whole by race, color, religion, national origin, disability, veteran status, sexual orientation, gender identity, gender expression, sex, genetic information, or age, the hearing panel/officer may consider this information an aggravating factor that increases the stringency of the sanction(s).

o

For cases resolved through the Undergraduate Conduct Board, all sanctions are decided by majority vote with the exception of a suspension or expulsion of an individual or dissolution of a group. These sanctions must be supported unanimously by a three-person panel or by four members of a five-person panel.

## EXPULSION

Dismissal and permanent removal from the university without possibility of readmission or reinstatement. A permanent notation to that effect is made on the student's permanent academic record.

## DEGREE REVOCATION

A student's degree may be revoked. In such a case, a permanent notation to that effect is made on the student's permanent academic record.

## SUSPENSION

A suspension is an involuntary dismissal from the university for a specified period of time, which may include the current semester and such additional semesters as deemed appropriate by the hearing panel/conduct officer.

Readmission as an undergraduate student in good standing is coordinated through the Office of Student Returns and is contingent upon satisfaction of any requirements stated in the original sanction. Upon a student's readmission to and matriculation in the university, the student is placed on disciplinary probation for at least one semester or for as long as a hearing panel/conduct officer determines is appropriate. Readmission for graduate/professional students is coordinated through their respective dean.

As suspension constitutes an involuntary withdrawal from the university, a permanent notation to that effect is made on the student's permanent academic record.

A student who is suspended after having satisfied all degree requirements must apply for readmission in accordance with normal procedures. If readmitted, the student's degree will be awarded at the regular conferral date for the final semester of the suspension period. The student may not participate in commencement exercises until readmitted.

In the event that a disciplinary suspension and an academic withdrawal occur simultaneously, the two withdrawals are to be in effect consecutively.

Students suspended twice as a consequence of having been found responsible for academic misconduct are eligible to apply for readmission no sooner than five years after the date of the second withdrawal.

## DISSOLUTION (GROUP)

The privilege of a group to be recognized at Duke University may be suspended or revoked (dissolution).

## SUSPENSION OF ACTIVITY (GROUP)

Residential or cohesive units may be suspended for a specified time period from activities sponsored, cosponsored, performed by, or attended by its members on and/or off campus. A suspension is generally followed by disciplinary probation for a specified period of time.

## DISCIPLINARY PROBATION

A status imposed on a student for a specific period of time during which another violation of university policy or violation of any of the conditions of the probation shall result in an augmented disciplinary action, including the possibility of suspension. Disciplinary probation restricts a student's ability to study away from Duke through the Global Education Office for Undergraduates, participate in DukeEngage, and be released early from the three-year residency requirement. It also may impact other opportunities in which a student's disciplinary record is considered as a criterion for participation.

Case 1:20-cv-00996   Document 1-3   Filed 11/02/20   Page 153 of 178

## DISCIPLINARY PROBATION (GROUP)

A status imposed on a group for a specific period of time during which another violation of university policy or violation of any of the conditions of the probation shall result in an augmented disciplinary action, including the possibility of suspension of activity and/or dissolution.

## FORMAL WARNING

A formal written reprimand for violation of the specified policy(ies).

## ADMONITION

A written notice indicating violation of the specified policy(ies). The resolution of this case will not become part of the student's/group's external disciplinary record (i.e., it will be treated as an informal resolution) unless there is a subsequent university policy violation.

## WITHDRAWAL OF PRIVILEGES

This may include, but is not limited to, withdrawal of the privilege to have a car on campus, park on campus, attend or participate in university programs or activities (such as sporting events, intramurals, performances, graduation exercises, host/sponsor events, etc.), or maintain computer account privileges.

## HOUSING LICENSE RESTRICTIONS/REVOCATION

A student's/group's privilege to live on campus may be restricted or revoked. This may include relocation, revocation for a period of time or permanent removal from the residential community. (Refunds for revocation may be denied based on HRL policies.)

## EXCLUSION

A student or group may be excluded from access to or use of specified university-owned premises and/or facilities.

## NO CONTACT ORDER

A student or group may be prohibited from communicating with a named individual.

## RESTITUTION

Payment for all or a portion of injury or damages to person(s) or property caused by an individual or a group.

## FINE

Payment to Duke University of a reasonable sum of money by an individual or group.

## COMMUNITY SERVICE

Specified length of time during which a student or group will perform in a service capacity at the university or in the Durham community beyond any volunteering with which he/she/it may already be involved. Before starting service, it must be pre-approved by a conduct officer. Failure to complete community service within the specified period, and present verification, may result in additional hours assigned or further disciplinary action.

Case 1:20-cv-00996   Document 1-3   Filed 11/02/20   Page 154 of 178

## MENTAL HEALTH/MEDICAL ASSESSMENT AND/OR TREATMENT

A hearing panel/officer may recommend or require a student to seek a mental health/medical assessment from CAPS, Student Health, or other appropriate professional. The hearing panel/officer will not be privy to the contents of that assessment without the permission of the student but may require verification that the assessment was completed and that the student followed through with recommendations of the professional.

## EDUCATIONAL PROJECTS/INITIATIVES

Students or groups may be required to complete a project or a written assignment, attend an educational program, or seek assistance from the Academic Skills Instructional Program, the Writing Studio, DukeReach, or other university resources.

# APPEALS

A student/group found responsible through a hearing panel ("respondent") and/or a complainant in a case involving harassment may appeal the hearing panel's decision by submitting a written appeal statement within five business days of the date the hearing report is sent to the respondent (and complainant, as applicable). Appeals are limited to five pages (12-point font, 1-inch margins). The two grounds for appeal are:

1. New information not reasonably available at the time of the hearing that is material to the hearing panel's decision; and/or

2. Procedural error(s) that materially impacted the hearing panel's decision.

The appeal statement must identify the ground(s) for appeal. Note that an appeal is not a re-hearing of the case.

The composition of the Appellate Board includes members of the university community appointed by the Vice President for Student Affairs. The chair of the Appellate Board or the chair's designee is responsible for selecting three-person panels from membership of the Appellate Board to consider appeals.

If, by majority vote, the appellate panel determines that a ground of appeal is substantiated, the panel will return the case to the Office of Student Conduct. Otherwise, the decision of the hearing panel stands. When a case is returned to the Office of Student Conduct, the Office of Student Conduct may decide to drop the case (e.g., based on insufficient information to believe that a policy violation may have occurred), send the case to the original hearing panel for reconsideration, send the case to a new hearing panel with the same or different charges, and/or (re)implement any aspect of the disciplinary process. A different decision (i.e., the decision of responsibility and/or sanctions) may subsequently result.

## PROCEDURES

The Appellate Board's role is limited to reviewing the hearing panel record, the appealing party's ("appellant") written appeal statement, any response to that statement by the other party ("appellee") as applicable, and information presented at a meeting of the Appellate Board, if convened.

The appellate panel will typically notify the parties of its decision regarding an appeal in writing within 20 business days from receipt of the appeal statement. If the decision will take longer, the chair will inform the parties.

The following procedures guide the Appellate Board process:

- Appeal Statement. The written hearing report will include instructions for submitting an appeal. The chair may summarily deny an appeal if it is not based on one or both grounds of appeal.

- Composition of Panel. If the appeal is not summarily denied by the chair, the chair will convene a three-person panel and notify the appellant and appellee of the names of the panel members. When possible, the chair will select at least one Appellate Board member from the school community of the respondent (and/or complainant, if applicable). The appellant and/or appellee may challenge the participation of an appellate panelist because of perceived conflict of interest, bias, or prejudice. Such challenges, including rationale, must be submitted in writing to the chair no later than 24 hours after notification of the names of the appellate panel members. The chair will determine whether such a conflict of interest exists and whether a panelist should be replaced.

- Response to Appeal By Appellee (In Cases Involving Harassment). The chair will provide written notice to the appellee that an appeal has been submitted and will give the appellee an opportunity to review the appeal statement. The appellee may submit a written response to the appeal ("response"). The response is due five business days from the date the chair provides written notice of the appeal to the appellee and is limited to five pages (12-point font, 1-inch

margins). The chair will provide the appellant an opportunity to review the response, though no additional opportunity to respond in writing will be provided to the appellant.

- Exceptions. The appellant (and appellee as applicable) may submit to the chair requests for exceptions to page limits or deadlines. Exceptions must be requested in advance of any deadline by sending an email to appeals@duke.edu, with justification for such request(s). If either party fails to meet a deadline or exceeds page limits without receiving an exception, the chair has the discretion to summarily reject an appeal or the appellate panel may disregard the response.

- Meetings. On its own or at the request of the appellant (or appellee, if applicable), the appellate panel may convene a meeting to give the party(ies) an opportunity to amplify the reason(s) for the appeal or the response. (A complainant or respondent in a case arising under the Student Sexual Misconduct Policy may bring an advisor of his/her choice to the meeting with the appellate panel. In such case, the advisor's role is limited to quietly conferring with the complainant or respondent through written correspondence or whisper, and may not address the appellate panel.) In the event an appeal alleges a procedural error, the appellate panel may request that (a) staff member(s) in the Office of Student Conduct, the Office for Institutional Equity, and/or member(s) of the hearing panel attend the meeting to gather more information about the alleged procedural error.

- Written Decision. The Appellate Board will provide written notification of the final decision to the appellant (and appellee, if applicable, at approximately the same time).

## DISCIPLINARY RECORDS/STUDENT STATUS

When students/groups are found responsible for a violation of university policy through an administrative or panel hearing, or accept responsibility through an agreement, the case will be recorded on a student's/group's disciplinary record. (See "Admonition" on page 62 under "Sanctions" for recording of these resolutions.) The record will be maintained by the Office of Student Conduct and kept in accordance with FERPA. Individual disciplinary records are kept on file for eight years from the date of a student's matriculation (or four years after graduation, whichever lapses first), except in cases resulting in suspension or expulsion, in which disciplinary records are kept indefinitely.

## STATUS OF A STUDENT/GROUP PENDING FINAL RESOLUTION OF A DISCIPLINARY CASE

Until a final resolution is determined, the status of a student/group will not change unless administrative actions have been imposed to protect the health and safety of the student/group or the university community. A student with disciplinary action pending, however, is not eligible to graduate and may not participate in commencement exercises until his/her case is resolved. A student currently on leave, suspended, or withdrawn from Duke who has a pending disciplinary matter is not eligible to seek readmission until that matter is resolved.

## DISCIPLINARY HOLD

At any time after the filing of a complaint, the conduct officer or designee, after consulting with a student's academic dean, may place a disciplinary hold on the academic and/or financial records of any student pending the outcome of proceedings or to enforce a disciplinary sanction. A disciplinary hold may prevent, among other things, registration, enrollment, matriculation, the release of transcripts, and the awarding of a degree.

## DISCIPLINARY ACTION WHILE CIVIL/CRIMINAL CHARGES PENDING

Students may be accountable to both civil authorities and to the university for acts that violate local, state or federal laws. (Students are encouraged to seek advice of legal counsel when they face criminal charges.) Disciplinary action through university processes concurrent with criminal action does not subject a student to "double jeopardy."

The university operates under different policies, procedures and standards and thus, will not be bound by the findings of a court of law. If the court's outcome satisfies the university's interests, such outcome may be recorded on the student's disciplinary record without invoking the university disciplinary process. Should any criminal proceeding result in a felony conviction, as a result of an incident on or off campus, the Vice President for Student Affairs reserves the right to summarily dismiss a student.

University disciplinary action will normally proceed during the pendency of a criminal or civil action. A student may request, however, that the university disciplinary process be placed on hold until criminal actions are resolved. The conduct officer or designee will decide whether this request will be granted. In such a case, administrative actions may be imposed. The university reserves the right to proceed with the disciplinary process at any point.

4



APPENDICES

community's judicial board. The chair of the board shall select five-person panels consisting of a chair and an equal number of students and faculty. Cases referred to the board shall be assigned to the panels in rotation, provided that a member of a panel may, at his/her request, be excused from sitting on a case by the chair of the board, who may appoint a substitute from among the other members of the board. Each panel shall be known as a "Hearing Committee of the University Judicial Board."

## Terms of Members

Faculty members shall normally serve for two-year terms, but are eligible for reappointment. The terms should be staggered in order to provide continuity. Two of the initial appointees shall be appointed for one-year terms. Student members shall serve for one-year terms, although they may be eligible for re-election. The board has the right to remove any member of the board for cause by a vote of a two-thirds majority of all members. The vacancy shall be filled promptly according to the original procedure.

## Conduct of the Hearing

- The hearing will be conducted in private unless the accused requests an open hearing. If any objection is raised to conducting an open hearing in any particular case, the Hearing Committee of the University Judicial Board will decide the issue by majority vote. If the decision is made not to hold an open hearing, the accused shall be informed in writing of the reasons for the decision.
- The university and the accused may be represented by an adviser of his/her choice.
- The board shall promulgate its own rules of procedure consistent with academic due process and all provisions of this document.
- The accused has the right to challenge on the grounds of prejudice any member of the Hearing Committee sitting on his/her case. If an accused makes such a challenge, the Hearing Committee shall deliberate in private to determine whether cause exists. By a majority vote of the members of the tribunal (excluding the member being challenged), a member shall be removed from the case and replaced by a member of the board designated by the chair of the Judicial Board. In addition, the accused may exercise a challenge directed at the entire panel, in which case the challenge shall be made to the chair of the University Judicial Board, who shall excuse the panel challenged and refer the accused's case to the next panel in rotation.

## The Right of Appeal

- In cases heard by the University Judicial Board, there will be no appeal when the accused is acquitted, except in cases of harassment or discrimination, in which case a complainant may appeal the accused's acquittal.
- A student or administrator who is not a member of the faculty convicted by the University Judicial Board may appeal to the president, or in his/her absence, the provost, in which case such appeal shall be solely on the record of the proceedings before the Hearing Committee. Argument or appeal shall be on written submission, but the president may, in addition, require oral argument.
- A member of the faculty convicted by the University Judicial Board may appeal to the Faculty Hearing Committee authorized under the provisions for Academic Freedom and Tenure of Duke University.

## Status of the Accused

Charges must be prepared without delay following the alleged commission of the offense. Pending final verdict on charges against the accused (including appeal), his/her status shall not be changed, nor his/her right to be on campus to attend classes suspended, except that the president or provost may impose an interim suspension upon any member of the university community who demonstrates, by his/her conduct, that his/her continued presence on the campus constitutes an immediate threat to the physical well-being or property of the members of the university community or the orderly functioning of the university. The imposition of interim suspension requires that the suspended individual shall immediately observe any restriction placed upon him/her by the terms of the suspension. The suspended individual shall be entitled to a hearing within three (3) days before the Hearing Committee on the formal charges. If he/she requires additional time to prepare his/her case before the Hearing Committee, he/she shall be entitled to an informal review of the decision imposing interim suspension by a three-person committee chosen from the members of the University Judicial Board by its chair. Interim suspension is an extraordinary remedy which will be invoked only in extreme cases where the interest of the university and members of its community require immediate action before the Hearing Committee can adjudicate formal charges against the suspended individual. If interim suspension is imposed and the accused is later found innocent, the university shall seek restitution as provided by the Hearing Committee with respect to the student's academic responsibilities incurred during the period of suspension.

Case 1:20-cv-00996   Document 1-3   Filed 11/02/20   Page 158 of 178

## Civil and Criminal Courts

Members of the university community may be subject to civil or criminal proceedings in a local court. The president may initiate legal action seeking injunctive or other civil relief, or file criminal charges, when it is necessary to protect the person or property of members of the university community, or the orderly functioning or property of the university. Such action may be in addition to the filing of formal charges before the University Judicial Board and/or interim suspension.

## Sanctions

A Hearing Committee of the University Judicial Board shall have the power to impose the following penalties upon students:

- Expulsion. Dismissal from the university with the recommendation that the person never be readmitted.
- Suspension. Dismissal from the university and from participation in all university activities for a specified period of time after which the subject may apply for readmission.
- Disciplinary Probation. Placing a student on a probationary status for a specified period of time, during which conviction of any regulation may result in more serious disciplinary action.
- Exclusion from participation in extracurricular activities. Without limiting the generality of that penalty, such restrictions might involve participation in any collegiate athletics, or any public participation or performance in the name of the university. However, a hearing committee may not exclude a person from performance of the duties of an elective office, but may make such a recommendation to the appropriate organization. This penalty may be imposed by itself or in addition to any of the other enumerated penalties.
- Censure. Written reprimand for violation of the specified regulation, including the possibility of more severe disciplinary sanction in the event of conviction for the violation of the same or one of equal seriousness within the period of time stated by the reprimand.
- Admonition. By an oral statement to the offender that he/she has violated the university rules or has been in contempt of the board.
- Restitution. Payment for all, or a portion of property damage caused during the commission of an offense. This penalty may be imposed by itself, or in addition to any of the other penalties.
- Fines. Payment of reasonable sums to be determined by a hearing committee. This penalty may be imposed by itself, or in addition to any of the other penalties.
- Exclusion from social activities where the nature of the violation so indicates including, but not limited to, curfews or other revocation of upperclass privileges.

A Hearing Committee of the University Judicial Board shall have the power to impose the following penalties upon faculty members and administrative personnel not subject to the provisions of the Personnel Policy Manual.

- Dismissal. Dismissal or termination of appointment.
- Censure.
- Admonition.
- Restitution.
- Fines.

## Other Powers

The Hearing Committee may recommend to the university that it seek restitution with respect to the accused's university responsibilities incurred during a period of suspension or during the period when a hearing has been conducted or shall make such other nonpunitive recommendations with respect to the accused as it shall deem appropriate.

## Records

The board shall promptly arrange a policy of keeping its own records, subject to the university policy on confidentiality.

## Excusal of Members of the University Community from University Obligations

Any member of the university community whose presence is required at a hearing shall be excused from the performance of any university responsibilities which would normally be performed at the time when his/her presence is required before the Hearing Committee.

3

# APPENDIX B — OPTIONAL, ONE-TIME FACULTY-STUDENT RESOLUTION PROCESS FOR CASES OF ACADEMIC DISHONESTY INVOLVING UNDERGRADUATES

This option for resolving cases of academic dishonesty is reserved for first-time, minor infractions by Duke undergraduates. The faculty member must first contact the Office of Student Conduct to discuss the appropriateness of this option with respect to the nature of the offense, as well as to learn of any prior violations by the student. If there is no record of prior offenses and the case appears to be one that, if adjudicated by a hearing panel, would result in probation or a sanction less severe than probation, it may be resolved between the faculty member and the student. Otherwise, the case must be forwarded to the Office of Student Conduct.

A faculty-student resolution may result in a reduced grade on the assignment, a reduced grade in the course, additional assignments, and/or other educational initiatives. (The outcome must be agreed upon by both parties.)

The faculty member must report the outcome(s) of a faculty-student resolution to the Office of Student Conduct for record keeping. This resolution will not become part of the student's external disciplinary record unless there is a second violation, at which time both cases will be noted on the student's disciplinary record.

## PROCESS

- The faculty member shall first contact the Office of Student Conduct to discuss the appropriateness of this option with respect to the nature of the offense, as well as to learn of any prior violations. Staff in the Office of Student Conduct may be reached at 919-684-6938.
- If the student has no record of prior offenses and the case appears to be one that, if adjudicated by a hearing panel, would result in probation or a sanction less severe than probation, it may be resolved between the faculty member and the student.
- The faculty member shall meet with the student and present any information relevant to the case.
- The student shall have an opportunity to respond to the allegations.
- If the faculty member believes that academic dishonesty has occurred, the faculty member should complete a Faculty-Student Resolution form, including the proposed outcome, and present this form to the student. The form may be found on the website of the Office of Student Conduct website at studentaffairs.duke.edu/conduct/undergraduate-disciplinary-system/types-resolution/faculty-student-resolutions.
- Upon receipt of the proposed resolution, the student has 96 hours to consider and seek advice on whether to accept responsibility and agree to the resolution.
- If the student agrees to the resolution, she/he should sign the resolution form in the presence of the faculty member. The faculty member should then forward a copy of the form to the Office of Student Conduct (Box 90893).
- If the student does not accept the proposed resolution, the faculty member should refer the case to the Office of Student Conduct.

# APPENDIX C — ADMINISTRATIVE ACTION POLICY

## POLICY

The Vice President for Student Affairs or designee may take administrative action(s) against an undergraduate student (or, if pursuant to the Student Sexual Misconduct Policy, a graduate or professional student) and/or a student group to protect the health, safety, or welfare of the university community or any member of it. Administrative action includes, but is not limited to, a "no contact" directive, removal of privileges, removal from or relocation within the residential community, suspension of activity, and/or suspension from the university. If administrative action is issued while a disciplinary action is pending, such action may remain in effect until the disciplinary process is resolved.

Case 1:20-cv-00996   Document 1-3   Filed 11/02/20   Page 160 of 178

## PROCEDURE

- Any member of the university community who has reason to believe that a student or student group may pose a threat to the health, safety, or welfare of the university community or any member of it should contact the Vice President for Student Affairs or other staff within Student Affairs as appropriate.

- The Vice President for Student Affairs or designee will conduct a preliminary review of available information and, where necessary and appropriate, gather additional information. If feasible under the circumstances, the Vice President for Student Affairs or designee will meet with the student in question before taking administrative action.

- Based on the available information, the Vice President for Student Affairs or designee shall determine whether administrative action is warranted. The Vice President for Student Affairs or designee will prepare a written statement identifying the administrative action(s), the time period such action(s) is/are in effect, and the reasons for the administrative action(s).

# APPENDIX D — FRATERNITY AND SORORITY RECOGNITION

Recognition is the formal process by which Duke University permits a fraternity or sorority to function on campus, conduct membership/intake activities, and be considered part of the university. For a fraternal organization to obtain recognition through the Office of Fraternity and Sorority Life (FSL), it must:

- Operate under a constitution and bylaws that have been approved by FSL and one of the recognized Greek Governing Councils: Interfraternity Council (IFC), Multicultural Greek Council (MGC), National Pan-Hellenic Council (NPHC), Panhellenic Association (Panhel).

- Demonstrate sound financial standing.

- Be affiliated with an inter/national fraternity or sorority.

- Present an initial membership list of at least three (3) currently registered, degree-seeking students who are not on academic or disciplinary probation. (While Duke recognizes that some organizations share membership with other colleges and universities, this relationship is prohibited by FSL.)

- Identify a person, who is not an undergraduate, to serve as the chapter advisor.

- Maintain general liability insurance with minimum limits of $1,000,000 per occurrence, $3,000,000 aggregate. A certificate of insurance evidencing current coverage must be provided to the Office of Fraternity and Sorority Life on an annual basis as a part of maintaining university recognition.

The university does not recognize local chapters.

The Office of Fraternity and Sorority Life determines, with the input of the appropriate Greek governing council, the status of recognized fraternity and sorority chapters. If a chapter no longer meets any or all of the above-stated conditions for full recognition or, as a provisionally recognized group, is not making sufficient progress towards full recognition, then full or provisional recognition may be withdrawn or the chapter may be placed on probation with suspended privileges. In addition, FSL and the governing councils support any sanctions given to chapters by their inter/national headquarters office.

The suspension of privileges may include, but is not limited to:

- Reservation and free usage of campus space.

- Participation in new member recruitment and intake activities.

- Ability to host/co-sponsor events on and off campus.

- Participation in community-wide events, education programs, intramural sports and service/philanthropy initiatives.

- Membership in one of the recognized Greek governing councils.

## FRATERNITY AND SORORITY MEMBERSHIP RECRUITMENT/INTAKE

Membership may be extended to students in the spring of their first year. Upperclass students may receive bids, or invitations to join recognized chapters, at any time during the academic year.

# APPENDIX E — RECOGNIZED STUDENT ORGANIZATIONS

Each student organization adds to the social, cultural, and intellectual environment of Duke. The university recognizes the contributions that student organizations make to the quality of life on campus and strives to support its own mission to "attending not only to [students'] intellectual growth but also to their development as adults committed to high ethical standards and full participation as leaders in their communities" (Duke University Mission Statement, 2001).

Recognition of any organization is not to be interpreted as an endorsement by the university of the purpose, activities, political position, or point of view of the organization.

## RECOGNITION SOURCES

The university identifies two (2) primary recognition sources for undergraduate student organizations: Student Organization Finance Committee (SOFC) and departmental.

1. The Student Organization Finance Committee (SOFC) of the Duke Student Government (DSG) is the major student organization recognition source; the financial, risk management, and policy authority for these organizations rests with the Vice President for Student Affairs.

Standards of Recognition. All undergraduate student organizations must align with the following basic standards:

- Have a unique mission that differentiates it from other recognized organizations.

- Be comprised of at least ten (10) members. All members are Duke-affiliated and at least fifty percent (50%) are currently enrolled undergraduate students. All leadership positions must be occupied by undergraduate students.

- Have a president, who oversees the operations and mission of the organization, and a treasurer, who oversees the financial health of the organization. These officer positions may be labeled differently within the organization but will be named as above for official university purposes. The position of the president must be voted in democratically through the organization. Both the president and the treasurer are responsible for attending and completing the required annual trainings offered through University Center Activities and Events (UCAE).

- Have a full-time faculty or staff member serve as an advisor. An organization advisor helps their organization grow and develop its activities in the spirit of the highest ideals of the Duke mission.

- List current mission statement, officers, and advisor on the official student organization directory DukeGroups (dukegroups.com) annually. The Division of Student Affairs maintains the official list of student organizations regardless of recognition source.

- Create and keep a constitution that defines:

  - The official name of the organization

  - The recognition source of the organization (SOFC or Department)

  - The mission of the organization (must not violate any university, local, state, or federal policies/laws)

  - The requirements of membership in the organization

  - Acknowledgment that the actions and opinions of the group are independent of Duke University and do not reflect the actions and opinions of the university as a whole

  - Alignment with the Duke University equal opportunity (non-discrimination) statement: Duke University prohibits discrimination and harassment, and provides equal [membership] opportunity without regard to race, color, religion, national origin, disability, veteran status, sexual orientation, gender identity, sex, genetic information, or age

  - Maintain a positive balance of funds in any university-granted financial account

For more information about student organizations please visit University Center Activities and Events (UCAE) in the Bryan Center or online at studentaffairs.duke.edu/ucae.

2. University schools, departments, and offices may also recognize student organizations or student ventures in congruence with their standards; the financial, risk management, and policy authority for these organizations or ventures rest with the department/program of the entity that bestows recognition.

All student groups are required to be knowledgeable of and abide by policies in the UCAE Student Organization handbook available on the UCAE website. UCAE reserves the right to update policies.

Case 1:20-cv-00996   Document 1-3   Filed 11/02/20   Page 162 of 178

# APPENDIX F — INFORMATION AND RESOURCES CONCERNING SUBSTANCE USE

## HEALTH EFFECTS OF ALCOHOL AND OTHER DRUGS

Psychoactive drugs are a class of drugs most frequently used socially or recreationally (and often illegally). These drugs act on the central nervous system (CNS), or more specifically the brain, creating altered states of consciousness. They may increase CNS activity (stimulants, such as cocaine, crack, amphetamines), decrease CNS activity (depressants, such as alcohol, barbiturates, tranquilizers), cause the creation of illusions (hallucinogens, such as LSD, peyote, mushrooms, PCP), or have a combined effect (marijuana). Every drug has multiple effects on the brain and the body. Addiction to any of these substances is a disease that affects the sufferer mentally, emotionally, physically, and spiritually. It can also have a profound effect on those closest to the addicted person.

## SHORT TERM OR ACUTE EFFECTS

Impaired judgment (violent behavior, physical injuries, accidents), unpredictable mood swings, acute psychotic episodes, risky sexual behaviors (unplanned pregnancy, impaired sexual response, sexually transmitted diseases), sexual assault, rape, hangovers, increased nervousness, tremors, shortness of breath, anxiety/panic reactions, reduced energy and stamina, digestive problems (nausea, vomiting, diarrhea, ulcer irritation), dehydration, halitosis, cardiovascular changes, seizures, loss of consciousness, death.

## LONG TERM OR CHRONIC EFFECTS

- Systemic Disorders. Increased heart rate, increased or sudden decrease in blood pressure, hyperactivity, decreased oxygen in blood supply to the brain, decreased immune system function, AIDS or hepatitis from needle sharing, reverse tolerance, hemorrhage, delirium tremens (D.T.s) from acute withdrawal, death.

- Brain/Central Nervous System Disorders. Short-term memory loss, concentration difficulties, damaged nerve connections, disruption of "chemical messengers."

- Mental Health Disorders. Sleep disorders, eating disorders, fatigue, acute or chronic depression, hallucinations, suicidal thoughts/actions, personality changes, delusional states, anxiety disorders, psychosis.

- Digestive Disorders. Ulcers in the mouth, diseases of the gums, inflammation of the esophagus, stomach, and pancreas, ulcers, cirrhosis, fatty liver disease, alcoholic hepatitis.

- Respiratory System Disorders. Painful nosebleeds, nasal erosion, tuberculosis, chronic lung diseases including emphysema and chronic bronchitis, exacerbation of sinus and asthma conditions, increased risk of lung cancer, decreased vital lung capacity.

- Sexual/Reproductive Disorders. Impotence, atrophy of testicles, impaired sperm production, absence of menstrual period, decrease in desire/arousal/performance, birth defects.

- Endocrine/Nutrition/Metabolic Disorders. Malnutrition, vitamin/mineral deficiencies, acute gout, obesity, diabetes, decreased testosterone levels in men, appetite disorders, weight gain or loss, impaired immune system.

- Skin and Subcutaneous Tissue Disorders. Skin infections, unsightly changes in the skin, dry skin, boils, skin abscesses, itching, increase in skin moles and benign skin tumors, spider angiomas, edema.

- Pregnancy and Fetal Development. Fetal Alcohol Syndrome, low birth weight babies, increased risk of miscarriage, stillbirth, increased risk of Sudden Infant Death Syndrome, brain damage, congenital deformities, addiction in the newborn.

- Other Disorders. Prone to cross-addiction to other drugs including prescription medications, laxatives, analgesics, and caffeine. Additionally, chronic abusers have an increased incidence of fractures, sprains, burns, lacerations, bruises, concussions, and other traumas.

Case 1:20-cv-00996   Document 1-3   Filed 11/02/20   Page 163 of 178

# FEDERAL PENALTIES AND SANCTIONS FOR ILLEGAL POSSESSION OF A CONTROLLED SUBSTANCE (from gpo.gov/fdsys)

## 21 U.S.C. 844(a)

1st conviction: Up to 1 year imprisonment and fined at least $1,000 but not more than $100,000, or both.

After one (1) prior drug conviction: At least 15 days in prison, not to exceed two (2) years and fined at least $2,500 but not more than $250,000, or both.

After 2 or more prior drug convictions: At least 90 days in prison, not to exceed 3 years and fined at least $5,000 but not more than $250,000, or both.

Special sentencing provision for possession of crack cocaine: Mandatory at least 5 years in prison, not to exceed 20 years and fined up to $250,000, or both, if:

- 1st conviction and the amount of crack possessed exceeds five (5) grams.
- 2nd crack conviction and the amount of crack possessed exceeds three (3) grams.
- 3rd or subsequent crack conviction and the amount of crack possessed exceeds 1 gram.

## 21 U.S.C. 853(a)(2) and 881(a)(7)

Forfeiture of personal and real property used to possess or to facilitate possession of a controlled substance if that offense is punishable by more than one year of imprisonment. (See special sentencing provisions re: crack.)

## 21 U.S.C. 881(a)(4)

Forfeiture of vehicles, boats, aircraft or any other conveyance used to transport or conceal a controlled substance.

## 21 U.S.C. 844a

Civil fine of up to $10,000.

## 21 U.S.C. 853a

Denial of Federal benefits, such as student loans, grants, contracts, and professional and commercial licenses, up to 1 year for first offense, up to 5 years for second and subsequent offenses.

## 18 U.S.C. 922(g)

Ineligible to receive or possess a firearm or ammunition.

## Miscellaneous

Revocation of certain Federal licenses and benefits, e.g., pilot licenses, public housing tenancy, etc... are vested within the authorities of individual Federal agencies. Note: These are only Federal penalties and sanctions. Additional State of North Carolina penalties and sanctions may apply.

## Effect on Financial Aid

Under the 2000 reauthorization of the Higher Education Act, eligibility for federal student aid is jeopardized for students convicted of a drug possession charge. For a first conviction, eligibility for aid may be suspended for one year; two years for a second; permanently for a third. Eligibility is restored once a student completes a drug rehabilitation program or has the conviction overturned.

# NORTH CAROLINA STATE LAWS REGARDING ALCOHOL AND DRUGS

For complete information regarding North Carolina state laws governing drugs, consult the North Carolina Controlled Substances Act in the North Carolina General Statutes, Article 5, Chapter 90.

For complete information regarding North Carolina state laws governing alcohol, consult the North Carolina General Statutes, Chapter 18B. Criminal penalties for a violation of these laws include a misdemeanor conviction, community service, possible loss of driver's license, and/or fines. Repeat violations incur greater penalties. The complete statutes are available online at ncga.state.nc.us/gascripts/Statutes/Statutes.asp.

Case 1:20-cv-00996   Document 1-3   Filed 11/02/20   Page 164 of 178

# RESOURCES FOR ALCOHOL, DRUG, AND TOBACCO CONCERNS

## Emergency Phone Numbers

Duke Emergency Medical Service and/or Police      911/919-684-2444

Alcohol-related emergencies can be difficult to assess. When in doubt, contact professionals.

Duke Hospital Emergency Department      911/919-684-2413

If an intoxicated student cannot be aroused, is breathing erratically or slowly, or appears to be in a life-threatening state, get the student to the Emergency Department. Duke Emergency Medical Service or Duke Police can assist in transporting students.

24-hour confidential advice on alcohol or drug-related emergencies can be obtained through Holly Hill Hospital at 1-800-422-1840 or 1-800-447-1800.

## Local Inpatient/Outpatient Treatment Facilities

Holly Hill Hospital      919-250-7000
3019 Falstaff Road
Raleigh, NC 27610
hollyhillhospital.com

Fellowship Hall      800-659-3381
5140 Dunstan Road
Greensboro, NC 27405
fellowshiphall.com

## Local Outpatient Treatment Facilities

Duke Child Development and Behavioral Health      919-668-5559
402 Trent Drive
DUMC Box 2906
Durham, NC 27710
ipmh.duke.edu/content/cdbh

## Information, Screening, and Education

The DuWell      studentaffairs.duke.edu/duwell  919-681-8421

The DuWell enhances the education of Duke University students by environmentally addressing issues contributing to substance use/abuse, promoting healthy emotional and social development, and providing screenings for students in need of addressing high-risk patterns of behavior. The office provides books and assistance with educational programming for student living groups and organizations. The DuWell offers assistance and support for students interested in changing their substance use patterns.

Student Health      studentaffairs.duke.edu/studenthealth  919-681-WELL (9355)
Student Health offers screening, evaluation, education and referral for alcohol and substance use/abuse.

Case 1:20-cv-00996   Document 1-3   Filed 11/02/20   Page 165 of 178

## Individual Assessment and Counseling

**Counseling and Psychological Services (CAPS)**  studentaffairs.duke.edu/caps  919-660-1000

CAPS offers evaluation, consultation, counseling, and referral for individuals with alcohol and other substance abuse issues. A substance abuse specialist is available for personal consultation and counseling for students who are concerned about themselves or others because of alcohol or drug use.

**UNC Health Care's Alcohol and Substance Abuse Program**  919-966-6039
  www.unchealthcare.org/site/healthpatientcare/alcoholsubstanceabuse

UNC offers a center for intensive outpatient treatment of chemical dependency and substance abuse.

**Cocaine Anonymous**  ca.org  1-800-347-8998

An around-the-clock information and referral service, staffed by recovering cocaine addict counselors.

**First Step Services**  www.firststepnc.com  919-833-8899

First Step specializes in intensive outpatient programs for individuals suffering from drug and alcohol abuse, stressing abstinence from mind and mood altering substances during the course of treatment.

**C.S.A.P.**  1-800-662-HELP; 1-800-662-9832 for information in Spanish

A 24-hour hotline maintained by the Center of Substance Abuse Prevention offers confidential information and referral.

**N.C.A.D.I.**  www.samhsa.gov  1-800-729-6686

The National Clearinghouse for Alcohol and Drug Information offers free print information on alcohol and other drugs. Other media may be available for rent or purchase.

**Cancer Information Service**  1-800-422-6237

Free telephone smoking cessation counseling, materials, support, referrals. Information in Spanish when needed.

**American Lung Association**  1-800-586-4872

Self-help materials available.

**Academic courses related to alcohol use, treatment, and research**

See course listings through the Office of University Registrar (registrar.duke.edu) or the Bulletin of each school.

## Support Groups

**Alcoholics Anonymous (AA)**  aanc32.org / aanc33.org  919-286-9499 / 1-800-662-4357

AA offers emergency support for individuals with alcohol problems in addition to group meetings. Many have found the 12-step program to be crucial in their recovery. Meeting locations in the Durham area can be found on the AA website.

**Narcotics Anonymous (NA)**  na.org  919-956-5900

Similar to Alcoholics Anonymous, except focused on drug abuse/addiction issues. A variety of drugs are addressed, including marijuana and prescription medications.

**ACOA/Al-Anon**  al-anon.alateen.org  919-403-0687 / 1-888-4AL-ANON

ACOA and Al-Anon meetings are support groups for family members dealing with the impact of living with, or being close to an alcoholic. Meeting locations in the Durham area can be found on the Al-Anon website.

Case 1:20-cv-00996   Document 1-3   Filed 11/02/20   Page 166 of 178

# FEDERAL DRUG TRAFFICKING PENALTIES FOR MARIJUANA (SCHEDULE I)

| Drug | Quantity | First Offense | Second Offense |
|---|---|---|---|
| Marijuana | 1,000 kg or more mixture; or 1,000 or more plants | Not less than 10 years or more than life<br><br>If death or serious bodily injury, not less than 20 years or more than life<br><br>Fine not more than $10 million if an individual, $50 million if other than an individual | Not less than 20 years or more than life<br><br>If death or serious bodily injury, life imprisonment<br><br>Fine not more than $20 million if an individual, $75 million if other than an individual |
| Marijuana | 100 kg to 999 kg mixture; or 100 to 999 plants | Not less than 5 years or more than 40 years<br><br>If death or serious bodily injury, not less than 20 years or more than life<br><br>Fine not more than $5 million if an individual, $25 million if other than an individual | Not less than 10 years or more than life<br><br>If death or serious bodily injury, life imprisonment<br><br>Fine not more than $8 million if an individual, $50 million if other than an individual |
| Marijuana | 50 kg to 99 kg mixture; or 50 to 99 plants | Not more than 20 years<br><br>If death or serious bodily injury, not less than 20 years or more than life<br><br>Fine $1 million if an individual, $5 million if other than an individual | Not more than 30 years<br><br>If death or serious bodily injury, life imprisonment<br><br>Fine $2 million if an individual, $10 million if other than individual |
| Hashish | More than 10 kg | | |
| Hashish Oil | More than 1 kg | | |
| Marijuana | Less than 50 kg (but does not include 50 or more plants regardless of weight)<br><br>1-49 marijuana plants | Not more than 5 years<br><br>Fine not more than $250,000, $1 million other than individual | Not more than 10 years<br><br>Fine $500,000 if an individual, $2 million if other than individual |
| Hashish | 10 kg or less | | |
| Hashish Oil | 1 kg or less | | |

Source: www.justice.gov/dea/druginfo/ftp3.shtml

Case 1:20-cv-00996   Document 1-3   Filed 11/02/20   Page 167 of 178

## FEDERAL DRUG TRAFFICKING PENALTIES

| Drug/Schedule | Quantity | Penalties | Quantity | Penalties |
|---|---|---|---|---|
| Cocaine (Schedule II) | 500–4999 gms mixture | First Offense: Not less than 5 years, and not more than 40 yrs. If death or serious bodily injury, not less than 20 years or more than life. Fine of not more than $5 million if an individual, $25 million if not an individual<br><br>Second Offense: Not less than 10 years, and not more than life. If death or serious bodily injury, life imprisonment. Fine of not more than $8 million if an individual, $50 million if not an individual | 5 kg or more | First Offense: Not less than 10 years, and not more than life. If death or serious bodily injury, not less than 20 years or more than life. Fine of not more than $10 million if an individual, $50 million if not an individual<br><br>Second Offense: Not less than 20 years, and not more than life. If death or serious bodily injury, life imprisonment. Fine of not more than $20 million if an individual, $75 million if not an individual<br><br>2 or more prior offenses: Life imprisonment. Fine of not more than $20 million if an individual, $75 million if not an individual |
| Cocaine Base (Schedule II) | 28–279 gms mixture | | 280 gms or more mixture | |
| Fentanyl (Schedule IV) | 40–399 gms mixture | | 400 gms or more mixture | |
| Fentanyl Analogue (Schedule I) | 10–99 gms mixture | | 100 gms or more mixture | |
| Heroin (Schedule I) | 100–999 gms mixture | | 1 kg or more mixture | |
| LSD (Schedule I) | 1–9 gms mixture | | 10 gms or more mixture | |
| Methamphetamine (Schedule II) | 5–49 gms pure or 50–499 gms mixture | | 50 gms or more pure or 500 gms or more mixture | |
| PCP (Schedule II) | 10–99 gms pure or 100–999 gms mixture | | 100 gms or more pure or 1 kg or more mixture | |

| | | Penalties | | |
|---|---|---|---|---|
| Other Schedule I & II substances | Any amount | First Offense: Not more that 20 years. If death or serious bodily injury, not less than 20 years, or more than life. Fine $1 million if an individual, $5 million if not an individual<br><br>Second Offense: Not more than 30 years. If death or serious bodily injury, life imprisonment. Fine $2 million if an individual, $10 million if not an individual | | |
| Any drug product containing Gamma Hydroxybutyric Acid | Any amount | | | |
| Flunitrazepam (Schedule IV) | 1 gm or more | | | |
| Other Schedule III drugs | Any amount | First Offense: Not more than 10 years. If death or serious bodily injury, not more than 15 years. Fine not more than $500,000 if an individual, $2.5 million if not an individual<br><br>Second Offense: Not more than 20 years. Fine not more than $1 million if an individual, $5 million if not an individual | | |
| All other Schedule IV drugs (other than one gram or more of Flunitrazepam) | Any amount | First Offense: Not more than 5 years. Fine not more than $250,000 if an individual, $1 million if not an individual<br><br>Second Offense: Not more than 10 years. Fine not more than $500,000 if an individual, $2 million if not an individual | | |
| All Schedule V drugs | Any amount | First Offense: Not more than 1 year. Fine not more than $100,000 if an individual, $250,000 if not an individual<br><br>Second Offense: Not more than 4 years. Fine not more than $200,000 if an individual, $500,000 if not an individual | | |

Case 1:20-cv-00996   Document 1-3   Filed 11/02/20   Page 168 of 178

## Highlights of State Statutes

It is illegal for anyone less than 21 years of age to:

- Possess or consume malt beverages, unfortified or fortified wine, spirituous liquor, or mixed beverages;
- Purchase or attempt to purchase malt beverages, unfortified or fortified wine, spirituous liquor, or mixed beverages.

It is illegal for anyone (regardless of age) to:

- Aid or abet another in the unlawful sale, purchase, or possession of malt beverages, unfortified or fortified wine, spirituous liquor, or mixed beverages;
- Fraudulently use identification in obtaining or attempting to obtain alcoholic beverages.

# APPENDIX G — PATIENT PRIVACY

The Health Insurance Portability and Accountability Act of 1996, or HIPAA, includes a privacy rule that creates national standards to protect individuals' personal health information. These standards were implemented by the Duke Health Enterprise on April 14, 2003.

Duke Student Health, Counseling and Psychological Services, and the Office of Gender Violence Prevention and Intervention comply with these standards. All incoming students are asked to review and electronically sign the HIPAA notice as part of the immunization and health history process. Students who have not yet received the Notice of Privacy Practices brochure, which describes how medical information may be used and disclosed and how one can get access to this information, will receive this at the first visit.

# APPENDIX H — THEME PARTIES AND DECORATIONS

This policy applies to all Duke University facilities to include Campus, Medical Center, Hospital and Health System. All students, visitors, and employees must adhere to this policy when planning a theme party, event, meeting, or decorating any work area. Notify OESO-Fire & Life Safety as soon as possible but no less than 72 hours prior to the placement of decorations.

## GENERAL RESTRICTIONS

- The use of pyrotechnics by individuals or performers is prohibited on campus.
- All decorations (to include artificial greenery such as wreaths and holly) must be non-combustible, inherently flame resistant or treated with an approved fire retardant in accordance with the manufacturer's specifications that will pass NFPA 701 test.
- Decorative materials shall not exceed 10% of the aggregate of wall and ceilings.
- Straw, hay, corn fodder, dried flowers, bamboo, and other similar decorations are prohibited as decoration inside facilities without written authorization from the OESO Fire & Life Safety Division.
- Combustible decorations shall be prohibited in all healthcare occupancies (Hospital, Duke Clinic, PDC, etc.) unless they are flame retardant. (Exception: combustible decorations, such as photographs and paintings, in such limited quantities that a hazard of fire development or spread is not present).
- Fog and smoke machines may not be used inside facilities without written authorization of the OESO-Fire & Life Safety Division.
- Animal(s), regardless of size or species, are strictly prohibited to attend or participate in any event, party, or meeting.
- Water, waterfalls, pools, spraying water, running water, or utilizing water in any way is strictly prohibited.
- All doors (i.e., exit, smoke, fire, interior, exterior), hallways, or any other means of egress may not be covered or blocked in any manner by decorations.
- Trash must not be allowed to accumulate, but collected in appropriate containers during the event and removed at the close of the event.

'8

# ELECTRICAL SAFETY AND HOLIDAY LIGHTING

- Electrical lights (110 volts) and fiber optic lights (110 volts) may be used on artificial Christmas trees, wreaths, and greenery, but may not be used on any live Christmas trees or greenery.
- All electrical lights, electrical equipment, animated, or electrical decorations must be UL listed.
- Manufacturer's instructions and precautions shall be followed.
- Each living group or office should have an appointed representative to ensure that the electrical decorations are de-energized at the end of the day.
- Any light string with worn, frayed, broken cords, loose bulb connections, and empty sockets shall not be used.
- Use of holiday lights and light strings shall be limited to reduce overheating.
- Lights shall not have more than three strings of light connected to each other.
- The use of lights and wiring on metal Christmas trees (aluminum trees from the '50s and '60s as defined by the NC Department of Insurance) is prohibited. Fiber optic and pre-wired artificial trees are acceptable as long as they are UL listed.
- Only indoor lights will be used inside facilities.
- Light strings or electrical decorations shall be de-energized before replacing bulbs or fuses.
- Light strings must be mounted in a manner that will not damage the cord's insulation.
- Light strings should be plugged directly into an outlet or an electrical power strip with built-in circuit breaker.

General. All combustible party decorations shall be removed from the area immediately following the event.

Exception. During the holiday season decorations shall be removed no later than December 30th. Residence halls shall have all decorations removed no later than the closing of the residence halls by Residence Life and Housing Services.

Live Greenery and Christmas Trees. Live greenery, such as Christmas trees, pine wreaths, and holly, are prohibited inside of Hospital and Medical Center buildings. In addition, live greenery is prohibited in assembly areas, education facilities, schools, day cares, stores, businesses, residence halls, and hotels unless the building is protected throughout with an approved automatic sprinkler system.

If a live Christmas tree is allowed in a facility, the following rules apply:

- Only one tree will be purchased for each department, group, or living group and the tree will be located in a public area such as a commons area, reception area or lounge.
- All trees will be prepared by sawing off the trunk of the tree at an angle at least one-half inch or more above the original cut and spraying the tree with an approved fire retardant in accordance with the manufacturer's specifications as required by NC State Building Code.
- The tree will be placed within a tree holder/stand capable of containing water to prevent drying. The stand will be checked daily to assure the water level is adequate. Remember: A tree will absorb large quantities of water while it is indoors.
- The tree will be placed in a location away from all heat sources.
- Smoking or open flames shall be prohibited near live greenery.
- The tree shall be removed from the facility whenever the needles or leaves fall off readily when a tree branch is shaken or if the needles are brittle and break when bent between the thumb and the index finger, or by December 30, whichever occurs first.

Artificial greenery may be utilized if it meets the general and electrical requirements as listed above.

Candle Safety. It is a violation of university policy to light any material on fire on campus. Candles, other open flame devices, grills, incense, and any other flame/heat producing items are strictly forbidden for use inside university facilities except during official religious ceremonies, such as the observance of Chanukah. Permission for use of any open flame devices (including those used for religious ceremonies) must be obtained from OESO-Fire & Life Safety Division prior to use. A copy of the signed approval letter must be maintained at the location approved for an open flame device.

Whenever possible, substitute open flame candles with battery operated or electrical powered candles.

Case 1:20-cv-00996   Document 1-3   Filed 11/02/20   Page 170 of 178

# APPENDIX I — PATENTS AND INTELLECTUAL PROPERTY

Duke's mission lies in the creation and dissemination of knowledge through (1) recognizing and acknowledging the right of intellectual property ownership, (2) encouraging the pursuit of patents and licenses, and (3) ensuring sufficient records are maintained.

Duke University is committed to the personal ownership of intellectual property rights by the creators of the intellectual works.

For further information, please visit provost.duke.edu/wp-content/uploads/FHB_App_P.pdf.

# APPENDIX J — MISSING STUDENT NOTIFICATION

In accordance with the Higher Education Opportunity Act of 2008, Duke University has developed a policy for notifying the designated emergency contact in DukeHub for a student who is determined to be missing.

A student may be deemed missing if it is reported to appropriate university officials (Duke Police, Residence Coordinator on-Call, or the Dean on-Call) that the student has been unreachable via personal contact, telephone, e-mail, or other means of electronic communication for 24 hours or more. If members of the Duke community believe that a student has been missing for 24 hours, it is critical that they report that information to the Duke University Police at (919) 684-2444. A Residence Coordinator on-Call or Dean on-Call who receives such a report will immediately report it to Duke University Police. Duke University will notify any missing student's confidential contact(s), if provided, within 24 hours of the determination that the student is missing. In the event a student is under 18 years of age and not emancipated, Duke University must notify a custodial parent or guardian within 24 hours of the determination that the student is missing, in addition to notifying any additional contact person designated by the student. For all missing students, Duke University will notify the local law enforcement agency within 24 hours of the determination that the student is missing, unless the local law enforcement agency was the entity that made the determination that the student is missing.

Upon determination by Duke University Police that a student is missing, the designated missing person contact will be notified as soon as possible, but no later than 24 hours after that determination that the student has been missing for 24 hours. The student's custodial parent or guardian will also be notified if that person is not the designated missing person contact and the student is under 18 years of age and not an emancipated individual. Regardless of whether the student has identified a contact person, is above the age of 18, or is an emancipated minor, Duke University Police will inform local law enforcement (or the local law enforcement with jurisdiction) that the student is missing within 24 hours.

Duke provides the option for each student living in an on-campus student housing facility to identify, separate from an emergency contact, a contact person or persons to whom Duke will make notification within 24 hours of the determination that the student is missing. Students are encouraged to periodically review and update their emergency contact information in DukeHub. When students enter a separate "Missing Person" emergency contact or contacts in DukeHub, that information will remain confidential and shared only with appropriate university personnel involved with a missing person investigation and law enforcement, and may not be disclosed outside of a missing person investigation.

# APPENDIX K — CONSEQUENCES OF COPYRIGHT INFRINGEMENT

Unauthorized distribution of copyrighted material, including peer-to-peer file sharing, may subject you to criminal or civil liability. Punishment for this unauthorized use or distribution can be severe: violation of federal copyright laws can range from imprisonment to hefty fines. For instance, online infringement of copyrighted music can be punished by up to five years in prison and/or $250,000 in fines, and you may be held liable for damages up to $150,000 per infringed copyright. To learn more about Duke University's policy on unauthorized peer-to-peer file sharing, including disciplinary actions that the university may take against students who engage in unauthorized distribution of copyright materials using the university's information technology system, please visit the website of the Dean of Students Office at studentaffairs.duke.edu/dos/riaa-file-sharing, which provides additional information on the application of copyright law to peer-to-peer file sharing.

Case 1:20-cv-00996   Document 1-3   Filed 11/02/20   Page 171 of 178



# PENALTIES FOR COPYRIGHT INFRINGEMENT

Type[a]: Innocent infringement (strict liability)

Minimum Penalty[b]: Minimum damages of $200 per work copied

Maximum Penalty: See below

Type: "Normal infringement"

Minimum Penalty**: Minimum damages of $750 per work copied

Maximum Penalty: Maximum $30,000 per work copied

Type: "Willful infringement"

Minimum Penalty: Minimum damages of $750 per work copied

Maximum Penalty: Maximum $150,000 per work copied

Type: Criminal infringement (infringement for private financial gain or commercial advantage, or where the total value of works infringed within a three-month period exceeds $1000)

Minimum Penalty: Fines or imprisonment up to one year

Maximum Penalty: Fines or imprisonment up to ten years

a. Kevin L. Smith, J.D., Director of Scholarly Communications, Duke University

b. From 17 U.S. Code 504 & 506 and 18 U.S. Code 2319 & 3571

Case 1:20-cv-00996   Document 1-3   Filed 11/02/20   Page 172 of 178

# INDEX

## A

academic dishonesty 16
  cheating 16
  lying 16
  plagiarism (definition) 16
  stealing 17
academic freedom 18
administrative action policy 69
administrative hearings. See undergraduate
    disciplinary system, administrative hearings
advertisements 18
  banners 18
  chalking 19
  posters, announcements, and
    bulletin boards 19
alcohol 19
  community expectations violation 20
  events with alcohol 22
  general provisions violation 21
  group-sponsored social functions 22
  health and safety intervention 21
  North Carolina state laws 73
  resources for alcohol concerns 72
  underage possession/consumption 20
  undergraduate policy 20
  university-wide policy 19
  unsafe/irresponsible behavior 20
amnesty. See alcohol, health and safety
    intervention
appeals. See undergraduate disciplinary system
arbitration 54

## B

bridge painting 23

## C

candles. See fire safety, open flames
classroom disruption 26
computing and electronic communications 26
  group e-mail 27
consent (for sexual activity). See Student Sexual
    Misconduct Policy
consequences of copyright infringement 80

## D

dean's certification 37
disciplinary action while civil/criminal charges
    pending 64

Disciplinary Advisors 14
disciplinary hold 64
disciplinary probation 28, 61
disciplinary records/student status 64
disorderly conduct 27
drones 27
drugs and drug paraphernalia 28
DukeCard 28
Duke Community Standard 12
Duke University Honor Council 14

## F

Faculty-Student Resolution 69
failure to comply 28
falsification/fraud 28
federal drug trafficking penalties 76
fire safety 29
  fire alarms/drills 29
  fireworks 29
  grills 29
  open flames 30
fraternity and sorority recognition 70

## G

gambling 30
guests 30

## H

harassment (non sex/gender-based) 30
hazing 31
  examples of 32

## I

informal resolution 54
information and resources concerning
    substance use 72

## J

judicial system of Duke University 66

## M

mediation 54
missing student notification 80

## N

noise
  Durham Noise Ordinance 36

Case 1:20-cv-00996   Document 1-3   Filed 11/02/20   Page 173 of 178

P

patents and intellectual property 80
patient privacy 78
physical abuse, fighting, and endangerment 35
pickets, protests, and demonstrations 35
plagiarism
  information about 17
property/facilities/services 36

R

recognized student organizations 71
resolution of student conflict 53
  filing a report 54
resources for alcohol, drug, and tobacco
    concerns 72

S

sanctions. See undergraduate disciplinary system
smoking 36
solicitation 37
stalking (non sex/gender-based) 37
Student Sexual Misconduct Policy
  administrative hearing 46
  advisors 45
  appeals 47
  complaint resolution 44
  confidentiality 40
  consent (for sexual activity) 43
  examples of sexual misconduct 50
  hearing panel 46
  hearing procedures 46
  immediate and/or interim measures 44
  information for complainants 41
  information for respondents 41
  interim measures and/or remedies 47
  investigation 45
  prohibited conduct 42
  reporting 44
  retaliation 43
  sanctions 47
  scope 41

support services and options for
    complainants 48
  time frames 45

T

theft. See property/facilities/services
theme parties and decorations 78

U

unauthorized access. See property/facilities/
    services
unauthorized surveillance/photography 37
Undergraduate Conduct Board 14
Undergraduate Conduct Board hearings
  advisors 58
  entering a plea 59
  hearing panels 58
  information to be considered 60
  notice 59
  notification and record 60
  outcome 60
  procedures 59
undergraduate disciplinary system 53
  administrative hearings 57
  appeals 63
  investigation 56
  organization 55
  participation 56
  referral for discipinary action 56
  resolution through a disciplinary hearing 56
  resolution through agreement 57
  sanctions 60
  scope 55
  types of resolution 54
  witnesses 59
University Judicial Board. See judicial system of
    Duke University

W

weapons/firearms/explosives 38

## PHOTO CREDITS

Cover: Duke Photography
Inside cover: Stock photo
Page 11: Adam Smith
Page 15: Hector F. Cadena
Page 39: Hector F. Cadena
Page 51: Hector F. Cadena
Page 65: Hector F. Cadena

## DESIGN & LAYOUT

Valerie Glassman

## EDITORS

Stephen Bryan, David Frankel, Valerie Glassman,
Victoria Krebs, Khary McGhee

Appendices

Case 1:20-cv-00996   Document 1-3   Filed 11/02/20   Page 174 of 178

# DUKE COMMUNITY STANDARD

Duke University is a community dedicated to scholarship, leadership, and service and to the principles of honesty, fairness, respect, and accountability. Citizens of this community commit to reflect upon and uphold these principles in all academic and non-academic endeavors, and to protect and promote a culture of integrity.

To uphold the Duke Community Standard:
- I will not lie, cheat, or steal in my academic endeavors;
- I will conduct myself honorably in all my endeavors; and
- I will act if the Standard is compromised.



Office of Student Conduct · 200 Crowell Building · 10 Epworth Lane
Box 90893 · Durham, North Carolina 27708

phone: 919-684-6938 · fax: 919-681-7390 · email: conduct@duke.edu
studentaffairs.duke.edu/conduct

# STATE OF NORTH CAROLINA

_____ County
Durham

FILED
2020 OCT -7 P 12: 10
DURHAM CO., N.C.
BY_____ es

20 CVS

In The General Court Of Justice
☐ District ☒ Superior Court Division

**Name Of Plaintiff**
JOHN DOE

**Address**
c/o Emilia I. Beskind, 119 E Main St

**City, State, Zip**
Durham, NC 27701

**VERSUS**

**Name Of Defendant(s)**
DUKE UNIVERSITY

## CIVIL SUMMONS
☐ **ALIAS AND PLURIES SUMMONS (ASSESS FEE)**

G.S. 1A-1, Rules 3 and 4

**Date Original Summons Issued**

**Date(s) Subsequent Summons(es) Issued**

### To Each Of The Defendant(s) Named Below:

**Name And Address Of Defendant 1**
Duke University

**Name And Address Of Defendant 2**

⚠️ **IMPORTANT! You have been sued! These papers are legal documents, DO NOT throw these papers out!**
**You have to respond within 30 days. You may want to talk to a lawyer about your case as soon as possible, and, if needed, speak with someone who reads English and can translate these papers!**
**¡IMPORTANTE! ¡Se ha entablado un proceso civil en su contra! Estos papeles son documentos legales.**
**¡NO TIRE estos papeles!**
**Tiene que contestar a más tardar en 30 días. ¡Puede querer consultar con un abogado lo antes posible acerca de su caso y, de ser necesario, hablar con alguien que lea inglés y que pueda traducir estos documentos!**

### A Civil Action Has Been Commenced Against You!

You are notified to appear and answer the complaint of the plaintiff as follows:

1. Serve a copy of your written answer to the complaint upon the plaintiff or plaintiff's attorney within thirty (30) days after you have been served. You may serve your answer by delivering a copy to the plaintiff or by mailing it to the plaintiff's last known address, and

2. File the original of the written answer with the Clerk of Superior Court of the county named above.

If you fail to answer the complaint, the plaintiff will apply to the Court for the relief demanded in the complaint.

**Name And Address Of Plaintiff's Attorney (if none, Address Of Plaintiff)**
Emilia I. Beskind
119 East Main Street
Durham, NC 27701

**Date Issued**
10/07/2020

**Time**
12:18 ☐ AM ☒ PM

**Signature**

☒ Deputy CSC ☐ Assistant CSC ☐ Clerk Of Superior Court

☐ **ENDORSEMENT (ASSESS FEE)**
This Summons was originally issued on the date indicated above and returned not served. At the request of the plaintiff, the time within which this Summons must be served is extended sixty (60) days.

**Date Of Endorsement**

**Time**
☐ AM ☐ PM

**Signature**

☐ Deputy CSC ☐ Assistant CSC ☐ Clerk Of Superior Court

**NOTE TO PARTIES:** *Many counties have **MANDATORY ARBITRATION** programs in which most cases where the amount in controversy is $25,000 or less are heard by an arbitrator before a trial. The parties will be notified if this case is assigned for mandatory arbitration, and, if so, what procedure is to be followed.*

(Over)

AOC-CV-100, Rev. 4/18
© 2018 Administrative Office of the Courts

FILE No(s): _____ 2 0 C V S 1 4 4 0 _____

CASE NAME: _____ Doe vs Duke University _____

PAYOR NAME: _____ Doe, John _____
(PARTY TO CASE)

PAYEE NAME: _____ Thomes, Ferguson + Beskind LLP _____
(PAID BY: ATTORNEY, PLAINTIFF, DEFENDANT, INTERESTED PARTY, ETC.)

| VCAP FLAG = YES | VCAP FLAG = NO |
|---|---|

**FILING FEES:**
(NEW/COUNTERCLAIMS/CROSS-CLAIMS)

_\_ CVS            $ 200.00

_____ CVD            $ 150.00

_____ CONDEMNATIONS $_____ (26130)

_____ CONFESSION OF JUDGMENT
                $_____ (21400)

_____ LIS PENDENS $_____ (21400)

_____ UPSET BID $_____ (26700)

_____ A&P/ENDORSEMENTS $_____ (21455)

_____ NOTICE OF HEARING $_____ (21450)

_____ NOTICE OF CONTRACT $_____ (21400)

_____ TRIAL DE NOVO $_____ (24310)

_____ CHANGE OF VENUE $_____ (22220)

_____ LIMITED DRIVING PRIVILEGE $_____ (24335)

_____ REST OF CITIZENSHIP $_____ (21400)

_____ PRO HAC VICE   $_____ (24625)

_____ MISC FEE $_____ _____

☑PLT PAID ____CASH, ____CC, ✓ CHECK #_25405_____ OR ____MONEY ORDER

☑PLT TOOK COPIES TO ____ SHERIFF OR ✓ CERT MAIL ETC   ○CLERK'S OFFICE SENT COPIES TO SHERIFF

PLT COPIES: ○ MAILED ☑ AT COUNTER ○ PICK UP LATER ○ PLACED IN BOX   DATE _10/07/20_

LIZ TAPLEY~EXT. 3073

DURHAM COUNTY CLERK OF COURT

R099804                10/07/20  12:17:21

PAYOR: DOE VS DUKE UNIVERSITY
PAYEE: PD BY THOMAS FERGUSON LLP
CASE#: 20CVS001440 VOAP:Y
CITA#:

21120 SC-CIVIL FEES              179.05
21124 SC-CV LAA FEES                .95
24601 JUD TECH & FAC               4.00
22120 CO FAC FEE S CV             16.00

              TOTAL PAID          200.00
              CO TENDERED          200.00
                   CHANGE            .00

B999   ID C310TD

DURHAM COUNTY CLERK OF COURT

R099804                10/07/20  12:17:21

PAYOR: DOE VS DUKE UNIVERSITY
PAYEE: PD BY THOMAS FERGUSON LLP
CASE#: 20CVS001440 VOAP:Y
CITA#:

21120 SC-CIVIL FEES              179.05
21124 SC-CV LAA FEES                .95
24601 JUD TECH & FAC               4.00
22120 CO FAC FEE S CV             16.00

              TOTAL PAID          200.00
              CO TENDERED          200.00
                   CHANGE            .00

B999   ID C310TD